**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| **SSGT. JASON A. ADKINS, USAF,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| v. | : | **C.A.No. 04-1453-JJF** |
| | : | |
| | : | |
| **DONALD H. RUMSFELD, Secretary of Defense;** | : | |
| **DR. JAMES G. ROCHE, Secretary of the Air Force;** | : | |
| **GENERAL JOHN W. HANDY, Commander Air** | : | |
| **Mobility Command; COL. JOHN I. PRAY JR., 436th** | : | |
| **Air Wing Commander, all in their official capacities,** | : | |
| | : | |
| **Defendants.** | : | |
| | : | |

**PLAINTIFF'S ANSWERING BRIEF IN OPPOSITION TO**
**DEFENDANTS' MOTION TO DISMISS**

<table>
<tr>
<td>

**THE RUTHERFORD INSTITUTE**
**JOHN W. WHITEHEAD, ESQ.**
**DOUGLAS MCKUSICK, ESQ.**
P.O. Box 7482
Charlottesville, VA 22906
(434) 978-3888
JohnW@Rutherford.org
DouglasM@Rutherford.org

Of Counsel

</td>
<td>

**THE NEUBERGER FIRM, P.A.**
**THOMAS S. NEUBERGER, ESQ. (#243)**
**STEPHEN J. NEUBERGER, ESQ. (#4440)**
Two East Seventh Street, Suite 302
Wilmington, DE 19801
(302) 655-0582
TSN@NeubergerLaw.com
SJN@NeubergerLaw.com

Attorneys for Plaintiff

</td>
</tr>
</table>

Dated: March 21, 2005

**TABLE OF CONTENTS**

NATURE AND STAGE OF THE PROCEEDINGS.....................................................1

SUMMARY OF THE ARGUMENT..................................................................1

STATEMENT OF FACTS..........................................................................1

    A.    Introduction....................................................................1

    B.    Plaintiff......................................................................2

    C.    Defendants....................................................................3

    D.    The Key Overarching Context in Which Plaintiff's Speech Occurred.................3

        1.    The Military Has Admittedly Conducted Secret Squalene Tests on Human Subjects Overseas....................................................3

        2.    The Military Also Has Secretly Tested Squalene Tainted Anthrax Vaccines at Dover Air Force Base.............................................3

        3.    Plaintiff is Injected With the Tainted Vaccine............................5

        4.    Investigative News Reporting in October 2004 Reveals the Military's Experimentation on Servicemen and Women at DAFB, Angering Defendants....................................................5

        5.    Members of Congress Demand Answers From the Military About the Tainted Anthrax Testing at DAFB......................................6

        6.    The Overall Military Anthrax Vaccination Program is Declared Illegal......................................................................6

    E.    The Form and Content of Plaintiff's Speech....................................7

    F.    Defendants Immediately Retaliate and Take Adverse Action Against Plaintiff.....................................................................9

    G.    Defendants' Further Involvement...............................................11

ARGUMENT.......................................................................................11

    I.    STANDARD OF REVIEW.....................................................11

    II.    INTRODUCTION............................................................15

        A.    The Big Picture............................................................15

        B.    Plaintiff's Protected Speech..............................................15

          1.     The Words Themselves.................................................................15

          2.     Plaintiff's Intent in Speaking Out.............................................16

III.   PLAINTIFF HAS STATED A CLAIM OF FIRST AMENDMENT
       RETALIATION FOR EXERCISING HIS FUNDAMENTAL RIGHT
       TO FREEDOM OF SPEECH....................................................................16

       A.    Protected Activity.................................................................................16

          1.     Matter of Public Concern............................................................17

                 a.     Content..........................................................................18

                 b.     Form and Context........................................................19

                        i.     News Coverage.................................................19

                        ii.    Legislative Concern.........................................20

                        iii.   Motivation........................................................20

                               (a)    Special Position and Obligation
                                      of Duties.............................................21

                        iv.    Internal Nature of Speech................................21

          2.     Balancing of Interests.................................................................22

                 a.     Disruption.....................................................................22

                 b.     Causation.......................................................................24

                 c.     Public Interest...............................................................24

       B.    Substantial or Motivating Factor..........................................................24

          1.     Temporal Proximity....................................................................27

          2.     Intervening Pattern of Antagonism.............................................27

          3.     Falsehoods and Other Pretextual Reasons.................................27

          4.     Violations of Procedures.............................................................28

          5.     Disparate Treatment....................................................................28

          6.     The Big Picture............................................................................29

       C.    Same Decision Absent Protected Conduct.............................................29

IV.    NO DEFERENCE TO MILITARY JUDGMENT IS APPROPRIATE IN
       THIS FIRST AMENDMENT CASE BECAUSE MEMBERS OF THE
       MILITARY DO NOT SURRENDER THEIR CONSTITUTIONAL
       RIGHTS AS A CONDITION OF WEARING THE UNIFORM........................30

V.     PLAINTIFF WAS NOT REQUIRED TO FIRST RESORT TO AND
       EXHAUST ADMINISTRATIVE REMEDIES BECAUSE HE HAS
       BROUGHT A CONSTITUTIONAL CLAIM, BASED SOLELY UPON
       A VIOLATION OF THE FIRST AMENDMENT..............................................32

CONCLUSION.......................................................................................................................36

<u>**TABLE OF AUTHORITIES**</u>

<u>**Cases**</u>                                                                                     <u>**Page**</u>

<u>Adair v. England</u>, 183 F. Supp. 2d 31 (D.D.C. 2002)....................................................33

<u>Andrews v. City of Phila.</u>, 895 F.2d 1469 (3d Cir. 1990).............................................29

<u>Azzaro v. County of Allegheny</u>, 110 F.3d 968 (3d Cir. 1997) (en banc)............................17,21-22

<u>Baldassare v. State of N.J.</u>, 250 F.3d 188 (3d Cir. 2001)....................................16-17,19,21-25,30

<u>Bray v. Marriott Hotels</u>, 110 F.3d 986 (3d Cir. 1997)..............................................28

<u>Brennan v. Norton</u>, 350 F.3d 399 (3d Cir. 2003)........................................18,20-22,24,29

<u>Bridges v. State of Cal.</u>, 314 U.S. 252 (1941)...................................................17

<u>Brown v. Armenti</u>, 247 F.3d 69 (3d Cir. 2001) ...................................................16

<u>Brown v. Glines</u>, 444 U.S. 348 (1980)..........................................................31,34

<u>Cal. Public Employees' Retirement Sys. v. The Chubb Corp.</u>, 394 F.3d 126
    (3d Cir. 2004)........................................................................12

<u>Carey v. Brown</u>, 477 U.S. 455 (1980)...........................................................17

<u>Chambers v. Local Union No. 639</u>, 578 F.2d 375 (D.C. Cir.1978)................................35

<u>Chappell v. Wallace</u>, 462 U.S. 296 (1983)......................................................31,36

<u>City of San Diego v. Roe</u>, -- U.S. --, 125 S.Ct. 521 (2004) (per curiam)......................19

<u>Conley v. Gibson</u>, 355 U.S. 41 (1957)..........................................................13

<u>Connick v. Myers</u>, 461 U.S. 138 (1983).........................................................17,21

<u>Czurlanis v. Albanese</u>, 721 F.2d 98 (3d Cir. 1983).............................................21

<u>D.P. Enterprises, Inc. v. Bucks County Comty. College</u>, 725 F.2d 943 (3d Cir. 1984)................12

<u>Dibble v. Fenimore</u>, 84 F.Supp. 2d 315 (N.D.N.Y. 2000).........................................32

<u>Dillard v. Brown</u>, 652 F.2d 316 (3d Cir. 1981) .................................................32

<u>Dilley v. Alexander</u>, 603 F.2d 914 (D.C. Cir. 1979).............................................31-32

<u>Doe v. Rumsfeld</u>, 297 F.Supp.2d 119 (D.D.C. 2003)..............................................7,15

<u>Doe v. Rumsfeld</u>, 341 F.Supp.2d 1 (D.D.C. 2004)................................................3,7

Downen v. Warner, 481 F.2d 642 (9th Cir. 1973)....................................................................33-34

Emerson v. Thiel College, 296 F.3d 184 (3d Cir. 2002)..............................................................11

Feldman v. Phila. Hous. Auth., 43 F.3d 823 (3d Cir. 1994)................................................19,21,23

Frontiero v. Richardson, 411 U.S. 677 (1973)..............................................................................31

Garrison v. Louisiana, 379 U.S. 64 (1964).....................................................................................17

Glines v. Ward, 586 F.2d 675 (9th Cir. 1978)..........................................................................34-35

Goldman v. Weinberger, 475 U.S. 503 (1986)..........................................................................30-31

Gould Electronics Inc. v. U.S., 220 F.3d 169 (3d Cir. 2000).........................................................12

Green v. Phila. Housing Auth., 105 F.3d 882 (3d Cir. 1997)..........................................................16

Hickey v. Commandant of the Fourth Naval District, 461 F. Supp. 1085
    (E.D.Pa. 1978)........................................................................................................................36

Holder v. City of Allentown, 987 F.2d 188 (3d Cir. 1993) ............................................17,20,22-23

In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410 (3d Cir. 1997)...................................13-14

Jalil v. Avdel Corp., 873 F.2d 701 (3d Cir. 1989).........................................................................27

Jordan v. Fox, Rothschild, O'Brien & Frankel, 20 F.3d 1250 (3d Cir. 1994)..........................12,25

Jorden v. National Guard Bureau, 799 F.2d 99 (3d Cir. 1986)..............................................32,34-35

Keenan v. City of Phila., 983 F.2d 459 (3d Cir. 1992)....................................................................25

Kulwicki  v. Dawson, 969 F.2d 1454 (3d Cir. 1992)......................................................................12

Kunda v. Muhlenberg College, 621 F.2d 532 (3d Cir. 1980)..........................................................28

Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,
    507 U.S. 163 (1993)................................................................................................................13

McQueeney v. Wilmington Trust Co., 779 F.2d 916 (3d Cir. 1985)..............................................28

Mele v. Federal Reserve Bank of New York, 359 F.3d 251 (3d Cir. 2004)...................................14

Miller v. Cigna, Corp., 47 F.3d 586 (3d Cir. 1995) (en banc).......................................................25

Mount Healthy City Bd. of Educ. v. Doyle, 429 U.S. 274 (1977)........................................25,29-30

Muti v. Schmidt, 96 Fed.Appx. 69 (3d Cir. 2004).........................................................................17

Muti v. Schmidt, 118 Fed.Appx. 646 (3d Cir. 2004)....................................................................17

NAACP v. Clairborn Hardware Co., 458 U.S. 886 (1982)........................................................17

Nelson v. Miller, 373 F.2d 474 (3d Cir. 1967).....................................................................35-36

Nicholas v. Pa. State Univ., 227 F.3d 133 (3d Cir. 2000)...................................................24,29

O'Donnell v. Yanchulis, 875 F.2d 1059 (3d Cir. 1989)............................................................20

Orloff v. Willoughby, 345 U.S. 83 (1953)...........................................................................31-32

Owens v. Brown, 455 F. Supp. 291 (D.D.C. 1978)...................................................................31

Parker v. Levy, 417 U.S. 733 (1974)........................................................................................31

Pickering v. Bd. of Educ., 391 U.S. 563 (1968)...............................................................16,20-21

Pro v. Donatucci, 81 F.3d 1283 (3d Cir. 1996)........................................................................17

Rankin v. McPherson, 483 U.S. 378 (1987).............................................................................24

Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133 (2000)......................................27

Resident Advisory Bd. v. Rizzo, 564 F.2d 126 (3d Cir. 1977)..................................................28

Rhoades v. U.S., 950 F.Supp. 623 (D.Del. 1996)....................................................................12

Robinson v. City of Pittsburgh, 120 F.3d 1286 (3d Cir. 1997)..................................................25

Rode v. Dellarciprete, 845 F.2d 1195 (3d Cir. 1988).........................................................20,24

Rostker v. Goldberg, 453 U.S. 57 (1981).................................................................................31

Roth v. United States, 378 F.3d 1371 (Fed. Cir. 2004)...........................................................35

San Filippo v. Bongiovanni, 30 F.3d 424 (3d Cir. 1994)......................................................28-29

Schlesinger v. Ballard, 419 U.S. 498 (1975)...........................................................................31

Sheridan v. E.I. DuPont de Nemours and Co., 100 F.3d 1061 (3d Cir. 1996) (en banc)..........27-28

Sprague v. Fitzpatrick, 546 F.2d 560 (3d Cir. 1976)................................................................23

Springer v. Henry, 2002 WL 389136 (D.Del. March 11, 2002).............................................20,24

Stewart v. Rutgers, the State Univ., 120 F.3d 426 (3d Cir. 1997)............................................28

Suppan v. Dadonna, 203 F.3d 228 (3d Cir. 2000)....................................................................25

Swann v. Charlotte-Mecklenburg Bd. of Educ., 402 U.S. 1 (1971)................................................30

Swierkiewicz v. Sorema, N.A., 534 U.S. 506 (2002).....................................................................13

Swineford v. Snyder County Pa., 15 F.3d 1258 (3d Cir. 1994).......................................................23

Thorne v. U.S. Dept. of Defense, 916 F. Supp. 1358 (E.D.Va. 1996)............................................34

Versarge v. Township of Clinton N.J., 984 F.2d 1359 (3d Cir. 1993)............................................21

Village of Arlington Heights v. Metro. Hous. Develop. Corp., 429 U.S. 252 (1977).................28

Von Hoffburg v. Alexander, 615 F.2d 633 (5th Cir. 1980).............................................................34

Waters v. Churchill, 511 U.S. 611 (1994) (plurality opinion)........................................................22

Watters v. City of Phila., 55 F.3d 886 (3d Cir. 1995).....................................................18-20,22-24

Woodson v. Scott Paper Co., 109 F.3d 913 (3d Cir. 1997)........................................................27,29

Zamboni v. Stamler, 847 F.2d 73 (3d Cir. 1988)...........................................................................24

Zelinski v. Pa. State Police, 2004 WL 1799234 (3d Cir. Aug. 1, 2004).......................................27

**Constitutions, Statutes, Rules and Other Authorities**

U.S. Constitution, Amendment I...............................................................................................passim

10 U.S.C. § 1552......................................................................................................................33-34

Fed.R.Civ.P. 8(a)(2)..................................................................................................................13,26

Fed.R.Civ.P. 12(b)....................................................................................................................11,15

Fed.R.Civ.P. 12(b)(1)....................................................................................................................12

Fed.R.Civ.P. 12(b)(6).........................................................................................................11-12,14,25

Fed.R.Evid. 201(a)..........................................................................................................................14

32 C.F.R. § 865.4(q).......................................................................................................................35

32 C.F.R. § 865.5............................................................................................................................35

Earl Warren, The Bill of Rights and the Military, 37 N.Y.U. L. Rev. 181, 188 (1962)................36

## NATURE AND STAGE OF THE PROCEEDINGS

This First Amendment free speech retaliation case was filed on November 18, 2004. In February 2005, defendants moved to dismiss. This is plaintiff's Answering Brief in opposition to defendants' motion.

## SUMMARY OF THE ARGUMENT

As demonstrated by the overwhelming public and media interest in the subject of airmen at Dover Air Force Base being poisoned by a tainted anthrax vaccine, plaintiff's speech questioning whether he had been poisoned by this very vaccine is clearly of vital public concern and is entitled to First Amendment protection. In our system of government, the military is not above the law. Our citizens in uniform are not stripped of their basic Constitutional rights simply because they have doffed their civilian clothes. The defense claim that plaintiff is relegated to administrative remedies alone and is barred from seeking redress for a Constitutional violation in the federal courts is utterly without merit under settled law.

## STATEMENT OF FACTS

**A. Introduction.** Since 1999 the Department of Defense has used military personnel at Dover Air Force Base ("DAFB") as guinea pigs for an experimental anthrax vaccine which has life threatening and debilitating side effects. When the adverse health effects of this vaccine were exposed by the Wing Commander, a cover-up began consisting of denials and threats of adverse action against uniformed military personnel. In October 2004 the media, though the News Journal papers, exposed this vital matter of public concern which threatened not only the health of uniformed airmen but also the safety of the missions they fly in C-5 aircraft. (D.I. 1; Compl. ¶ 1) (hereinafter "¶ 1").

Plaintiff is a respected and decorated airman with an unblemished military record who on the night of October 20th 2004, experienced a debilitating attack of side effects from the experimental anthrax vaccine, which if not treated would have endangered the safety of his crew on an impending wartime military mission in a 769,000 pound C-5 aircraft. Rather than cover-up

his symptoms, plaintiff instead immediately reported to the flight surgeon, spoke out about his condition and questioned whether he was suffering because of the experimental anthrax vaccine which the military had inflicted upon him. The flight surgeon immediately grounded plaintiff because his condition endangered his crew mates and the safety of their mission. (¶ 2).

Mere hours later, plaintiff was ordered to attend a meeting the very next day where, in direct violation of written rules of progressive discipline, he was given a permanent written reprimand which ended his military career. He then was forced to undergo humiliating public punishment intended to make an example of him and silence all other aviators who spoke within the chain of command or otherwise about their life threatening and mission endangering symptoms caused by the experimental anthrax vaccine. Plaintiff now seeks injunctive and declaratory relief from this court for the violation of his First Amendment protected right to be free from retaliation for speaking out about hazards which would endanger the lives of military personnel and for questioning whether he and others are suffering dire medical effects from a secret military program in which they are the guinea pigs. (¶ 3).

**B. Plaintiff.** SSgt. Jason A. Adkins, USAF, is a citizen of the United States and a resident of the State of Delaware. He is 32 years old, married with one infant child, and is a career Air Force enlisted man who currently serves as a flight engineer and technical sergeant on C-5 aircraft based at DAFB. He enlisted in October 1990. He is an outstanding airman. (¶¶ 6, 8).

On May 13, 2003, he was on the first C-5 aircraft flown into the Baghdad, Iraq war zone during Operation Iraqi Freedom. On another mission on January 8, 2004, he and his crew successfully flew a crippled 454,000 pound C-5 aircraft out of Baghdad after one engine was shredded by a surface-to-air missile. For that successful mission he and his crew were recommended for the Distinguished Flying Cross for bravery. He has an unblemished service record spanning 14 years. Prior to the events at issue in this case, he had never been disciplined. As one of DAFB's best fliers, he has been selected for numerous classified special operations

missions. (¶¶ 7-8).

     **C. Defendants.** Defendant Pray is the Commander of the 436th Air Wing and commands the 4,000 airmen at DAFB. Defendant Handy is the Commander of the Air Mobility Command located at Scott Air Force Base in Illinois. DAFB is in his chain of command. Defendant Roche is currently Secretary of the Air Force. (¶ 11). Defendant Rumsfeld is the Secretary of Defense. All are sued solely in their official capacities. (¶¶ 10-13).

     **D. The Key Overarching Context in Which Plaintiff's Speech Occurred.** All U.S. armed forces personnel are forced to take a series of six or more anthrax vaccinations. These vaccinations are involuntary and are forced on these servicemen and women without their consent. (¶ 14). This vaccination program was recently held to be <u>illegal</u>. <u>See</u> <u>Doe v. Rumsfeld</u>, 341 F.Supp.2d 1, 19 (D.D.C. 2004).

     **1. The Military Has Admittedly Conducted Secret Squalene Tests on Human Subjects Oversees**. Squalene is a substance that can be used to increase the potency of anthrax vaccines. Scientists around the world have demonstrated squalene's ability to stimulate the immune system - which then has the hazardous side effects of causing health problems such as arthritis, neurological problems, multiple sclerosis and lupus, which are associated with symptoms such as rashes, seizures, memory loses and incapacitating migraine headaches. (¶ 17).

     The military has secretly experimented with squalene tainted vaccines on unsuspecting human subjects to test its ability to boost the effectiveness of the vaccines. For example, the Department of Defense has admitted to secretly conducting tests on humans using squalene in vaccines in Thailand. In a March 1999 report, the General Accounting Office ("GAO") accused the Defense Department of a "pattern of deception" in its efforts to hide its testing of contaminated vaccines on unsuspecting human guinea pigs. (¶ 19).

     **2. The Military Also Has Secretly Tested Squalene Tainted Anthrax Vaccines at Dover Air Force Base.** Starting in 1998 or 1999, airmen at DAFB received

numerous batches of anthrax vaccine that contained squalene. DAFB received more tainted

batches of anthrax vaccine than any other military installation. Subsequent testing by the Food

and Drug Administration ("FDA") in 2000 detected squalene in increasing concentrations in the

batches of vaccine sent to DAFB. Scientists believe that the military may have been measuring

airmens' responses to the steadily increasing doses. (¶¶ 17-18).

 In 1999, when the pilots at DAFB were forced to take the anthrax vaccine, 55 out of 120

pilots in the Air Force Reserve wing stationed there resigned rather than take the vaccine, leaving

the base far below strength. Thereafter, in May 1999 many of the remaining airmen in their 20's

and 30's who had been forced to take the tainted vaccine began suffering from severe headaches,

severe dizziness and "gray-outs." Many also began developing illnesses normally associated

with old age. (¶¶ 20-21).

 The wing commander of the DAFB at that time was Colonel Felix Grieder. As a result

of significant health problems and other health issues raised by his airmen, and in response to a

Pentagon spokesman who stated that "I don't know and I don't care" about the health problems

your airmen are suffering from, Colonel Grieder halted the tainted vaccination program. In doing

this, he effectively killed his military career. Colonel Grieder was immediately ordered to the

Pentagon, where he was pressured by high ranking generals as a whitewash commenced. (¶¶ 22-

23).

 The military immediately began a program at DAFB designed to cover-up legitimate

concerns by airmen for their health and safety as a result of the tainted vaccination program. The

Pentagon convened a special briefing for the airmen at DAFB where many high-ranking officers

promised that the inoculations were safe and that there were no dangerous side effects. The

airmen were told to trust the military because the military purportedly would never do anything

to harm them. But information about the occurrence of actual side effects was purposefully

withheld from personnel at the base. Airmen were kept in the dark about health and safety

issues. Airmen were actively discouraged from speaking about the topic. The topic of health

and safety was frowned upon.  (¶¶ 24-26).

Notably, one of the Pentagon officials who spoke at the special DAFB briefing was Air Force Surgeon General Charles H. Roadman II.  He told the airmen that, "You've got to take my word as an officer, my word as a physician at face value . . . if you have anti-squalene antibodies in your body . . . it didn't come from the anthrax immunization."  After Surgeon General Roadman gave his personal assurances that the vaccine was safe and effective, the tainted anthrax vaccination program was restarted.  Colonel Grieder then was transferred out of his wing commander position and parked in a dead-end desk job at the Pentagon without command responsibilities.  He was replaced by a commander who was more amenable to the Pentagon's wishes.  (¶¶ 27-28).

Shortly thereafter, FDA testing discovered squalene in steadily increasing doses in multiple vaccine lots that had been forced upon the airmen at DAFB.  The FDA discovered that the Pentagon and its military representatives had lied to the airmen at DAFB.  (¶ 29).

**3.  Plaintiff is Injected with the Tainted Vaccine.**  In September 1998, plaintiff was transferred to DAFB.  In September, October and November of 1998, he received three anthrax inoculations.  He received two more in 1999, another in 2000, one in 2003 and another in 2004, for a total of eight.  Six of his inoculations were tainted with squalene.  (¶¶ 15-16).

**4.  Investigative News Reporting in October 2004 Reveals the Military's Experimentation On Servicemen and Women at DAFB, Angering Defendants.**  Beginning on October 10th and continuing through the present, the News Journal paper - the newspaper of general circulation in Delaware - and its investigative reporters Lee Williams and Hiran Ratnayake, ran a hard hitting, well researched and exhaustive series of major news articles exposing the military experimentation on the airmen stationed at DAFB. (¶ 30).

Those news articles and the attendant negative publicity were brought immediately to the attention of each of the defendants.  They rose quickly to the top of the chain of command which then took control of the situation from Washington, D.C. and directed all subsequent actions in

response to the media expose <u>and in how to limit and control the facts which were being revealed to the general public</u>. Each of the defendants were angered and displeased by this unwelcome media scrutiny and sought to do whatever they could to squelch or kill the news story and to control the flow of information from the military personnel at DAFB. Numerous attempts were made by the defendants in writing and through the media to discredit the story. For example, after the first news story of October 10th, spokespersons for defendants Rumsfeld and Roche as well as other members of their staffs issued numerous public statements in an attempt to discredit this major news story. Immense pressure was brought to bear on senior officers at DAFB by the Pentagon, the defendants, and the chain of command <u>to stifle all speech contrary to the approved military version and speech about health issues raised by the contaminated anthrax vaccine</u>. (¶¶ 31-37).

**5. Members of Congress Demand Answers from the Military About the Tainted Anthrax Testing at DAFB.** On October 13, 2004, United States Senators Joseph R. Biden, Jr. and Thomas R. Carper, together with Representative Michael N. Castle, delivered a two page letter to defendant Rumsfeld about the recent press reports about the anthrax vaccination program at DAFB. They demanded a "thorough investigation" because "[a]t a maximum, intentional actions or unintentional incompetence may have created a health hazard for our personnel." For them the issues of servicemen being used as guinea pigs for a tainted vaccine were "critical." (¶ 38). They added -

> The importance of clearing the air on this issue cannot be overstated. It is in the best interest of everyone for there to be well-documented and readily available information regarding the necessity of the anthrax vaccine, the presence or absence of squalene, and the possible health effects associated with the vaccine and given amounts of squalene. It is critical to the credibility of the U.S. Air Force that the concerns raised by a former wing commander be reviewed in an open and transparent fashion. The controversy surrounding the history of the anthrax vaccine at Dover AFB creates a drag on morale and concerns among personnel at a time when all of their energy should be devoted to their vital missions. (¶ 39).

**6. The Overall Military Anthrax Vaccination Program is Declared Illegal.**

In March 2003 the defendant Secretary was sued in federal court in Washington, D.C. over the

mandatory involuntary anthrax vaccination program.  <u>See</u> <u>Doe v. Rumsfeld</u>,  Civ.A.

No.03-707-EGS (D.D.C.).  Subsequently, on October 27, 2004 U.S. District Court Judge Emmet

G. Sullivan issued a permanent injunction against the Secretary preventing his use of the anthrax

vaccine "on the basis that the vaccine is either a drug unapproved for its intended use or an

investigational new drug within the meaning of 10 U.S.C. § 1107.  Accordingly, the involuntary

anthrax vaccination program, as applied to all persons, is rendered <u>illegal</u> absent informed

consent or a Presidential wavier."  <u>Doe v. Rumsfeld</u>, 341 F.Supp.2d 1, 19 (D.D.C. 2004)

(emphasis added).  The court had previously issued a preliminary injunction to the same effect.

<u>See</u> <u>Doe v. Rumsfeld</u>, 297 F.Supp.2d 119 (D.D.C. 2003).   (¶¶ 40-41).

     **E.  The Form and Content of Plaintiff's Speech.**  Since being injected with the tainted

vaccine, plaintiff has experienced medical symptoms that included memory loss, severe

headaches, weight loss, constant body aches, and an irregular heart beat. However, plaintiff was

afraid to discuss his symptoms with anyone.  <u>Discussion of the effects of the anthrax vaccine had</u>

<u>been discouraged</u> at DAFB after Col. Grieder's career ended when he tried to protect his airmen

from the side effects of the tainted vaccination program. (¶¶ 44-45).

     Since his first day in the Air Force, plaintiff has been trained in one basic sacred safety

principle established for all military fliers - flight officers with unsafe medical conditions are not

to fly.  This is because the aircraft, the crew and the mission are endangered if aircrews cannot

perform their duties to the fullest of their abilities.  Even during a flight, if crew members

become ill or overly tired, they are encouraged to declare "safety of flight," at which point they

are relieved of their duties - no questions asked - and always without any fear of discipline or

repercussions. (¶ 47).

     During the night of October 20, 2004 and the early morning of the 21st, plaintiff received

very little rest as a result of a severe and incapacitating headache.  At approximately noon on the

21st, he left his home in Smyrna, DE and traveled to the Base to visit the Flight Surgeon since his

headache had not subsided.   Plaintiff is the flight engineer on the C-5 aircraft.  He sits directly

behind the co-pilot and is responsible for all the electronic and mechanical systems on this aircraft that is longer than a football field. If there are any problems on this massive plane, plaintiff is responsible for fixing them. Plaintiff was going to the Flight Surgeon to determine if he was fit to fly. Plaintiff felt that his health would endanger the lives of his crew, the mission and his aircraft and thus, that his duties required that he report his health condition. Plaintiff believed that it was more preferable to seek qualified medical attention than to take the risk of being tasked to fly a mission when not medically able to do so and thus endanger the safety of his crew and the success of the mission. (¶¶ 46,48-50).

Plaintiff's freedom to speak out and seek medical help is essential to operational safety and to the success of the mission. If aviators are not free to seek medical attention whenever it is needed out of fear of being subjected to an unwarranted reprimand, a dangerous chilling effect would result. This chilling effect would cause squadron members to hesitate or otherwise fail to seek out medical attention when they are not fit for flying duty. As a result, the lives of the crew and the success of their missions would be endangered as C-5's are manned by medically incapacitated airmen. This is why the Air Force trains its fliers that if they are suffering from unsafe conditions, medical or otherwise, they are not to fly. (¶¶ 51,47).

While on route to DAFB, TSgt Terry Miller called plaintiff's home at 12:45 p.m. to inform him that he was required to participate in a flight to take place on Friday October 22nd, some 22 hours later. Plaintiff's wife Amy called him on his cell phone at the Base and relayed the message. Plaintiff returned the call to Miller at 12:50 p.m. and told him of his intention to see the Flight Surgeon with regard to his medical condition. Plaintiff told Miller that he was unsure if he would be available for the launch the next day and that there was a possibility of his being placed on DNIF (Duties Not to Include Flying) status by the Air Force physician but that he would notify Miller as soon as he knew something. (¶¶ 52-53).

Plaintiff signed in at the Flight Surgeon's office at 12:55 p.m. He spoke at length with the Air Force doctor and was examined for 30-45 minutes. During his medical examination,

plaintiff described his debilitating symptoms truthfully and in great detail.  Among other things, he explained to the physician that he had been having severe headaches for a long time and that they might be migraines.[1]  Migraines also are a known side effect of the squalene tainted anthrax vaccine.  Consequently plaintiff next discussed with and told the Flight Surgeon that he associated his headaches and current medical condition with the tainted anthrax vaccine he had been injected with by the military.  (¶¶ 54-55,57).

The Flight Surgeon then immediately downplayed the connection between his headaches and the anthrax vaccine.  Plaintiff was told that the military would not have exposed him to anything dangerous.  Nonetheless, when the examination was finished, the Flight Surgeon immediately grounded plaintiff, prescribed a narcotic medication and DNIF'd him.  Plaintiff immediately notified Miller that he had been DNIF'd because of his medical condition. (¶¶ 58-60).

### F.  Defendants Immediately Retaliate and Take Adverse Action Against Plaintiff.

Within 3 ½ hours of being DNIF'd, plaintiff was ordered to report to the Base the very next morning in full uniform.  He arrived at 7:45 a.m. on October 22nd and saw his squadron commander Lt. Col. Cristos Vasilas and Chief Flight Engineer SMSgt. Ronald J. Mahoney in a closed door session.  Mahoney then met with plaintiff and Miller.  They accused plaintiff of dereliction of duty, of faking his medical condition and other false accusations.  Then in violation of military regulations, plaintiff was given the written letter of reprimand (LOR). (¶¶ 61-64).

The LOR falsely accused plaintiff of having faked his migraine headaches and other medical conditions.  It accused him of consciously deciding to go off sick for a non-emergency reason.  He then was threatened with further "more serious actions."  The LOR has effectively killed plaintiff's Air Force career.  It will bar plaintiff from further promotion, access to

---

[1]  In the Air Force, the word "migraine" is a red flag for every aviator.  If a flier is diagnosed as having a migraine, he is immediately grounded from ever flying again - it is a permanently disqualifying medical condition.  (¶ 56).

speciality schools, choice assignments and even possibly re-enlistment. In the words of one Air Force attorney who has seen hundreds of LORs, the LOR issued to plaintiff is a "pretty bad one." He added, "It's very unusual and strange he was given an LOR for going on sick call." Both letters of counseling and letters of admonishment are lesser forms of correction than LORs. The Air Force's progressive discipline system required that for someone with plaintiff's unblemished record a lesser form of discipline should have been invoked. However, it was not invoked. (¶¶ 65-68).

Plaintiff also was given additional punishment. Again, contrary to the progressive discipline policy, plaintiff received 76 hours of additional duty. He then was placed on public display in the Base's control room as a warning to other airmen who otherwise would have reported their deteriorating medical conditions to the Flight Surgeon. Plaintiff was made a public example at DAFB and publically humiliated so that other uniformed personnel would not (1) speak out about safety issues arising from the symptoms they are experiencing from the tainted anthrax vaccine, and (2) question whether their medical condition may be caused by the tainted vaccine. (¶¶ 69-71).[2]

Plaintiff's speech on the issues raised in this case has resulted in negative feedback by his chain of command. For the first time in his stellar career, plaintiff's professionalism, loyalty, leadership, and character have been called into question. This is in stark contrast to all previous characterizations and endorsements that rated him with the highest level as to all of these qualities. This negative feedback was received as a direct and proximate result of his protected speech. (¶ 72).

---

[2] This retaliation for his speech is in accord with the military's past policies and practices. As discussed earlier, beginning in 1999, the military "actively discouraged" airmen from speaking about the side effects of the tainted vaccine. (¶ 26,45). Then in October 2004, following the bright light of the News Journal's investigation, the Pentagon decided "to limit and control the facts ... being revealed to the general public" (¶ 31) as "[i]mmense pressure" was brought to bear through the chain of command "to stifle all speech contrary to the approved military version" and all "speech about health issues raised by the contaminated anthrax vaccine." (¶ 34).

10

The Air Force's actions as discussed above also violate other policies.  For example, as defendant General Handy's spokesman recently stated on his behalf, "[i]t is <u>not policy</u> at any level to punish people for reporting to sick call."  (emphasis added).  (¶ 3).

The totality of retaliatory adverse action taken by defendants against plaintiff is sufficient to deter a person of ordinary firmness from exercising their First Amendment right to freedom of speech.  A reasonable person of ordinary firmness would be deterred from exercising their First Amendment right to freedom of speech when threatened with an LOR which can end their career, humiliating public punishment and attacks on their professionalism, loyalty, leadership, and character.   (¶¶ 74-75).

**G.  Defendants' Further Involvement.**  Immediately after plaintiff was retaliated against, through their public affairs staffs, defendants Pray, Handy, Roche and Rumsfeld ordered that all uniformed personnel at DAFB be <u>forbidden to speak about the anthrax vaccination program and that they would be held accountable if this order was violated</u>. (¶ 76).[3]  The media by e-mail and telephone calls brought the retaliation against plaintiff to defendants' attention but they refused to void the adverse actions taken against plaintiff.  Defendants ratified, sanctioned and approved the retaliation against plaintiff.  (¶ 76-81).

<u>**ARGUMENT**</u>

## I.   STANDARD OF REVIEW.

Defendants clearly have a substantial burden to carry in seeking dismissal of the Complaint under Fed.R.Civ.P. 12(b).  "A complaint will withstand an attack under Federal Rule of Civil Procedure 12(b)(6) if the material facts as alleged, in addition to inferences drawn from those allegations, provide a basis for recovery."  <u>Emerson v. Thiel College</u>, 296 F.3d 184, 188 (3d Cir. 2002).  "[I]n deciding a Rule 12(b)(6) motion, factual allegations of the complaint are to

---

[3]  This order also reveals defendants' illicit intent.  Speech about the program was at the forefront of their minds.  They explicitly ordered that all service personnel were forbidden to speak about the very program plaintiff dared to question.

be accepted as true and the complaint should be dismissed only if it appears to a certainty that no relief could be granted under any set of facts which could be proved. Reasonable factual inferences will be drawn to aid the pleader." D.P. Enterprises, Inc. v. Bucks County Comty. College, 725 F.2d 943, 944 (3d Cir. 1984). Stated another way, the trial court is "required to accept as true all allegations in the complaint and all reasonable inferences that can be drawn from them after construing them in the light most favorable to the non-movant." Jordan v. Fox, Rothschild, O'Brien & Frankel, 20 F.3d 1250, 1261 (3d Cir. 1994); see also California Public Employees' Retirement Sys. v. The Chubb Corp., 394 F.3d 126, 143 (3d Cir. 2004) (motion to dismiss "may be granted only if, accepting all well pleaded allegations in the complaint as true, and drawing all reasonable factual inferences in favor of the plaintiff, it appears beyond doubt that the plaintiff can prove no set of facts in support of the claim that would warrant relief"); Kulwicki v. Dawson, 969 F.2d 1454, 1462 (3d Cir. 1992) ("the plaintiff must be given the benefit of every favorable inference to be drawn"). In the 12(b)(6) context, "a court looks only to the facts alleged in the complaint and its attachments without reference to other parts of the record. Moreover, a case should not be dismissed for failure to state a claim unless it clearly appears that no relief can be granted under any set of facts that could be proved consistently with the plaintiff's allegations." Jordan, 20 F.3d at 1261 (emphasis added).

The Standard of Review for their 12(b)(1) motion is the same. As the defense brief recognizes (OB at 5-6), defendants have made a facial attack on the sufficiency of this Court's subject matter jurisdiction. "In reviewing a facial attack, the court must only consider the allegations of the complaint and documents referenced therein and attached thereto, in the light most favorable to the plaintiff." Gould Electronics Inc. v. U.S., 220 F.3d 169, 176 (3d Cir. 2000). As such, "the court must accept as true all factual allegations and draw all reasonable inferences in favor of the non-moving party." Rhoades v. U.S., 950 F.Supp. 623, 628 (D.Del. 1996).

The United States Supreme Court has repeatedly and explicitly rejected the heightened

pleadings standards defendants seek to foist upon the Court and instead has unanimously reaffirmed its long time holding that Fed.R.Civ.P. 8(a)(2) indeed means what it clearly says and that the required "short and plain statement of the claim" must simply "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." Swierkiewicz v. Sorema, N.A., 534 U.S. 506, 512 (2002); accord Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit, 507 U.S. 163 (1993);  Conley v. Gibson, 355 U.S. 41 (1957). "The liberal notice pleading of Rule 8(a) is the starting point of a simplified pleading system, which was adopted to focus litigation on the merits of a claim." Swierkiewicz, 534 U.S. at 514. Notice pleading "relies on liberal discovery rules and summary judgment motions to define disputed facts and issues and to dispose of unmeritorious claims." Id. at 512.  Given this simplified notice pleading standard, "a court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." Id. at 514 (internal punctuation omitted).

Recognizing the enormity of its burden on this motion, defendants seek to have this Court consider matters appended to its motion to dismiss hoping that this will convince the Court that the plaintiff is not entitled to relief.  But it is well-established that "a district court ruling on a motion to dismiss may not consider matters extraneous to the pleadings." In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir. 1997).   Defendants seek to avoid this rule by citing an exception allowing consideration of materials de hors the pleadings if the material is integral to or specifically relied upon by the plaintiff. Id. at 1426.  But the extraneous materials relied upon by defendants, a DAFB order and plaintiff's written response to the LOR, are not mentioned nor are they relied upon anywhere in plaintiff's Complaint.  Thus, consideration of the materials at this stage is not warranted under the idea that plaintiff specifically relied upon the order or his LOR response.  See id. at 1424-25 ("since the district court was ruling on a motion to dismiss, it was not permitted to go beyond the facts alleged in the Complaint and the documents on which the claims made therein were based").

13

Nor are these materials "integral" to the Plaintiff's claim that he was retaliated against because he spoke out on a matter of significant public interest. This is not a case where a plaintiff is relying upon a document to support a claim and the defendant merely is seeking consideration of omitted portions of that document. See Mele v. Federal Reserve Bank of New York, 359 F.3d 251, 256 n. 5 (3d Cir. 2004) (where provisions of guidebook were relied upon as basis for plaintiff's claim that an employment contract existed, court could look to all provisions of guidebook in determining existence of such a contract). "What the rule seeks to prevent is the situation in which a plaintiff is able to maintain a claim of fraud by extracting an isolated statement from a document and placing it in the complaint, even though if the statement were examined in the full context of the document, it would be clear that the statement was not fraudulent." Burlington Coat Factory, 114 F.3d at 1426. And that has not occurred in this case.

Additionally, and contrary to defendants' contention, it is not simply a matter of whether a plaintiff has notice of a particular document; the plaintiff also must have relied upon the document at issue in framing his complaint in order for that document to be considered on a Rule 12(b)(6) motion. Id. The documents at issue here are not integral to the plaintiff's claim, were not relied on and are not required in order to fairly evaluate the sufficiency of the Complaint, so they should not be considered in deciding the defendants' motion to dismiss.

Defendants also base their argument upon the idea that this Court can take judicial notice of the order. However, they do not cite any precedent holding that this kind of order can be judicially noticed. Under Fed.R.Evid. 201(a), judicial notice may be taken of facts that are not subject to reasonable dispute and are either generally known in the territorial jurisdiction of the court or capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned. First, it cannot be said that there is no reasonable dispute concerning the order in question because the order may have been amended, changed, or countermanded. Moreover, the order clearly is not one that is generally known in this jurisdiction and defendants have referred to no unimpeachable source where this order can be found. Thus the order is not

14

capable of being judicially noticed and cannot be considered in connection with defendants' motion to dismiss.[4]

## II.    INTRODUCTION.

**A.    The Big Picture.**  "The women and men of our armed forces put their lives on the line every day to preserve and safeguard the freedoms that all Americans cherish and enjoy ... [T]he United States cannot demand that members of the armed forces also serve as guinea pigs for experimental drugs."  Doe v. Rumsfeld, 297 F.Supp.2d 119, 135 (D.D.C. 2003).  But this is exactly what has occurred.  In accord with sacred Air Force safety principles, rather than risk the lives of his fellow airmen and jeopardize the safety and success of a military mission, Sgt. Adkins spoke out and questioned whether he had been used as a guinea pig and whether his unexplained health problems were the result of illegal medical experimentation.

As the Complaint makes clear, the military has admittedly tested squalene tainted vaccines on unsuspecting human subjects overseas.  After they tried to hide all evidence of their wrongdoing, the GAO investigated and ultimately accused it of a pattern of deception for its efforts to conceal its actions.  Now, for the last 6-7 years, the military has shifted its focus to testing squalene tainted anthrax vaccine on unsuspecting U.S. military subjects like Sgt. Adkins. The Pentagon repeatedly denied that there was ever any squalene in the vaccines.  The FDA subsequently proved that again the Pentagon was being deceptive and dishonest.

**B.    Plaintiff's Protected Speech.**  This tainted vaccine has had innumerable negative side effects on servicemen around the country.  Sgt. Adkins is one of those injured airmen. When the pain and illness was too much to bear, rather than risk the lives of his crew and jeopardize the safety of his mission, in accord with longstanding Air Force safety principles, he immediately reported to the Flight Surgeon.

**1.    The Words Themselves.**  There, he spoke out in great detail and questioned

---

[4] As a result, because plaintiff did not reference or rely upon these documents in his Complaint, plaintiff relies upon the long established 12(b) rules and will not address the documents in his brief.

whether his debilitating symptoms were caused by the tainted vaccine. He then told the Flight Surgeon that he believed his debilitating medical condition had been caused by the tainted anthrax vaccine the military had inflicted upon him. (¶¶ 54-57).

       **2. Plaintiff's Intent in Speaking Out.** In speaking out, plaintiff sought to express two distinct ideas. First, that his debilitating health condition presented serious risks to the lives of his fellow aviators and to the safety of a military mission during time of war. And second, he questioned whether and also stated his belief that he and other aviators were experiencing medical side effects of a secret experimental anthrax vaccine which the military has been illegally testing on them. (¶¶ 49-51,2).

Within hours of so speaking out, the roof caved in as his superiors stumbled over themselves to retaliate against and silence him.

## III.    PLAINTIFF HAS STATED A CLAIM OF FIRST AMENDMENT RETALIATION FOR EXERCISING HIS FUNDAMENTAL RIGHT TO FREEDOM OF SPEECH.

"Employees of federal and state government do not relinquish their First Amendment rights to comment on matters of public interest as a condition of their government employment." Brown v. Armenti, 247 F.3d 69, 74 (3d Cir. 2001) (citing Pickering v. Bd. of Educ., 391 U.S. 563, 568 (1968)). "Public employers cannot silence their employees simply because they disapprove of the content of their speech." Baldassare v. State of N.J., 250 F.3d 188, 194 (3d Cir. 2001). Public employee claims of retaliation for engaging in protected speech are analyzed using a three-step process. Green v. Phila. Housing Auth., 105 F.3d 882, 885 (3d Cir. 1997). First, the plaintiff must demonstrate that he engaged in protected activity. Id. Second, plaintiff must demonstrate that the protected activity was a substantial or motivating factor in the alleged retaliatory action. Id. Lastly, the burden shifts to the defense to demonstrate that the same action would have been taken in the absence of the protected conduct. If this can be established, the defendant defeats the plaintiff's claim. Id.

       **A. Protected Activity.** The protected status of speech is a question of law. Baldassare,

250 F.3d at 195. The protected speech examination requires a two part analysis for the trial court. First, the court must determine that the speech addressed a matter of "public concern." Second, the court must balance the relevant interests to determine if the government's interests as an employer in promoting the effective and efficient fulfillment of its public responsibilities outweigh the public employee's interest as a citizen in speaking out on matters of public concern and the value to the community at large of being free to hear such speech. Azzaro v. County of Allegheny, 110 F.3d 968, 976 (3d Cir. 1997) (en banc) (internal punctuation omitted) (citing Connick v. Myers, 461 U.S. 138, 147, 150 (1983)).[5]

  **1. Matter of Public Concern.** Unfortunately for defendants, "[n]o suggestion can be found in the Constitution that the freedom there guaranteed for speech and the press bears an inverse ratio to the timeliness and importance of the ideas seeking expression." Bridges v. State of Cal., 314 U.S. 252, 269 (1941). "[S]peech concerning public affairs is more than self-expression, it is the essence of self-government." Holder v. City of Allentown, 987 F.2d 188, 195 (3d Cir. 1993) (quoting Garrison v. Louisiana, 379 U.S. 64, 74-75 (1964)). "[S]peech on public issues occupies the 'highest rung of the hierarchy of First Amendment values,' and is entitled to special protection." Connick, 461 U.S. 138, 145 (1983) (quoting NAACP v. Clairborn Hardware Co., 458 U.S. 886, 913 (1982) and Carey v. Brown, 477 U.S. 455, 467 (1980)).

  "An employee's speech addresses a matter of public concern when it can be 'fairly considered as relating to any matter of political, social, or other concern to the community.'" Pro v. Donatucci, 81 F.3d 1283, 1288 (3d Cir. 1996). This is determined by reference to the "content, form, and context of a given statement, as revealed by the whole record." Connick, 461 U.S. at 147-48. Importantly, and the key to this case, is that all three factors must be considered, the content, form and overall context in which the speech is occurring.

_____

  [5] Importantly, as the Third Circuit has noted, "it is generally inappropriate to conduct the [ ] balancing analysis at the pleading stage, mostly because the analysis is very fact intensive, and often requires delicate line drawing." Muti v. Schmidt, 96 Fed.Appx. 69, 73-74 (3d Cir. 2004) (internal punctuation and citations omitted) (superseded by Muti v. Schmidt, 118 Fed.Appx. 646 (3d Cir. 2004)).

a. **Content.**  The Third Circuit has had several occasions to deal with

speech addressing the health of government employees and on each occasion, has found such

speech to be of public concern.  For example, in <u>Brennan v. Norton</u>, 350 F.3d 399, 415 (3d Cir.

2003), the Third Circuit was decidedly unimpressed by and flatly rejected the same argument

that defendants now make - that speech addressing health risks in the work place do not touch on

a matter of public concern because <u>only</u> public employees are affected.

> [W]e are not impressed by the "limitation" that "only" firefighters may be harmed by the presence of asbestos in the firestation . . . Residents of the Township clearly had an interest in knowing that their tax dollars were being spent on an asbestos contaminated firestation that endangered the health and lives of its firefighters. *This is such a basic proposition that we need not belabor the point.*  Quite simply, the statements regarding exposure of public employees to hazards such as asbestos can be fairly considered as relating to a matter of concern to the community.

<u>Id.</u> at 415 (internal punctuation omitted) (emphasis added).  Similarly, our present case deals

with speech about illegal experimentation on members of our armed forces and the exposure of

servicemen and women to a tainted anthrax vaccine with severe and debilitating side effects.

And both the taxpayers and the citizenry at large have an interest in learning that airmen are

being used as guinea pigs by the Pentagon.  "[S]tatements regarding exposure of public

employees to [health] hazards ... can be fairly considered as relating to a matter of concern to the

community."  <u>Id.</u> (internal punctuation omitted).

Then in <u>Watters v. City of Phila.</u>, 55 F.3d 886 (3d Cir. 1995), a Philadelphia police

department employee was terminated from his employment for his speech critical of the lack of

formal policies in place for the program that addressed the health problems of police officers.

The Third Circuit held that Watters' speech was on a matter of public concern as the "public had

a significant interest in learning about problems which may have impaired the effective

functioning of the [the program] and which, in turn, could have affected the delivery of police

services." <u>Id.</u> at 895.  It was observed that Watters' speech addressed "fundamental problems

going to the heart" of the government service and thus addressed issues of "political, social, or

other concern to the community."  <u>Id.</u> at 894 (internal punctuation omitted).  Similarly, the public

has a significant interest in learning about problems which have impaired the effective

functioning of the U.S. military in time of war.  The poisoning of our servicemen and women by

the government is a fundamental problem that goes to the heart of an effective national defense.

Moreover, the content of plaintiff's speech is protected because "[d]isclosing corruption,

fraud and illegality in a government agency is a matter of significant public concern."

Baldassare, 250 F.3d at 196; accord Feldman v. Phila. Hous. Auth., 43 F.3d 823, 829 (3d Cir.

1994).  As discussed above, Sgt. Adkins' speech questioned illegality and "attempted to expose

specific wrongs and abuses within the [federal] government."  Baldassare, 250 F.3d at 196

(internal punctuation omitted).  He questioned whether he had been the guinea pig for illegal

medical experiments and if those illegal actions were the cause of his debilitating health

problems that jeopardized the safety of his crew and mission.  As demonstrated by the pervasive

national news coverage surrounding the issues of both the regular and the tainted anthrax

vaccine, the public would certainly be interested in hearing such speech because "allegations of

corrupt practices by government officials are of the utmost public concern."  Id. at 197.

**b.  Form and Context.**  Not surprisingly, defendants have completely

ignored and refused to address the overarching context in which plaintiff's speech occurred.  As

a result, defendants have failed to address the facts as pled.

**i.  News Coverage.**  Whether a particular issue receives news

coverage is relevant in determining the public import of speech.  In the Supreme Court's recent

words, "public concern is something that is a subject of legitimate news interest; that is, a subject

of general interest and of value and concern to the public at the time of publication."  City of San

Diego v. Roe, -- U.S. --, 125 S.Ct. 521, 525-26 (2004) (per curiam).  In the same way, the Third

Circuit has found that news coverage is relevant to determining whether speech addresses a

matter of public concern.  Watters, 55 F.3d at 895.[6]  The District of Delaware has done the same.

---

[6]  The Third Circuit in Watters gave consideration to the newspaper articles which formed the
basis of the employee discharge.  55 F.3d at 895.  In doing so, the court observed that the articles put the

Springer v. Henry, 2002 WL 389136, *5 (D.Del. March 11, 2002) (finding that news coverage and the involvement of the federal government "strongly indicates that the public was interested" in the subject matter of plaintiff's speech). Courts have long held that speech covered by newspapers and television stations may be protected.[7]    As discussed above, the exact topics that plaintiff spoke out about - the tainted anthrax vaccine at DAFB and the poisoning of servicemen - have been the subject of pervasive media coverage.

ii. **Legislative Concern**.  Moreover, legislative concern also may be used to demonstrate the public value of speech.  In analyzing the public importance of a claim by a civilian employee of the Pennsylvania State Police to a newspaper that she was the victim of racial animus, the court in Rode found hearings conducted by the state legislature into racial discrimination in the department attested to the public's concern in the matter.  Rode, 845 F.2d at 1201-02.  Similarly, the Delaware Congressional delegation has demanded answers to the "critical" concerns raised by the press about "health hazard[s] for our personnel" caused by the tainted vaccine at DAFB.  In their words, the "importance of clearing the air on this issue cannot be overstated." (¶¶ 38-39).

iii. **Motivation**.  As the Third Circuit has held, "motivations will rarely, by themselves, justify silencing speech that otherwise addresses matters concerning the public."  Brennan, 350 F.3d at 413.  "[W]hile often a relevant part of the context of the speech, [it] is not dispositive."  Id.  Indeed,

> Common sense suggests that public employees, no less than other employees, will be more likely to speak out when they are disgruntled or personally dissatisfied with some aspect of their employment or employer.  Nevertheless, the harm that results from silencing or chilling public speech is neither negated nor mitigated merely because the speaker may have harbored motivations that were less than altruistic.

---

speech *in the context of larger problems* within the public agency.  Id.  See also Rode v. Dellarciprete, 845 F.2d 1195, 1202 (3d Cir. 1988).

[7]  See e.g., Pickering v. Bd. of Educ., 391 U.S. 563 (1968) (newspaper); O'Donnell v. Yanchulis, 875 F.2d 1059 (3d Cir. 1989) (television); Holder, 987 F.2d 188 (newspaper); Rode, 845 F.2d at 1202 (newspaper); Watters, 55 F.3d 886 (newspaper).

Id.  "Motiv[e] is relevant to the extent that it indicates whether the speaker is speaking as a citizen upon matters of public concern or . . . upon matters only of personal interest." Versarge v. Township of Clinton N.J., 984 F.2d 1359, 1364 (3d Cir. 1993).  Even impure motives will not stop speech from touching on a matter of public concern.  See Connick, 461 U.S. at 148-49; Versarge, 984 F.2d at 1365-66.  Here, plaintiff's motive were pure.  He did not want to risk the lives of his fellow airmen or endanger the success of a military mission.

(a) **Special Position and Obligation of Duties.**  That an employee became aware of the issues on which he later spoke during the course of his employment does not make his speech on those same issues of any less public import. Czurlanis v. Albanese, 721 F.2d 98, 104 (3d Cir. 1983).  By virtue of their jobs, certain persons are in better positions to speak out on certain issues then are the public at large and "it is essential that they be able to [do so] without fear of retaliatory dismissal." Pickering, 391 U.S. at 572.  The Third Circuit has adopted this same idea.

> Silencing a public employee seeking to speak on a matter of public concern deprives a
> self-governing society of information that may be vital to informed decision-making . . .
> [t]his can be a particularly serious loss because public employees, by virtue of their
> constant interactions with a public office, are often in the best position to know what ails
> that office.

Azzaro, 110 F.3d at 977.  And in our present case, who is in a better position to speak out about the poisoning of airmen then one of the airmen who was poisoned?[8]

iv. **Internal Nature of Speech.**  Importantly, speech by public employees that is made privately, rather than publicly also may be protected.

> Internal dissemination of information and ideas can be as important to effective self-
> governance as public speeches.  Thus, if the *content and circumstances* of an internal
> communication are such that the message conveyed would be relevant to the process of
> self-governance if disseminated to the community, that communication is public concern
> speech, even though it occurred in a private context.

---

[8]  To the extent defendants claim that plaintiff's speech is not protected because his job duties required him to speak out the way he did, the Third Circuit has already held that speech required by one's job duties is nonetheless protected.  See Feldman, 43 F.3d at 827-30; Baldassare, 250 F.3d at 196-97.

<u>Baldassare</u>, 250 F.3d at 197 (internal punctuation omitted) (emphasis added).  The Third Circuit has "declined to distinguish between a public employee's expression as an employee and a public employee's expression as a citizen."  <u>Id.</u> (internal punctuation omitted).  Instead, it is the nature and value of the speech, not its audience, which determines its worth to the public interest. <u>Id.</u>; <u>accord</u> <u>Brennan</u>, 350 F.3d at 413 ("Instead, we concentrate on the value of the speech itself"). And the nature and value of plaintiff's speech is self-evident in light of the overall context in which it occurred.  Plaintiff believed that illegal government experimentation was occurring and was causing him debilitating health problems.

　　　　**2.  Balancing of Interests**.  The trial court next must balance the interests of the government as an employer in promoting the effective and efficient fulfillment of its public responsibilities against the public employee's interest as a citizen in speaking out on matters of public concern and the value to the community at large of being free to hear such speech. <u>Azzaro</u>, 110 F.3d at 980.  If the government interest in the effective and efficient provision of services outweighs the value of speech itself, it will be held to be unprotected.  <u>Id.</u>  The burden is on the employer here to make a "substantial showing."  <u>Waters v. Churchill</u>, 511 U.S. 611, 674 (1994) (plurality opinion); <u>Watters v. City of Phila.</u>, 55 F.3d at 816.

　　　　　　**a.  Disruption.**  Factors relevant in the balancing are "the extent to which the employee's speech activity disrupts the working of the office, the extent to which the employee threatens the authority of the employer to run the office, and the extent to which the employee uses the speech activity to resolve an essentially private grievance."  <u>Holder</u>, 987 F.2d at 195.  In evaluating the disruptiveness of the speech, the court should look at:

> whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise.

<u>Watters</u>, 55 F.3d at 897.

　　　　In our present case, there is no evidence of disruption whatsoever.  Plaintiff was not the

alter ego of defendants.  See Sprague v. Fitzpatrick, 546 F.2d 560, 565 (3d Cir. 1976).  He did

not aid in the formulation of policy or make independent policy judgments.  Watters, 55 F.3d at

897-98.  He did not impugn the integrity of his supervisor.  Sprague, 546 F.2d at 565.  He did not

take a personal grievance with his superiors and then escalate it to disrupt the office.  Swineford

v. Snyder County Pa., 15 F.3d 1258, 1262-65 (3d Cir. 1994).  He did not threaten the authority of

his employer to run the workplace.  Holder, 987 F.2d at 195.

      The defense claim that plaintiff's reporting to sick call disrupted flight operations is

simply without merit.  Air Force regulations and military practices anticipate and indeed

explicitly require sick and injured officers such as Sgt. Adkins to report to sick call so that their

health conditions do not risk the lives of other airmen or the success of the missions they fly.  (¶

47, 51).  This is why, in the words of defendant Handy's authorized agent, "[i]t is not policy at

any level to punish people for reporting to sick call." (¶ 73).  The Third Circuit also has twice

rejected attempts to justify retaliatory adverse action caused by meritorious job performance -

doing one's job the way it is expected.  See Feldman, 43 F.3d at 830; Baldassare, 250 F.3d at

196-97.  For example, the Feldman court refused to give any weight in the balancing test to the

disruption caused by that plaintiff's laudable job performance.  43 F.3d at 830.  In the Circuit's

words, "[t]his type of disruption . . . cannot justify a retaliatory discharge."  Id.  Thus, as a matter

of law, any disruption caused by conforming to Air Force regulations and standard military

practices does not factor into the analysis.

      But even if there was evidence of disruption, there is a presumption in favor of free

speech and mere disruption is insufficient to deprive speech of protection.  Swineford, 15 F.3d at

1272.  Disruption is only one aspect on the employer side of the scale.

> The First Amendment balancing of Pickering can hardly be controlled by a finding that
> disruption did or could occur.  An employee who . . . exposes . . . corruption in her office
> no doubt may disrupt and demoralize much of the office.  But it would be absurd to hold
> that the First Amendment generally authorizes . . . officials to punish subordinates who
> blow the whistle simply because the speech somewhat disrupted the office.

Baldassare, 250 F.3d at 200 (internal punctuation omitted).  A true balancing is required.

Zamboni v. Stamler, 847 F.2d 73, 79 (3d Cir. 1988). "[N]o single factor . . . is dispositive[,] they are all weights on the scales." Baldassare, 250 F.3d at 198 (internal punctuation omitted). "The public employer . . . bears the burden of justifying the discharge, which varies depending upon the nature of the employees expression." Id. (internal punctuation omitted). The "First Amendment stands as a barrier to punishing a public employee simply because his/her speech disrupts the workplace." Brennan, 350 F.3d at 414. As the Supreme Court has warned, "[v]igilance is necessary to ensure that public employers do not use authority over employees to silence discourse, not because it hampers public functions but simply because superiors disagree with the content of employees' speech." Rankin v. McPherson, 483 U.S. 378, 384 (1987).

   **b. Causation**. Additionally, when evaluating the disruption, the court must consider whether it was caused by the employee's speech or by factors independent of the speech. "Disruption caused by actions independent of the speech at issue cannot be equated with disruption caused by the speech itself." Watters, 55 F.3d at 897 (finding that discontent within the agency was caused by the "very problems to which the plaintiff's speech was directed"); see also Rode, 845 F.2d at 1202; Zamboni, 847 F.2d at 79; Springer, 2002 WL 389136, *5. Simply put, the disruption claimed by defendants was not caused by Sgt. Adkins' speech, but by his deteriorating medical condition and exposure to the tainted anthrax vaccine, the very problems his speech was designed to address.

   **c. Public Interest**. Plaintiff respectfully submits that there is no disruption whatsoever to be balanced against the weighty public interest in hearing Sgt. Adkins' speech. But even if there were some minimal disruption present, as discussed above, it is heavily outweighed by the multifaceted and weighty public interests in his speech.

   **B. Substantial or Motivating Factor.** Following a determination that his conduct was constitutionally protected, a plaintiff must demonstrate that his conduct was a "substantial" or "motivating factor" in the relevant decision. Nicholas v. Pa. State Univ., 227 F.3d 133, 144 (3d

Cir. 2000) (quoting Mount Healthy City Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977)).  This

is a question of fact, not one of law.  Baldassare, 250 F.3d at 195.  "But for" causation is not

needed. Suppan v. Dadonna, 203 F.3d 228, 236 (3d Cir. 2000).  Instead, a plaintiff need only

show that his protected First Amendment rights "played any substantial role in the relevant

decision."  Id. at 236; see also Miller v. Cigna, Corp., 47 F.3d 586, 597 n.9 (3d Cir. 1995) (en

banc) ("played a role" in the adverse decision).

    Contrary to the principles set forth in the Standard of Review above, and in particular the

rule that all favorable inferences are to be drawn in favor of the claimant on a Rule 12(b)(6)

motion, Jordan, 20 F.3d at 1261, defendants contend that plaintiff failed to plead the causation

element, and insist that plaintiff was required to allege that SMSgt. Mahoney or someone else in

the plaintiff's chain of command was told by the Flight Surgeon that the Plaintiff attributed his

health problems to the tainted anthrax vaccine.

    The law in this regard requires that sufficient evidence be produced to demonstrate that

the defendants knew of the protected activity.  Keenan v. City of Phila., 983 F.2d 459, 466 (3d

Cir. 1992). Here supervisor liability may be established 1) "through allegations of personal

direction or of actual knowledge and acquiescence," or 2) "through proof of direct discrimination

by the supervisor."  Id.  "Where a supervisor with authority over a subordinate knows that the

subordinate is violating someone's rights but fails to act to stop the subordinate from doing so,

the factfinder may usually infer that the supervisor 'acquiesced' in (i.e., tacitly assented to or

accepted) the subordinate's conduct."  Robinson v. City of Pittsburgh, 120 F.3d 1286, 1294 (3d

Cir. 1997).

    Defendants' argument is spurious for several reasons.  First, the Complaint very plainly

alleges that each defendant "was aware of plaintiff's protected speech ... and it antagonized"

them.  (¶¶ 10-13).  That ends the matter.  They knew he spoke out and were angered by it.

Moreover, the Complaint further alleges that the retaliation against plaintiff was immediately

brought to the attention of each defendant, and that they "refused to void the adverse actions

taken against plaintiff" and instead "ratified, sanctioned and approved the retaliation." (¶¶ 77,79-81). Finally, defendant Handy's "staff investigated the matter and spoke publically about it," and yet acquiesced to the retaliation nonetheless. (¶ 79). These short, plain statements of the elements of the retaliation claim are all that are required by Fed.R.Civ.P. 8(a)(2) to survive a motion to dismiss.

Second, ¶ 60 states that upon the conclusion of his meeting and protected speech with the Flight Surgeon that resulted in his being DNIF'd, plaintiff "notified Miller immediately" of what had occurred. In the present procedural posture, with the benefit of all the inferences, this sufficiently alleged that plaintiff notified Miller of what had occurred and what he said to the Flight Surgeon. Miller thus had knowledge of his protected speech which he then passed up the chain of command.

Third, even prior to his meeting with the Flight Surgeon, plaintiff contacted Miller by telephone and "told him of his intention to see the Flight Surgeon with regard to his medical condition" and of the "possibility of his being place on DNIF ... status by the physician." (¶ 53). Again, given the procedural posture of this case, plaintiff may very well have discussed the specifics of his condition and his beliefs that he had been used as a guinea pig by the Pentagon during that telephone call to Miller.

Fourth, given the Pentagon's policy of "actively discourag[ing]" airmen from discussing the vaccine (¶ 26,45), its efforts "to limit and control the facts ... being revealed" (¶ 31), and the "immense pressure" being brought to bear "to stifle all speech contrary to the approved military version" and all "speech about health issues raised by the contaminated anthrax vaccine" (¶ 34), it is a fair inference that as soon as plaintiff dared to speak out on these very issues, his speech was immediately sent up through the chain of command by both the Flight Surgeon and Miller, either by word of mouth, or by written report - each of which plaintiff intends to conduct vigorous discovery into.

Fifth, as will be discussed below, the Complaint also sets forth substantial additional

26

facts from which an inference of causation may be drawn. (See e.g., ¶¶ 82-83).

   **1. Temporal Proximity.** "[T]emporal proximity between the protected activity and the termination is sufficient to establish a causal link." Woodson v. Scott Paper Co., 109 F.3d 913, 920 (3d Cir. 1997). For example, adverse action taken against an employee two days after engaging in protected activity is "unusually suggestive." Jalil v. Avdel Corp., 873 F.2d 701, 708 (3d Cir. 1989). Here, the temporal proximity is 3 ½ hours, which is "unusually suggestive." (¶¶ 61,82).

   **2. Intervening Pattern of Antagonism.** "[A] plaintiff can establish a link between his or her protected behavior and subsequent discharge if the employer engaged in a pattern of antagonism in the intervening period." Woodson, 109 F.3d at 920-21. Here, the pattern of antagonism includes being accused of dereliction of duty, of faking his medical condition, other false accusations, being put on public display, and defendants' order that no one at DAFB be permitted to speak about the anthrax program. (¶¶ 63,65,69-71,76,82).

   **3. Falsehoods and Other Pretextual Reasons.** "A plaintiff also can establish the causation element by proving evidence of inconsistent reasons for the adverse employment action." Zelinski v. Pa. State Police, 2004 WL 1799234, *6 (3d Cir. Aug. 1, 2004). "If it is determined that [the stated reasons for the action] are merely pretextual, then they can be considered inconsistent reasons for the adverse employment action, ultimately leading to a conclusion of causation." Id. As the Supreme Court has held, it is a "general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as affirmative evidence of guilt." Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 147 (2000). This is because "[r]esort to a pretextual explanation is, like flight from the scene of a crime, evidence indicating consciousness of guilt, which is, of course, evidence of illegal conduct." Sheridan v. E.I. DuPont de Nemours and Co., 100 F.3d 1061, 1069 (3d Cir. 1996) (en banc). Regarding the effect of the falsity of a defendant's stated reason or other evidence, the

Third Circuit has said, "a party's *falsehood or other fraud* in the preparation and presentation of his cause, his fabrication or suppression of evidence by bribery or spoilation, is receivable against him as an indication of his consciousness that his case is a weak or unfounded one; and from that consciousness may be inferred the fact itself of the cause's lack of truth and merit." Id. (citing McQueeney v. Wilmington Trust Co., 779 F.2d 916, 921-22 (3d Cir. 1985)). Importantly, there the en banc court also declared "[w]e routinely expect that a party give honest testimony in a court of law; there is no reason to expect less of an employer charged with unlawful [retaliation]." Id. As discussed above, false charges of misconduct have been levied against plaintiff. All are baseless, and are further evidence of defendants' retaliatory intent as defendants flee from the scene of their crimes which violate the U.S. Constitution.

  **4. Violations of Procedures.** Violations of laws, rules and procedures are additional proof of wrongdoing. See Village of Arlington Heights v. Metro. Hous. Develop. Corp., 429 U.S. 252, 267 (1977) ("Departures from the normal procedural sequence also might afford evidence that *improper purposes are playing a role*. Substantive departures, too, may be relevant, particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached"); see also Stewart v. Rutgers, the State Univ., 120 F.3d 426, 434 (3d Cir. 1997); Bray v. Marriott Hotels, 110 F.3d 986, 992, 994 (3d Cir. 1997); Kunda v. Muhlenberg College, 621 F.2d 532, 539 (3d Cir. 1980); Resident Advisory Bd. v. Rizzo, 564 F.2d 126, 143-44 (3d Cir. 1977). In our present case, the Air Force policy of progressive discipline was not applied. (¶¶ 68,64,82). Additionally, as defendants' own spokesperson has admitted, the Air Force policy of not disciplining airmen who report to sick call was violated. (¶¶ 73,82).

  **5. Disparate Treatment.** Similarly, evidence of disparate treatment also can demonstrate causation. In San Filippo v. Bongiovanni, 30 F.3d 424 (3d Cir. 1994), the Third Circuit noted that "evidence that other faculty members committed infractions of comparable seriousness [to the plaintiff] yet went unpunished ... support[s] his position that his protected

conduct was a substantial factor motivating his dismissal." Id. at 444; see also Brennan, 350 F.3d at 421 (observing that disparate treatment of employees can be evidence of causation). Here, plaintiff was singled out and punished for reporting to sick call, despite Air Force policy forbidding this. (¶¶ 73,47,51).

      **6. The Big Picture.** "A play cannot be understood on the basis of some of its scenes but only on its entire performance, and similarly, a [retaliation] analysis must concentrate not only on individual incidents, but on the overall scenario." Andrews v. City of Phila., 895 F.2d 1469, 1484 (3d Cir. 1990). The factfinder should not "examine each alleged incident of harassment in a vacuum. What may appear to be a legitimate justification for a single incident of harassment may look pretextual when viewed in the context of several other related incidents. The factfinder must not only look to the frequency of the incidents but to their gravity as well." Id. (internal punctuation and citation omitted). Thus, even when individual incidents by themselves may be *de minimis* or otherwise insufficient when standing alone, when viewed together, the totality of the actions may be sufficient. Woodson, 109 F.3d at 921 ("While each piece of evidence alone is not sufficient to support an inference of a pattern of antagonistic behavior, taken together the evidence is sufficient"). Simply put, the totality of the evidence in our case plainly demonstrates causation. The highly unusual discipline meted out here combined with the other factors discussed above is plainly sufficient to prove that plaintiff's exercise of his First Amendment rights caused and was a substantial or motivating factor in the adverse actions against him.[9]

      **C. Same Decision Absent Protected Conduct.** The burden of proof then "shifts to the defendant to show 'by a preponderance of the evidence that it would have reached the same decision even in the absence of the protected conduct.'" Nicholas, 227 F.3d at 144 (quoting Mount Healthy, 429 U.S. at 287). This last step is an "affirmative defense" to be met by the

---

   [9]  Defendants' claim that plaintiff was not retaliated against because of his speech but for other reasons is undisguised jury argument that the jury will be free to reject at trial. (OB at 24).

defendants. Id. This is a question for the fact-finder. Baldassare, 250 F.3d at 195. The Mount Healthy court explained that this last step ensures that the employee is placed in no better a position for engaging in constitutionally protected conduct then he would have been had he done nothing at all. 429 U.S. at 285. Presently, there is simply no evidence that defendants would have had grounds to retaliate against plaintiff anyway. Sgt. Adkins had a flawless service record. (¶¶ 2,6-8). Defendants violated their progressive discipline policies and practices of not punishing airmen who report to sick call. (¶¶ 73,47,51,68, 64). Absent retaliatory intent, there is absolutely no basis for any adverse action against plaintiff.[10]

## IV. NO DEFERENCE TO MILITARY JUDGMENT IS APPROPRIATE IN THIS FIRST AMENDMENT CASE BECAUSE MEMBERS OF THE MILITARY DO NOT SURRENDER THEIR CONSTITUTIONAL RIGHTS AS A CONDITION OF WEARING THE UNIFORM.

Throughout their Brief defendants suggest that inappropriate deference should be given to their pretextual claim that a distinguished and honorable aviator was simply punished for 12 hours of misconduct endangering a military mission and that this assertion should not be second guessed by the courts. However, while it is, of course, well-established that courts should generally exercise a significant degree of self-restraint before second-guessing military judgment, see, e.g., Goldman v. Weinberger, 475 U.S. 503, 507-08 (1986), in cases alleging a violation of Constitutional rights, any principle of deference is properly applied during the substantive review of any actions or policies at issue, not at the motion to dismiss stage. "[T]he deserved margin of latitude afforded the political branches of government in rendering military judgments seems as a general matter to figure more prominently into whether particular decisions are lawful than into

---

[10] Defendants' claim that plaintiff has requested mandamus relief also is simply mistaken. (OB at 18 n.5). Plaintiff did not request any form of mandamus relief in his Complaint. Instead, among other types of relief, plaintiff requested that the Court exercise its equitable powers and grant several forms of injunctive relief, including a reparative injunction directing that each defendant apologize in writing for violating plaintiff's First Amendment rights. (Compl. at Wherefore Clause). Such remedial action is well within this Court's equitable powers. See e.g., Swann v. Charlotte-Mecklenburg Bd. of Educ., 402 U.S. 1, 15 (1971) ("Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies").

whether they are susceptible to review at all." <u>Owens v. Brown</u>, 455 F. Supp. 291, 300 (D.D.C. 1978) (finding equal protection challenge to statute banning women from serving on combat ships justiciable and holding the statute unconstitutional).

The Supreme Court "has never held . . . that military personnel are barred from all redress in civilian courts for constitutional wrongs suffered in the course of military service." <u>Chappell v. Wallace</u>, 462 U.S. 296, 304 (1983). To the contrary, courts have not hesitated to engage in a substantive review of the constitutionality of military policy. In <u>Goldman</u>, the Supreme Court did not find the plaintiff's claim that an Air Force regulation that prohibited him from wearing a yarmulke violated his First Amendment rights was nonjusticiable, for example; instead it evaluated the merits of his First Amendment arguments. 475 U.S. at 507-11. The same substantive review is found in all of the leading Supreme Court cases involving constitutional challenges involving the military. <u>See</u> <u>Rostker v. Goldberg</u>, 453 U.S. 57 (1981) (substantive merits review of a Fifth Amendment challenge to all-male draft registration); <u>Brown v. Glines</u>, 444 U.S. 348 (1980) (substantive First Amendment review of regulations concerning the circulation of petitions on Air Force bases); <u>Schlesinger v. Ballard</u>, 419 U.S. 498 (1975) (substantive equal protection review of statutory scheme that favored the promotion of female naval officers over male officers); <u>Frontiero v. Richardson</u>, 411 U.S. 677 (1973) (applying substantive equal protection principles without any suggestion that it was improper for the Court to second-guess military personnel policies); <u>Parker v. Levy</u>, 417 U.S. 733 (1974) (addressing constitutionality of Army regulations permitting the court martial of military personnel for making disrespectful and disloyal statements).

In <u>Dilley v. Alexander</u>, 603 F.2d 914 (D.C. Cir. 1979), the court stated that it was "fully mindful of the restricted role of the judiciary with respect to the internal affairs of the military departments" and recognized that "[t]his deference is at its highest when the military, pursuant to its own regulations, effects personnel changes through the promotion or discharge process." <u>Id.</u> at 919-20 (citing, <u>inter alia</u>, <u>Orloff v. Willoughby</u>, 345 U.S. 83 (1953)). Nonetheless the Court

found that a review of an actual promotion boards' decision was appropriate and ordered

reinstatement of discharged officers.

> This logic [of cases such as <u>Orloff</u>] is wholly inappropriate, however, when a case presents an issue that is amenable to judicial resolution. Specifically, courts have shown no hesitation to review cases in which a violation of the Constitution, statutes, or regulations is alleged.

<u>Id.</u> at 920 (internal citations omitted); <u>accord, e.g.</u>, <u>Dillard v. Brown</u>, 652 F.2d 316, 321 (3d Cir.

1981) (rejecting argument that Equal Protection challenge to military policy was nonjusticiable

where plaintiff "complained that her constitutional rights have been violated by a specific

military regulation and its application"). This also applies to claims of retaliation for exercise of

constitutional rights. <u>See, e.g.</u>, <u>Jorden v. National Guard Bureau</u>, 799 F.2d 99, 111 (3d Cir.

1986) (finding National Guard member's claim for reinstatement after allegedly being discharged

for exercising his First Amendment rights to be justiciable). As the Northern District of New

York noted in rejecting a nonjusticiability argument made by the Secretary, "[t]he logical

conclusion of applying that argument to all conceivable cases would be that a military official

could engage in unlawful discrimination or retaliation against a protected person, and need only

make sure that the adverse action falls in a category characterized as `discretionary' or `internal'

to avoid any risk of the unlawful act -- no matter how egregious -- being reviewed in court."

<u>Dibble v. Fenimore</u>, 84 F.Supp. 2d 315, 318 (N.D.N.Y. 2000) (denying motion to dismiss claim

that denial of request to reenlist was an unconstitutional retaliation for exercise of constitutional

rights). As a result, defendants' desperate plea that this Court allow them to operate above the

Constitution simply has no basis in the law.

**V.    PLAINTIFF WAS NOT REQUIRED TO FIRST RESORT TO AND EXHAUST ADMINISTRATIVE REMEDIES BECAUSE HE HAS BROUGHT A CONSTITUTIONAL CLAIM, BASED SOLELY UPON A VIOLATION OF THE FIRST AMENDMENT.**

Defendants also seek dismissal under the doctrine of exhaustion of administrative

remedies. They allege that plaintiff should first submit his claim that he was retaliated against in

violation of his First Amendment rights to the Air Force Board for Correction of Military

Records ("AFBCMR"), a board established pursuant to 10 U.S.C. § 1552.

While resort to the AFBCMR may be an appropriate forum for service members claims in run-of-the-mill cases challenging military discipline, this is no such case. The allegations here are not that the LOR is simply unwarranted or based upon a misunderstanding of the facts, but that the plaintiff was specifically targeted for retribution in violation of his First Amendment rights because he spoke out on matters of grave public concern that the Pentagon wants kept secret. The instant Complaint sets forth facts showing that the defendants attempted to silence plaintiff because of his exercise of a fundamental right protected by the Constitution.

Courts have recognized that where a claim by a member of the armed forces is based upon a violation of the constitutional rights of the member, the judiciary is not disabled from acting simply because the claim was not first presented to a board established under 10 U.S.C. § 1552. In Adair v. England, 183 F. Supp. 2d 31 (D.D.C. 2002), the Court rejected the argument that Navy Chaplains challenging Navy assignment and promotion policies under the First and Fifth Amendments were required to exhaust administrative remedies before the Board for Correction of Naval Records. "'Resolving a claim founded solely upon a constitutional right is singularly suited to a judicial forum and clearly inappropriate to an administrative board.'" Id. at 55 (quoting Downen v. Warner, 481 F.2d 642, 643 (9th Cir. 1973)). In Downen, the court reversed a district court dismissal of an action that challenged on Fifth Amendment grounds a servicewoman's discharge from the service because she married a man who had young children. Rejecting the district court's ruling that the challenge should first have been presented to the Navy's board for correction of records, the circuit court pointed out that the doctrine of exhaustion is judicially created and "is intended to facilitate the development of a full factual record, to encourage the exercise of administrative expertise and discretion, and to promote judicial and administrative efficiency." 481 F.2d at 643. Those interests are not at stake where the service member's claim is based on an allegation that the Constitution has been violated. In those cases, it is the judiciary that is the best forum for resolution of the legal issues involved,

and application of the exhaustion doctrine is unwarranted.  Id.

Similarly, in Glines v. Ward, 586 F.2d 675 (9th Cir. 1978), rev'd on other grounds, sub

nom Brown v Glines, 444 U.S. 348 (1980), the court rejected a claim that an Air Force Reserves

Captain was required to first present his case to the AFBCMR where he raised a First

Amendment challenge to an order removing him from active duty and reassigning him.  The

Captain received these adverse actions after he circulated a petition, allegedly in violation of Air

Force regulations.  In holding that the district court properly refused to dismiss the case, the court

wrote as follows:

> Captain Glines' claim depends on constitutional and statutory interpretations which are
> beyond the scope of the jurisdiction of the AFBCMR. While the government treats the
> case as simply a claim for reinstatement and back pay, Captain Glines also sought and
> received a declaratory judgment invalidating the challenged regulations. Without this
> judgment he would remain subject to the regulations after his reinstatement. Resolving a
> claim founded solely upon a constitutional right is singularly suited to a judicial forum
> and clearly inappropriate to an administrative board.

Glines, 586 F.2d at 678.  The court also pointed out that boards established under 10 U.S.C. §

1552 are essentially clemency-oriented bodies, are not legally trained, and were never intended

by Congress to resolve what are essentially legal issues. Id.  It also noted that the AFBCMR

could not protect the Captain from further actions that would violate his First Amendment rights;

only a court could grant such relief. Id.; see also Von Hoffburg v. Alexander, 615 F.2d 633, 638

(5th Cir. 1980) (an exception to the exhaustion doctrine is where the plaintiff has raised a

substantial constitutional question); Thorne v. U.S. Dept. of Defense, 916 F. Supp. 1358, 1363-

64 (E.D.Va. 1996) (Navy lieutenant's challenge to discharge based upon First Amendment did

not have to be first presented to the board for correction of military records)

Even under the flexible approach to the exhaustion doctrine submitted by the defendants,

the doctrine is inapplicable here.  As pointed out in Jorden v. National Guard Bureau, 799 F.2d

99, 102 n. 5 (3d Cir. 1986), the Third Circuit has rejected an approach that requires service

members to resort to boards established under 10 U.S.C. § 1552 before bringing claims in federal

court.  "Rather, . . . exhaustion depends on the potential adequacy of that remedy in the particular

34

case." Id.

One glaring inadequacy with the remedy in this case is that any favorable decision for plaintiff would be subject to the approval of the Secretary of the Air Force, one of the very defendants in this case. 32 C.F.R. §§ 865.4(q), 865.5; see also Nelson v. Miller, 373 F.2d 474, 478 (3d Cir. 1967) (board for correction of military records makes recommendation to secretary of the service branch that records be corrected). The conflict of interest inherent in this situation clearly renders any administrative remedy before the AFBCMR inadequate. See Chambers v. Local Union No. 639, 578 F.2d 375, 387-88 (D.C. Cir.1978) (exhaustion of remedies is not required where a conflict of interest exists within the administrative process).

Additionally, plaintiff in this case seeks not just a removal of the LOR from his records, but declaratory and injunctive relief that prevents the defendants and their officers and agents from retaliating against him in the future. Although the defendants assert that the AFBCMR has broad remedial authority, they cite no case in which it was found that the AFBCMR or the Secretary of the Air Force can provide the kind of permanent relief required to protect the First Amendment rights of the Plaintiff. Indeed, the AFBCMR can only make recommendations for correction of records; it cannot determine the respective rights and obligations of individuals or order members of the military to refrain from violating the First Amendment rights of service members. It was precisely the AFBCMR's lack of power to grant such relief that led the court in Glines, 586 F.2d at 678, to find that the plaintiff was not required to pursue administrative remedies.[11]

---

[11] Defendants cite Roth v. United States, 378 F.3d 1371 (Fed. Cir. 2004), as authority for their assertion that an effective remedy can be had in administrative proceedings. But that court held that the fundamental purpose of a board established under 10 U.S.C. § 1552 is simply to assure that a service members records do not reflect an injustice. Roth, 378 F.3d 1381-82. An examination of the board action reviewed in Roth shows that the board only granted relief as to the records of the plaintiff. Defendants also cite Nelson v. Miller, 373 F.2d 474 (3d Cir. 1967), a case in which a service member sought declaratory and injunctive relief. However, that relief related only to notations on his service records, so the court found that an administrative board could provide sufficient relief. More importantly, neither of these cases dealt with any constitutional issues, unlike our present case which deals with vital First Amendment concerns.

The fundamental purpose behind the exhaustion of remedies doctrine is not served by requiring plaintiff to seek relief before the AFBCMR. "The basic purpose of the exhaustion doctrine is to allow an administrative agency to perform functions within its special competence to make a factual record, to apply its expertise, and to correct its own errors so as to moot judicial controversies." Hickey v. Commandant of the Fourth Naval District, 461 F. Supp. 1085, 1093 (E.D.Pa. 1978). As stressed by the defendants, the AFBCMR was established because of its special expertise in military orders, regulations, and actual knowledge of military life. But the essential issue in the instant case, whether plaintiff was singled out and targeted for discipline because of his expression on a matter of public importance in violation of his First Amendment rights, does not implicate any special expertise in military matters. This is not a case where the interpretation of some military regulation is required or at issue. Id. (citing Nelson, 373 F.2d at 479-80). Instead, this case involves questions and issues that are within the special province and expertise of the judiciary. Because the rationale for requiring pursuit of administrative remedies within the Air Force is not applicable here, there is no basis for dismissing the Complaint.

## CONCLUSION

The Supreme Court has unanimously stated that "'our citizens in uniform may not be stripped of basic rights simply because they have doffed their civilian clothes.'" Chappell v. Wallace, 462 U.S. 296, 304 (1983) (quoting Earl Warren, The Bill of Rights and the Military, 37 N.Y.U. L. Rev. 181, 188 (1962)). Despite defense claims to the contrary, this case is not about simply correcting a piece of paper, such as a written reprimand. Instead, as a reading of the Wherefore Clause of the Complaint illustrates, it is about obtaining an injunction prohibiting further retaliation or discipline against plaintiff by virtue of his protected speech. While defendants would like to keep the enlisted personnel at Dover Air Force Base silent and terrorized, their conspiracy to cover-up their illegal experimentation on dedicated service men and women in this particular case will not survive First Amendment scrutiny. One brave airman spoke out, and within hours was severely disciplined. He has appealed to this Court to protect

his Constitutional right to speak out and question the illegal polices in effect at the base.  Settled

precedent allows the judicial resolution of his claims and requires the rejection of defendants'

motion.

Respectfully Submitted,

**THE NEUBERGER FIRM, P.A.**

/s/ Stephen J. Neuberger
**THOMAS S. NEUBERGER, ESQ. (#243)**
**STEPHEN J. NEUBERGER, ESQ. (#4440)**
Two East Seventh Street, Suite 302
Wilmington, DE 19801
(302) 655-0582
TSN@NeubergerLaw.com
SJN@NeubergerLaw.com

Attorneys for Plaintiff

**THE RUTHERFORD INSTITUTE**
**JOHN W. WHITEHEAD, ESQ.**
**DOUGLAS MCKUSICK, ESQ.**
P.O. Box 7482
Charlottesville, VA 22906
(434) 978-3888
JohnW@Rutherford.org
DouglasM@Rutherford.org

Dated: March 21, 2005                    Of Counsel

# Exhibit A



Not Reported in F.Supp.2d                                                     Page 1
2002 WL 389136 (D.Del.)
**(Cite as: 2002 WL 389136 (D.Del.))**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, D. Delaware.
David T. SPRINGER, M.D., Plaintiff,
v.
Renata J. HENRY, individually and in her official
capacity, and Gregg C.
Sylvester, M.D. in his official capacity, Defendants.
**No. 00-885(GMS).**

March 11, 2002.

MEMORANDUM AND ORDER

SLEET, District J.

 **\*1** On October 6, 2000, Dr. David Springer filed this
complaint against Renata J. Henry and Dr. Gregg
Sylvester. Springer was a physician who had been under
contract to provide medical services at the Delaware
Psychiatric Center ("DPC"). Springer alleges that Henry
and Sylvester refused to renew his contract in retaliation
for remarks he made concerning the operation of the
DPC facility. Springer contends that his termination
therefore violated the First Amendment.

 Presently before the court are two motions--Springer's
Motion for Partial Summary Judgment and the
defendants' Motion for Summary Judgment. Springer's
motion asserts that his speech was protected under the
First Amendment. He further contends that if the court
determines that his speech was protected--a question of
law--a jury must decide whether his speech caused his
termination. Finally, Springer contends that defendant
Henry is not entitled to qualified immunity because his
First Amendment right was clearly established prior to
his termination.

 The defendants' motion argues that Springer's speech

was not protected because it addressed his personal
concerns. Alternatively, the defendants argue that
Springer's speech was disruptive. Additionally, the
defendants contend that Springer would have been
terminated regardless of his speech due to his failure to
bid for renewal of his contract. Moreover, the
defendants argue that Springer has failed to prove that
he has suffered damages as a result of their alleged
actions. Finally, the defendants argue that Henry is
entitled to qualified immunity because it was not certain
that Springer's contract would be renewed, and
therefore, his rights were not clearly established.

 Upon review of the briefs and the law, the court agrees
with Springer that his speech was protected under the
First Amendment. Moreover, the undisputed facts
establish that his speech was not disruptive.
Furthermore, the court agrees with the plaintiff that his
right to engage in speech was clearly established at the
time he was terminated. Therefore, Ms. Henry is not
entitled to qualified immunity. Thus, the court will
grant the plaintiff's motion for partial summary
judgment on the issues of protected speech and
qualified immunity. The court must, therefore, deny the
defendants' motions on these issues.

 Additionally, the court finds that questions of fact
remain as to whether Springer's speech was the
motivation behind his termination, whether the
circumstances required his termination such that his
speech was immaterial, and whether he suffered
damages. In light of these genuine issues of material
fact, summary judgment is inappropriate on these
issues. Thus, the court will deny the defendants' motion
in its entirety. The court will now explain the reasons
for its decision.

II. FACTS

 Dr. David Springer began working for the DPC in
1991. [FN1] The hospital was supervised by the
Delaware Department of Health and Social Services
("DDHSS"). More specifically, it was supervised by the
DDHSS's Division of Alcoholism, Drug Abuse, and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 2
2002 WL 389136 (D.Del.)
**(Cite as: 2002 WL 389136 (D.Del.))**

Mental Health ("DADAMH"). Renata Henry was the director of the DADAMH. [FN2] Dr. Gregg Sylvester was the Secretary of the DDHSS. From August 1992 to June 2000, Springer was the director of the DPC. In that capacity, he was responsible for training psychiatric residents. He was also a member of the credentials committee responsible for hiring new doctors.

> FN1. In 1991, DPC was known as Delaware State Hospital. Nevertheless, Delaware State Hospital and DPC are the same entity.

> FN2. Although she served as director of DADAMH, Ms. Henry is not a physician.

*2 The DPC confronted numerous, serious problems. Several patients had committed suicide. Others had escaped. In December 1999, the federal Healthcare Financing Agency threatened to end DPC's federal funding. Moreover, the Delaware News Journal ran several highly critical articles about the DPC.

On November 23, 1999, Springer wrote a memorandum addressed to the Governor, the DPC Governing Board, and Ms. Henry. Springer's memo addressed at least twenty-three separate topics. However, the memo generally described attempted suicides, security failures (including patient escapes), under-staffing, violations of Medicare regulations (including an alleged failure to properly notify Medicare officials of the correct number of staff on hand), and lack of quality medical care. Springer also mentioned the need to continue the medical residency program. On March 21, 2000, Springer filed a report with the DPC Governing Board which addressed concerns similar to those outlined in his memo. In his report, however, he also alleged fraud and threatened to take his concerns to regulatory agencies.

Like the other doctors at the DPC, Springer was an independent contractor under contract with the DPC. From 1991 to 2000, Springer's contracts specified that the contract term was for one year and could be terminated without cause upon fifteen days notice. The contract terms do not guarantee renewal. Nevertheless, Springer's contract--as well as those of the other DPC physicians--was renewed each year.

In 1996, the Delaware General Assembly amended the Delaware Procurement Act, 29 Del. C. ch. 69, to provide that all contracts for professional services exceeding $50,000 per year must be subject to public bidding. In early 2000, Secretary Sylvester instructed his division directors to comply with the new provisions and require public bidding on professional service contracts. The DPC physicians earned more than $50,000 per year.

After Springer wrote his memo to the Governor, the situation at the DPC workplace became progressively worse. On May 12, 2000, Henry notified Springer that his contract would not be renewed. Springer was told that he would have to submit a bid to maintain his employment. Defendants maintain that all fifteen DPC psychiatrists were required to submit bids. Conversely, Springer maintains that he was the only physician who was made to reapply. Moreover, Springer contends that he was not informed of the bidding procedures until the day before the bids were due.

Springer asserts that the non-renewal of his contract was based on his comments to the Governor. However, DPC offered three other reasons. First, they believed that Springer was insubordinate because he failed to return documents relating to the credentials certification of a physician applicant. Springer asserts that he missed the deadline for returning the materials because he wished to consult his attorney. Second, DPC alleged that Springer improperly kept patient records at home. Springer submits that he never kept originals or copies of patient documents in his home office. Finally, DPC told Springer that he had improperly considered his personal feelings in deciding whether a certain physician applicant should be credentialed. Springer contends that he did not act inappropriately in the decision-making process.

III. STANDARD OF REVIEW

*3 Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to a judgment as a matter of law. See Fed. R. Civ. P 56(c). A fact is material if it might affect the outcome of the case, and an issue is genuine if the evidence is such that a reasonable factfinder could

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                          Page 3
2002 WL 389136 (D.Del.)
**(Cite as: 2002 WL 389136 (D.Del.))**

return a verdict in favor of the nonmovant. *See In re Headquarters Dodge, Inc.,* 13 F.3d 674, 679 (3d Cir.1993) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)). When deciding a motion for summary judgment, the court must evaluate the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *See Pacitti v. Macy's,* 193 F.3d 766, 772 (3d Cir.1999). The nonmoving party, however, must demonstrate the existence of a material fact supplying sufficient evidence--not mere allegations--for a reasonable jury to find for the nonmovant. *See Olson v. General Elec. Aerospace,* 101 F.3d 947, 951 (3d Cir.1996) (citation omitted). To raise a genuine issue of material fact, the nonmovant "need not match, item for item, each piece of evidence proffered by the movant but simply must exceed the 'mere scintilla' [of evidence] standard." *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.,* 998 F .2d 1224, 1230 (3d Cir.1993) (citations omitted). The nonmovant's evidence, however, must be sufficient for a reasonable jury to find in favor of the party, given the applicable burden of proof. *See Anderson,* 477 U.S. at 249-50.

IV. DISCUSSION

A. Springer's Rights under the First Amendment

In order to establish that his First Amendment rights were violated, Springer must demonstrate that his speech was protected. *See Green v. Philadelphia Housing Authority,* 105 F.3d 882, 885 (3d Cir.1997). He must then establish that his protected speech was a motivating factor behind the alleged retaliation. *See id.* Finally, the burden will then shift to the defendants to demonstrate that the same action would have been taken if the speech had not occurred. *See id.*

1. Springer's Speech was Protected

The Third Circuit has outlined a two-part test to determine whether a public employee's speech is protected. First, the speech must pertain to a matter of public concern. *See Azzaro v. County of Allegheny,* 110 F.3d 968, 976 (3d Cir.1997). Second, the court must balance the government's interest in effective administration against the employee's free speech rights.

*See id.* This is commonly referred to as the *Pickering* balancing test. *See Pickering v. Board of Ed. of Tp. High School,* 391 U.S. 563, 568 (1968) ("The problem in any case is to arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.").

a. Matters of Public Concern

**\*4** Whether speech addresses a matter of public concern is an issue for the court to decide. *See Waters v. Churchill,* 511 U.S. 661, 668 (1994). To ascertain whether speech addresses a matter of public concern, the court must consider whether the speech can be "fairly considered as relating to any matter of political, social, or other concern to the community." *Pro v. Donatucci,* 81 F.3d 1283, 1288 (3d Cir.1996) (citations omitted). In making this determination, the court can consider the "content, form, and context of a given statement." *Connick v. Myers,* 461 U.S. 138, 147-48 (1983).

The content of Springer's speech clearly addressed a matter of public concern. Speech may be characterized as a matter of political or social concern if the speech reveals "actual or potential wrongdoing." *See Holder v. City of Allentown,* 987 F.2d 188, 195 (3d Cir.1993). The cases cited by the plaintiff clearly establish that health care issues are matters of public concern when addressed by medical professionals. *See Schneiner v. New York City Health and Hospitals,* 157 F.Supp.2d 487, 495-96 (S.D.N.Y.2001) (finding speech protected where physician wrote to Mayor Giuliani's office regarding problems at municipal hospital); *Kattar v. Three Rivers Area Hospital Auth.,* 52 F.Supp.2d 789, 799 (W.D.Mich.1999) ("In several cases, courts have held that statements by health care providers regarding patient care involved matters of public concern.") (collecting cases).

In the present case, similar to *Schneiner* and *Kattar,* Springer was a health care provider who commented on the state of health care at the DPC facility. All of his statements concerned deficiencies at the facility. Moreover, many of problems Springer addressed

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                         Page 4
2002 WL 389136 (D.Del.)
**(Cite as: 2002 WL 389136 (D.Del.))**

involved danger to the lives of patients or the surrounding community (i.e. suicides and escapes). Thus, he raised concerns of a grave nature that would be relevant to the medical community, the community surrounding the DPC facility, the families of DPC patients, and the Delaware taxpayers who financed the operation. The court therefore concludes that the content of Springer's speech addressed issues that would be relevant to many groups of Delaware residents.

The defendants assert that Springer's statements were motivated by his own personal interests and thus did not address a matter of public concern. This allegation is based on the fact that Springer's comments also addressed the medical residency program. The defendants argue that since Springer was in charge of the residency program, only he would benefit from such comments. The court rejects this argument. First, a medical residency program could be beneficial to the DPC even in Springer's absence. Second, and more important, the medical residency program was but one of many points Springer addressed. The record clearly demonstrates that the vast majority of Springer's comments addressed the safety and medical concerns at the DPC. Thus, the court finds that the content of Springer's speech addressed a matter of public concern.

**\*5** The context of Springer's speech also indicates that he was addressing a matter of public concern. First, his comments were addressed to the Governor, the DPC Governing Board, and Ms. Henry. If Springer merely wanted to raise his personal issues, addressing his comments to Henry alone would have sufficed. The fact that his statements were addressed to public officials, however, indicates that was attempting reach an audience that could provide redress for the serious issues he raised. Furthermore, the federal government had already begun to investigate problems at the DPC long before Springer's statements. Additionally, several News Journal articles had also addressed the issues Springer raised. *See Watters v. City of Philadelphia,* 55 F.3d 886, 895 (3d Cir.1995) (noting that news coverage can be relevant to determining whether speech addresses a matter of public concern.) The involvement of the federal government and the press strongly indicates that the public was interested in the operations

of the DPC. Thus, the court finds that the content and context of Springer's speech addressed a matter of public concern.

b. Balancing the Government's and Springer's Interests

The only argument the defendants assert on this point is that Springer's comments were disruptive to the DPC's operation. The defendants assert that Springer's comments were intended to be disruptive. The court has reviewed the defendants' recitations of the facts and neither recitation includes facts that would permit the court to reasonably conclude that Springer's comments had any disruptive effect. Indeed, as far as the court can tell, the only fact that the defendants assert in support of this argument is that after agreeing to return the documents regarding the physician applicant, Springer delayed in producing the documents while he consulted his attorney. First, the defendants have failed to adduce facts demonstrating that the delay was disruptive. More important, even if this delay in returning the documents was disruptive, the defendants have failed to show how this disruption was in any way related to Springer's *speech.* Therefore, the court rejects the defendants' argument and concludes that they have not sufficiently demonstrated a government interest sufficient to outweigh Springer's First Amendment rights.

3. The Remaining Prongs of the Test

The court finds that summary judgment is inappropriate as to whether Springer's termination was motivated by his speech or, similarly, whether he would have been terminated in the absence of the speech. First, the record reveals that any number of factors could have motivated the defendants' decision to terminate Springer's contract. Indeed, the defendants have provided at least three reasons that are unrelated to Springer's comments--his insubordination, keeping documents at home, and improperly considering his personal feelings during the physician applicant process. However, issues of fact surround whether plaintiff was truly insubordinate, whether he kept documents at home, or whether he had a "vendetta" against the physician applicant. Springer denies all of these allegations. Thus, the parties do not agree on the facts concerning these issues. The court cannot decide

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                  Page 5
2002 WL 389136 (D.Del.)
**(Cite as: 2002 WL 389136 (D.Del.))**

these issues on the record before it because they all involve credibility determinations. The motivation behind the defendants' decision is, therefore, a question of fact that is more properly addressed to the fact-finder than to the court. Moreover, it is unclear whether the plaintiff would have been terminated if he had not spoken. The defendants' assert that all fifteen psychiatrists were required to bid for their contracts. Conversely, Springer contends that he was the only physician made to bid. Additionally, Springer asserts that he was not notified of the bidding process in a timely fashion. Since the parties disagree on this highly relevant fact, the jury, rather than the court, should decide this matter. The court will, therefore, deny summary judgment on these two prongs.

4. Damages

**\*6** The court similarly finds that summary judgment on the issue of damages is inappropriate. Based on Singer's tax returns for the years 1997 to 2000, the defendants assert that he suffered no economic loss. Conversely, Springer alleges that his 2001 tax return (not mentioned by defendants) proves a significant economic loss. Moreover, Springer states that he can provide expert testimony to prove that he has, indeed, suffered damages. In light of these conflicting factual interpretations, the court finds that there is a genuine issue of material fact on the damages issue. Therefore, the court will also deny defendants' motion on this point.

B. The Qualified Immunity Issue

Henry is not entitled to qualified immunity. Although state officials may be sued in federal court, their liability may be limited by the doctrine of qualified immunity, which permits officials to avoid liability for actions performed in the course of their official duties. The Supreme Court recently affirmed the two part test for qualified immunity. First, the court must determine whether the facts alleged, taken in the light most favorable to the plaintiff, are sufficient to show that the defendant violated a constitutional right. *See Saucier v. Katz,* 121 S.Ct. 2151, 2155-56 (2001). Second, if a constitutional violation can be demonstrated on the facts alleged, the court must next consider whether the

right was clearly established at the time of the alleged violation. *See id.* at 2156. In *Saucier,* the court further clarified that the right must be established in a "particularized" sense, meaning that "the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *See id.* Additionally, the court noted that although the court must decide whether the facts alleged--not proved--by the plaintiff amount to a constitutional violation, even where there may be a material issue of fact, if the law did not put the officer on notice that his conduct was unlawful, summary judgment may be permissible. *See id.* at 2156-57.

The parties here contest only whether Springer's rights were clearly established at the time he was terminated. A right is clearly established where "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted ." *See id.* at 2156. More specifically, a right is clearly established where case law speaks "with obvious clarity to the specific conduct in question." *United States v. Lanier,* 520 U.S. 259, 271 (1997).

Relevant Supreme Court precedent establishes that "independent government contractors cannot be terminated for exercising their First Amendment rights." *Board of Comm. Wabaunsee v. Umbehr,* 518 U.S. 668, 686 (1996). *See also O'Hare Truck Service, Inc. v. City of Northlake,* 518 U.S. 712, 721 (1996) (noting same). Thus, the Supreme Court has recognized on at least two occasions that an independent contractor--such as Dr. Springer--- has a constitutional right to free speech. Therefore, it cannot be more clear that this right was clearly established.

**\*7** The defendants assert that this court should be persuaded by *Hauge v. Brandywine School District,* 131 F.Supp.2d 573 (D.Del 2001). In that case, the court held that the right to be free from retaliation was not clearly established because due to the "fact-intensive nature of the *Pickering* balancing test," the officials were not on notice that their conduct violated the First Amendment. *Id.* at 584. The court will not follow *Hauge* for two reasons. First, the court is persuaded by the plaintiff's contention that *Hauge,* although it may have been correctly decided on the record before that

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2002 WL 389136 (D.Del.)
(Cite as: 2002 WL 389136 (D.Del.))

court, is unique. Although the *Hauge* court granted qualified immunity based on the fact-intensive balancing required by the *Pickering* test, neither the plaintiff nor the defendants have presented any authority to permit this court to conclude that the *Pickering* balancing test must always lead to a denial of qualified immunity. [FN3] If the court were to accept the defendants' position, qualified immunity could never be denied in First Amendment retaliation cases. This is an extreme result, one the *Hauge* court probably did not intend and one that this court will not sanction.

> FN3. Indeed, the *Hauge* court itself cites no authority for this novel proposition.

Second, this case is factually distinguishable from *Hauge.* Hague involved a school district administrator who brought allegations of fraud against the school district. *See id.* at 577-578. This case involves a physician who spoke on the various problems confronting hospital administration. Under facts very similar to those in this case, courts have found that the right to speak was clearly established. *See Schneiner,* 152 F.Supp.2d at 493 ("There is no doubt that the plaintiff [physician's] rights under both the First Amendment and the Fourteenth Amendment [to comment on health care at the hospital] were clearly established at the time the plaintiff was disciplined."). Thus, considering the facts before this court, this court also finds that Springer's right was clearly established at the time he spoke. [FN4]

> FN4. The court finds that the defendants' reliance on *Saucier v. Katz,* 121 S.Ct. 2151 (2001) for the proposition that there must be exact congruence between the precedential facts and the facts of the present case is misplaced. First, *Saucier* involves a completely different context-- excessive force under the Fourth Amendment. More important, *Saucier* does not require that the facts of each case be identical. The court therefore rejects the defendants' argument on this issue.

Finally, the defendants contend that the plaintiff's right was not clearly established because under the new

bidding process, his contract was not certain to be renewed. As Springer notes, however, independent contractors are entitled to First Amendment protection where there is a *preexisting* contractual relationship. *See Umbehr,* 518 U.S. at 685 (noting that holding establishing right to First Amendment speech was limited to independent contractors with "preexisting commercial relationship" with government). Springer had been under contract with the DPC since 1991. Thus, it is clear that he had a pre-existing commercial relationship. The court therefore rejects the defendants' argument on this issue.

For these reasons, the court finds that Ms. Henry is not entitled to qualified immunity.

V. CONCLUSION

For all of the foregoing reasons, the court concludes that Springer's speech was protected. Nevertheless, a jury must decide whether his protected speech motivated his termination, whether he would have been terminated in the absence of the speech, and whether he suffered damages. Finally, Henry is not entitled to qualified immunity. Thus, the court will deny the defendants' motion for summary judgment and grant Springer's motion for partial summary judgment.

*8 NOW, THEREFORE, IT IS HEREBY ORDERED that:
  1. The Defendants' Motion for Summary Judgment (D.I.35) is DENIED;
  2. The Plaintiff's Motion for Partial Summary Judgment (D.I.38) is GRANTED.

2002 WL 389136 (D.Del.)

**Motions, Pleadings and Filings** (Back to top)

. 1:00CV00885 (Docket)
                 (Oct. 06, 2000)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



108 Fed.Appx. 700                                                                                          Page 1
108 Fed.Appx. 700, 2004 WL 1799234 (3rd Cir.(Pa.))
**(Cite as: 108 Fed.Appx. 700,  2004 WL 1799234 (3rd Cir.(Pa.)))**

**Briefs and Other Related Documents**

This case was not selected for publication in the Federal Reporter.

NOT PRECEDENTIAL

Please use FIND to look at the applicable circuit court rule before citing this opinion. Third Circuit Local Appellate Rule 28.3(a) and Internal Operating Procedure 5.3. (FIND CTA3 Rule 28.0 and CTA3 IOP APP I 5.3.)

United States Court of Appeals,
Third Circuit.
Laura ZELINSKI, Appellant,
v.
PENNSYLVANIA STATE POLICE;
Commonwealth of Pennsylvania, the;  Lou Altieri,
Richard Weinstock.
**No. 03-4025.**

Argued May 24, 2004.
Decided Aug. 11, 2004.

**Background:**  Trooper sued the Pennsylvania State Police (PSP), the Commonwealth of Pennsylvania, and PSP employees, alleging sexual harassment and discrimination in violation of Title VII, the Pennsylvania Human Relations Act, and 42 U.S.C.A. §§ 1983, 1985, and 1988. The United States District Court for the Middle District of Pennsylvania, Thomas J. Vanaskie, Chief Judge, 282 F.Supp.2d 251, granted defense motions for summary judgment, and the trooper appealed.

 **Holdings:**  The Court of Appeals, Roth, Circuit Judge, held that:
 (1) trooper failed to prove that defendant employee was her superior at any time that he engaged in alleged acts of sexual harassment, thus precluding imposition of § 1983 liability;

 (2) genuine issues of material fact existed as to whether harassment suffered by a trooper was sufficiently severe or pervasive to create a hostile work environment;

 (3) there were genuine issues of material fact as to whether her statement to a superior was protected under Title VII and related to her transfer; but

 (4) that statement was not protected by the First Amendment.
 Affirmed in part, reversed in part, and remanded.

West Headnotes

**[1]** Civil Rights ⚷1326(11)
78k1326(11) Most Cited Cases

**[1]** Civil Rights ⚷1359
78k1359 Most Cited Cases
State trooper failed to prove that a defendant was her superior at any time that he engaged in alleged acts of sexual harassment, thus precluding imposition of § 1983 liability;  both of them were troopers at all relevant times, neither person having authority over the other. 42 U.S.C.A. § 1983.

**[2]** Federal Civil Procedure ⚷2497.1
170Ak2497.1 Most Cited Cases
Genuine issues of material fact as to whether harassment suffered by a trooper was sufficiently severe or pervasive to create a hostile work environment precluded summary judgment against the trooper on her Title VII discrimination claim.  Civil Rights Act of 1964, § 701 et seq., as amended, 42 U.S.C.A. § 2000e et seq.

**[3]** Federal Civil Procedure ⚷2497.1
170Ak2497.1 Most Cited Cases
Genuine issues of material fact as to whether trooper's report of alleged incidents of sexual harassment to her superior was protected activity and whether there was a causal relationship between that activity and her transfer to another unit precluded summary judgment against the trooper on her Title VII retaliation claim.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

108 Fed.Appx. 700                                                                                    Page 2
108 Fed.Appx. 700, 2004 WL 1799234 (3rd Cir.(Pa.))
**(Cite as: 108 Fed.Appx. 700, 2004 WL 1799234 (3rd Cir.(Pa.)))**

Civil Rights Act of 1964, § 704(a), as amended, 42 U.S.C.A. § 2000e-3(a).

**[4] Constitutional Law** ☞90.1(7.2)
92k90.1(7.2) Most Cited Cases

**[4] States** ☞53
360k53 Most Cited Cases
State trooper's statement to a superior in an informal conversation, that a non-supervisory co-worker made improper sexual advances toward her but that she did not desire to see any official action taken, did not address a matter of sufficient public concern to warrant First Amendment protection. U.S.C.A. Const.Amend. 1.

**\*701** On Appeal from the United States District Court for the Middle District of Pennsylvania. (D.C. Civ. No. 01-cv-01979). Chief District Judge: Honorable Thomas J. Vanaskie.

Spero T. Lappas, Serratelli, Schiffman, Brown & Calhoun, Harrisburg, PA, for Appellant.

Sarah C. Yerger, Harrisburg, PA, James P. Golden, Jane B. LaPorte, Hamburg & Golden, Philadelphia, PA for Appellees.

Before: ROTH, STAPLETON, Circuit Judges and SCHWARZER, [FN*] Senior District Judge.

    FN* The Honorable William W Schwarzer, Senior United States District Judge for the Northern District of California, sitting by designation.

    **\*702** OPINION

ROTH, Circuit Judge.

 **\*\*1** Trooper Laura Zelinski brought an action against the Pennsylvania State Police (PSP), the Commonwealth of Pennsylvania, Corporal Lewis Altieri, and Trooper Richard Weinstock (both employees of the PSP), pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2000e-17 (West 2004), the Pennsylvania Human Relations Act, 43 PA. CONS. STAT. ANN. § 955 (West 2004), and

42 U.S.C. §§ 1983, 1985, and 1988. Zelinski's claims arise out of alleged incidents of sexual harassment and discrimination. For the reasons that follow, we will affirm in part and reverse in part.

 **I. FACTUAL AND PROCEDURAL HISTORY**
 Zelinski became a member of the PSP specialized drug investigation unit, known as the Tactical Narcotics Team (TNT) unit, in May of 1999. According to Zelinski, Trooper Weinstock began sexually harassing her almost immediately. After several months, Zelinski told her supervisor, Corporal Altieri, that she did not feel comfortable working with Weinstock. She related to Altieri the incidents of sexual harassment and told Altieri that she did not want anything to be done about them. Zelinski maintains that Altieri subsequently subjected her to unfair criticism because Altieri favored Weinstock.

 Beginning in the fall of 1999, there was significant tension within the TNT unit, much of it the result of individual members' problems with Trooper Weinstock. Altieri, head of the unit, informed his immediate supervisor, Sergeant Michael Ruda, about the unit's problems. Once this information went through the appropriate chain of command, Captain John Duignan recommended that Zelinski and another TNT member be removed from the unit. In August 2000, Major Tyree Blocker transferred Zelinski from the TNT unit. Zelinski lost neither rank nor pay as a result of the transfer. After the transfer, Zelinski filed a written sexual harassment complaint with the PSP's Equal Opportunity Officer. On November 15, 2000, she filed a complaint with the Pennsylvania Human Relations Commission. After receiving a right to sue letter, Zelinski brought this action.

 Zelinski filed an action in the District Court for the Middle District of Pennsylvania against the PSP, the Commonwealth of Pennsylvania, Corporal Lewis Altieri, and Trooper Richard Weinstock, bringing claims pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2000e-17 (West 2004), the Pennsylvania Human Relations Act, 43 PA. CONS. STAT. ANN. § 955 (West 2004), and 42 U.S.C. §§ 1983, 1985, and 1988. Weinstock filed a motion to dismiss, and all defendants filed motions for summary

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

108 Fed.Appx. 700                                                                    Page 3
108 Fed.Appx. 700, 2004 WL 1799234 (3rd Cir.(Pa.))
**(Cite as: 108 Fed.Appx. 700,  2004 WL 1799234 (3rd Cir.(Pa.)))**

judgment. The District Court denied Weinstock's motion to dismiss but granted the defendants' motions for summary judgment on all claims. Zelinski appealed.

## II. JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction to hear this appeal pursuant to 28 U.S.C. § 1291. We exercise plenary review over a District Court's grant of summary judgment. *Assaf v. Fields,* 178 F.3d 170, 171 (3d. Cir.1999). Summary judgment should be granted if the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A fact is "material" if its existence or nonexistence might affect the outcome of the suit under the applicable law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "[S]ummary judgment will not lie if the *703 dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

## III. DISCUSSION

**A. Summary Judgment in favor of Trooper Weinstock on the 42 U.S.C. § 1983 claim**

**\*\*2** [1] Zelinski claims that the District Court erred in granting summary judgment in favor of Weinstock on her § 1983 claim. In order to sustain a claim under 42 U.S.C. § 1983, [FN1] Zelinski must establish that a person, acting under the color of state law, deprived her of a right secured by the Constitution. *Renda v. King,* 347 F.3d 550, 557 (3d Cir.2003). "A finding of liability under 42 U.S.C. § 1983 requires that the defendant ... have exercised power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *Bonenberger v. Plymouth Township,* 132 F.3d 20, 23 (3d Cir.1997) (internal quotations and citations omitted). Generally, in order to act under the color of state law, the wrongdoer must be in a supervisory position in relation to the plaintiff. *See id.* at 23-24. The District Court concluded that Zelinski presented no evidence "to suggest that Weinstock was Zelinski's superior at any time that he engaged in the alleged acts of sexual harassment." *Zelinski v. Pa. State Police,* 282

F.Supp.2d 251, 266 (M.D.Pa.2003). We agree that summary judgment was proper.

> FN1. Section 1983 provides, in pertinent part: Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ..., subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress....
> 42 U.S.C. § 1983 (2004).

Zelinski offers no evidence that any of the incidents of sexual harassment occurred at any time when Weinstock was in a supervisory position in relation to Zelinski. Both Zelinski and Weinstock were troopers at all relevant times, neither person having authority over the other. The only time Weinstock was in a supervisory position in relation to Zelinski was at the end of July 2000 when Corporal Altieri was on vacation. No incidents of sexual harassment occurred during this period of time.

The fact that Weinstock was not Zelinski's formal supervisor at the time of the harassment, however, is not dispositive. *See Bonenberger,* 132 F.3d at 23-24. In *Bonenberger,* we looked at the substance of the individual defendant's job functions, rather than the form, to determine whether an employee was acting in a supervisory capacity. *Id.* The two primary factors the Court examined to determine whether there was de facto supervisory control were 1) whether the defendant could alter the plaintiff's workload, and 2) whether the plaintiff would face charges of insubordination for failure to obey the defendant's order. *Id.* At all relevant times, Weinstock could not alter Zelinski's workload and Zelinski could not be charged with insubordination for failing to obey Weinstock's orders.

For the foregoing reasons, we will affirm the District Court's grant of Weinstock's motion for summary judgment on Zelinski's § 1983 claim.

**B. Summary Judgment for the PSP on the Title VII**

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

108 Fed.Appx. 700                                                                          Page 4
108 Fed.Appx. 700, 2004 WL 1799234 (3rd Cir.(Pa.))
**(Cite as: 108 Fed.Appx. 700,  2004 WL 1799234 (3rd Cir.(Pa.)))**

**sexual discrimination claim**

 [2] Zelinski also argues that the District Court erred in granting the PSP's motion for summary judgment on her Title **\*704** VII claim.  A plaintiff can establish a violation of Title VII by proving that discrimination based on sex has created a hostile or abusive work environment.  *Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 66, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986).*  However, "not all work place conduct that may be described as 'harassment' affects a 'term, condition, or privilege' of employment within the meaning of Title VII." *Id.* at 67.  "When the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated." *Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 78, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998)* (quoting *Harris v. Forklift Sys., Inc., 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)*).

 **\*\*3** The District Court held that there was no genuine issue of material fact as to hostile work environment because the harassment Zelinski suffered was not severe or pervasive enough.  We disagree with the District Court and will remand the case on this claim because we do find that there is a genuine issue of material fact.

 A totality of the circumstances test determines whether the threshold level of severity and pervasiveness has been reached.  *Harris, 510 U.S. at 23.*  The severity of the harassment, the frequency of the harassment, and the degree of abuse are factors courts should consider. *Id.* Zelinski offers four alleged incidents of sexual harassment as proof that she was exposed to a hostile work environment.  The first incident occurred while Weinstock and Zelinski were car pooling from a training session when Weinstock told Zelinski he was sexually attracted to her, placed his hand on her leg, and suggested that he come over to Zelinski's hotel room to give her a full body massage.  The second incident occurred while Weinstock and Zelinski were riding in a surveillance van together when Weinstock described in graphic detail the manner in which he wanted to have sex with Zelinski.  The third incident occurred when Weinstock told Zelinski, "If I can see down your

sweater, everyone else can."  The fourth incident occurred when Weinstock, repeatedly throughout the day, told Zelinski that he could see her underwear.

 Aside from these four specific incidents of sexual harassment, other circumstances contributed to the creation of a hostile work environment. Zelinski alleges that Altieri did not believe what Zelinski told him about Weinstock, he criticized her for making the report, and he told Zelinski that Weinstock was a "nice guy." Zelinski also claims that Altieri subjected Zelinski to unjustified criticism concerning the execution of a search warrant and other alleged misconduct, and he placed a disciplinary notation in her file.

 There is also a genuine issue of material fact as to whether Weinstock failed to provide Zelinski with protection and assistance during an undercover drug operation.  If Weinstock failed to provide Zelinski with protection and if there was a connection between Zelinski's rejections of Weinstock's advances and the failure to provide protection, then a reasonable jury may conclude that the harassment was sufficiently severe and pervasive.  By failing to provide Zelinski with adequate protection in the dangerous and sometimes deadly world of drug law enforcement, Weinstock may have created a hostile work environment.  Viewing this incident in light of a comment Weinstock made to another trooper after Zelinski's report to Corporal Altieri, "Laura [Zelinski] tried to hurt me with Lou [Altieri] and now I'm going to hurt her," it becomes more apparent **\*705** that Zelinski may have been exposed to a hostile work environment.

 All of the alleged incidents that contributed to the hostile work environment occurred over a period of time slightly over one year.  The number of incidents in this relatively short length of time shows that the incidents of harassment are more than isolated and unrelated.  Considering all of these alleged incidents together, Zelinski has presented enough evidence to establish that there is a genuine issue of material fact, sufficient to go to a fact finder, as to whether she was exposed to a severe and pervasive hostile work environment.  Summary judgment in favor of the PSP was inappropriate because "the evidence is such that a reasonable jury could return a verdict for the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

108 Fed.Appx. 700                                                                                              Page 5
108 Fed.Appx. 700, 2004 WL 1799234 (3rd Cir.(Pa.))
**(Cite as: 108 Fed.Appx. 700, 2004 WL 1799234 (3rd Cir.(Pa.)))**

nonmoving party." *Anderson,* 477 U.S. at 248.

**\*\*4** For the foregoing reasons, we will vacate the judgment on the Title VII discrimination claim and remand it for further proceedings.

### C. Summary Judgment for the PSP, Altieri, and Weinstock on the Title VII and First Amendment retaliation claims

[3] Finally, Zelinski appeals the District Court's grant of summary judgment in favor of the PSP, Altieri, and Weinstock on her Title VII and First Amendment retaliation claims. Zelinski has the initial burden of proving a prima facie case of discriminatory retaliation. Zelinski must demonstrate that (1) she engaged in a Title VII protected employee activity, (2) the employer took an adverse employment action against her, and (3) there is a causal link between the engaged protected activity and the adverse employment action. *Weston v. Pennsylvania,* 251 F.3d 420, 430 (3d Cir.2001). The District Court held that Zelinski's report of the sexual harassment incidents to Altieri was not a protected activity under Title VII and that, even if it was, there was no causal connection between the report and her transfer. We disagree with the District Court. We will vacate the judgment on this claim because there are genuine issues of material fact and remand it to the District Court.

Protected activities under Title VII include situations where an employee "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under" Title VII. 42 U.S.C. § 2000e-3(a). A formal letter of complaint to an employer or the EEOC is not the only way to meet the protected activity criterion. *Barber v. CSK Distribution Services,* 68 F.3d 694, 702 (3d Cir.1995). Protected activities include formal charges of discrimination, "as well as informal protests of discriminatory employment practices, including making complaints to management...." *Sumner v. United States Postal Serv.,* 899 F.2d 203, 209 (2d Cir.1990). It is necessary to analyze the message conveyed, rather than "the medium of conveyance." *Barber,* 68 F.3d at 702.

Zelinski reported the alleged incidents of sexual

harassment to her superior, Corporal Altieri, after being questioned about how she was getting along with the other members of the TNT unit. During the conversation, Zelinski related to Altieri the two incidents when Weinstock made sexual advances toward Zelinski. The fact that Zelinski told Altieri that she did not want anything to be done in response to Weinstock's conduct, does not bar her statements to Altieri from being a protected activity. A reasonable jury could conclude that this conversation fell within the ambit of a protected activity.

The District Court properly held that Zelinski's transfer to a patrol unit was an "adverse employment action" under Title VII. The fact that Zelinski lost neither pay nor rank as a result of the transfer is not **\*706** dispositive. *See Hampton v. Borough of Tinton Falls Police Dept.,* 98 F.3d 107, 115-116 (3d Cir.1996) (summary judgment reversed where plaintiff claimed that patrol assignment was less desirable than detective bureau, even though plaintiff did not lose pay or rank as a result of transfer); *Torre v. Casio, Inc.,* 42 F.3d 825, 831 n. 7 (3d Cir.1994) ("[A] transfer, even without loss of pay or benefits, may, in some circumstances, constitute an adverse job action.").

**\*\*5** In addition to proving protected activity and adverse employment action, Zelinski must also show a causal relationship between the protected activity (her complaint to Altieri) and the adverse employment action (her transfer from the TNT unit). Zelinski's alleged complaint to Altieri regarding Weinstock's sexually harassing comments occurred during a conversation in October of 1999. Her transfer from the TNT unit occurred in August of 2000, ten months after her report to Altieri.

In *Farrell v. Planters Lifesavers Co.,* we acknowledged that "our case law is 'seemingly split' as to whether temporal proximity between the protected activity and the alleged retaliatory act can be sufficient in itself to create an inference of a causal connection for the purposes of a prima facie case of retaliation." 206 F.3d 271, 279 (3d Cir.2000) (citing *Robinson v. City of Pittsburgh,* 120 F.3d 1286, 1302 (3d Cir.1997)). The facts and contexts of each case are important in determining whether there is a causal relationship.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

108 Fed.Appx. 700                                                                Page 6
108 Fed.Appx. 700, 2004 WL 1799234 (3rd Cir.(Pa.))
**(Cite as: 108 Fed.Appx. 700,  2004 WL 1799234 (3rd Cir.(Pa.)))**

Temporal proximity alone is insufficient to establish the required causal connection when temporal proximity is not "unusually suggestive." *Id. at 280.* "When there may be a valid reason why the adverse employment action was not taken immediately, the absence of immediacy between the cause and effect does not disprove causation." *Kachmar v. SunGard Data Sys., 109 F.3d 173, 178 (3d Cir.1997).*

A discharge occurring two days after a plaintiff filed an EEOC complaint is "unusually suggestive." *Jalil v. Avdel Corp., 873 F.2d 701, 708 (3d Cir.1989).* By itself, a nineteen-month span of time was considered too long a period to be "unusually suggestive." *Krouse v. American Sterilizer Co., 126 F.3d 494, 503 (3d Cir.1997).* The ten-month time period between Zelinski's complaint and her transfer is not as "unusually suggestive" as the two-day period in *Jalil,* but is more "suggestive" then the nineteen-month period of time in *Krouse.* Alone, the ten-month period of time may not meet the threshold test of "unusually suggestive."

By examining the other factors that can establish causation, however, we believe that a rational fact finder could decide that there was causation between the two events. There may have been a valid reason why no adverse action was taken right away. Corporal Altieri began to communicate Zelinski's sexual harassment claims to his superiors sometime before June 2000. It is possible that the individuals with authority to transfer Zelinski (or any other member of the TNT unit for that matter) were unaware of the problems and therefore did not react before August 2000. The time period between Altieri telling his superiors about the sexual harassment and Zelinski's transfer was a period of only two months. This is much more "unusually suggestive" than a period of ten months.

Zelinski has also presented evidence of at least four incidents of intervening antagonism between the time she told Altieri of her problems with Weinstock and the time of her transfer. *See Robinson v. S.E. Pa. Transp. Auth., 982 F.2d 892, 895 (3d Cir.1993)* ("intervening pattern of antagonism" during the period between the protected activity and the adverse employment action

can prove causation). Zelinski alleges she was subjected to false criticism **707** for the execution of a search warrant in January 2000, in front of other troopers; she was unfairly criticized for misconduct in April 2000; and Altieri placed a disciplinary note in her file. Finally, Zelinski maintains that she had to undergo two separate sessions of unwarranted disciplinary counseling in July of 2000.

**6** A plaintiff can also establish the causation element by providing evidence of inconsistent reasons for the adverse employment action. *Farrell, 206 F.3d at 281.* Captain Duignan provided a number of reasons why Zelinski was transferred. Zelinski has presented evidence, contradicting Duignan, to show that a genuine issue of material fact exists pertaining to those reasons. If it is determined that these reasons are merely pretextual, then they can be considered inconsistent reasons for the adverse employment action, ultimately leading to a conclusion of causation. The reasons offered by Captain Duignan for Zelinski's transfer include that 1) Zelinski had an attitude problem, was not a team player, and was difficult to supervise; 2) she bad-mouthed Altieri to other people; 3) she mishandled herself during the execution of a search warrant; 4) she criticized PSP patrol officers; 5) she failed to keep her search warrant probable cause information current; 6) she cancelled a planned undercover drug operation; and 7) she was argumentative during a meeting. Zelinski either denies or offers evidence to negate or contradict each reason.

Viewing all of the other evidence in the light most favorable to Zelinski, the nonmoving party, we believe that a reasonable jury could find in favor of Zelinski regarding the causation element. Therefore, we will vacate the judgment on the Title VII retaliation claim and remand it to the District Court.

[4] The District Court also granted summary judgment on Zelinski's First Amendment retaliation claim based on its ruling on Zelinski's Title VII retaliation claim. *Zelinski, 282 F.Supp.2d at 273, n. 22.* ("As Zelinski has failed to show any retaliation, it is unnecessary to determine whether her complaint was protected speech," for purposes of her First Amendment retaliation claim.) Because we are remanding on the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

108 Fed.Appx. 700                                                                Page 7
108 Fed.Appx. 700, 2004 WL 1799234 (3rd Cir.(Pa.))
**(Cite as: 108 Fed.Appx. 700, 2004 WL 1799234 (3rd Cir.(Pa.)))**

issue of retaliation, we must now also consider Zelinski's First Amendment retaliation claim. We conclude that there is no validity to the First Amendment claim. As we held in *Azzaro v. County of Allegheny,* 110 F.3d 968, 977 (3d Cir.1997) (en banc), "the expressive rights of public employees are more restricted that those of public citizens who are not in an employment relationship with the government." (citing *Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983)). A public employees's speech is protected only if it relates to a matter of public concern, *i.e.,* if "it is important to the process of self-governance that communications on this topic, in this form and in this context, take place." *Id.* at 977.

In *Azzaro,* we reversed the District Court's grant of summary judgment to the defendants because Azzaro's speech "brought to light actual wrongdoing on the part of one exercising public authority that would be relevant to the electorate's evaluation of the performance of the office of an elected official." *Id.* at 978. The *Azzaro* Court contrasted the situation presented in our case:

**7 We are not here presented with a situation in which a public employee has filed a complaint about an isolated incident of what he or she perceived to be inappropriate conduct on the part of a non-supervisory co-worker. While we express no opinion on such a situation, it would presumably be less important to an evaluation of the performance of the **708 public office involved than the situation now before us.

*Id.* at 979 n. 4.

Here, Zelinski, a public employee, complained to Altieri about inappropriate conduct by Weinstock, a non-supervisory co-worker. Neither Altieri or Weinstock work directly under any elected official, and their actions do not appear relevant to the electorate's evaluation of the performance of the office of any elected official. While speech about sexual harassment and other discrimination is certainly important, neither the form, context, nor content of Zelinski's speech support a finding that it addressed a matter of public concern. *See id.* at 976 (whether an employee's conduct addresses a matter of public concern "is to be determined by the 'content, form, and context of a given

statement' " (quoting *Connick,* 461 U.S. at 147-48)). Zelinski did not make a public speech about the evils of sexual harassment; she, instead, stated in an informal conversation that a non-supervisory co-worker made improper sexual advances toward her but that she did not desire to see any official action taken. This conversation, while protected under Title VII, has little or no "instrumental value to the community in enabling self-governance," *id.* at 977, and thus does not appear to have addressed a matter of sufficient public concern to warrant First Amendment protection. For those reasons, we will affirm the dismissal of the First Amendment claim.

### IV. Conclusion

For the foregoing reasons, we will affirm the District Court's grant of summary judgment in favor of Trooper Weinstock on the 42 U.S.C. § 1983 claim and the judgment dismissing the First Amendment retaliation claim. We will vacate the judgment on the Title VII discrimination claim and remand it to the District Court for further proceedings consistent with this opinion.

108 Fed.Appx. 700, 2004 WL 1799234 (3rd Cir.(Pa.))


**Briefs and Other Related Documents** (Back to top)

. 03-4025 (Docket)

(Oct. 08, 2003)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**CERTIFICATE OF SERVICE**

I, Stephen J. Neuberger, being a member of the bar of this Court do hereby certify that on

March 21, 2005, I electronically filed this Pleading with the Clerk of the Court using CM/ECF

which will send notification of such filing to the following:

Rudolph Contreras, Esq.
Assistant U.S. Attorney
Chief, Civil Division, U.S. Department of Justice
1007 N. Orange Street, Suite 700
Wilmington, DE 19899-2046
Rudolph.Contreras@usdoj.gov

Jeffrey D. Kahn, Esq.
Trial Attorney, Federal Programs Branch
Civil Division, U.S. Department of Justice
P.O. Box 883 Ben Franklin Station
20 Massachusetts Ave., N.W.
Washington, DC 20044
Jeffrey.Kahn@usdoj.gov

/s/ Stephen J. Neuberger
**STEPHEN J. NEUBERGER, ESQUIRE**

cc:    SSgt. Jason A. Adkins
       John W. Whitehead, Esq.
       Douglas McKusick, Esq.

Adkins, Sgt. Jason \ Briefs \ Motion to Dismiss AB.final

38