**IN UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| SSGT JASON A. ADKINS, USAF, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. Act. No. 04-1453-JJF |
| | ) | |
| DONALD H. RUMSFELD, Secretary of Defense; | ) | |
| JAMES G. ROCHE, Secretary of the Air Force; | ) | |
| GEN. JOHN W. HANDY, Commander Air | ) | **PLAINTIFF'S ANSWERING** |
| Mobility Command, COL. JOHN I. PRAY, JR., | ) | **BRIEF IN OPPOSITION TO** |
| 436th Air Wing Commander, in their official | ) | **DEFENDANTS' MOTION** |
| capacities, | ) | **TO DISMISS** |
| | ) | |
| Defendants. | ) | |

**EXHIBIT A:**

**RULE 56(f) AFFIDAVIT**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

SSGT. JASON A. ADKINS, USAF, :
 :
   **Plaintiff,** :
 :
  **v.** :
 :  C.A.No.: 04-1453-JJF
 :
 :
DONALD H. RUMSFELD, Secretary of :
Defense; DR. JAMES G. ROCHE, Secretary :
of the Air Force; GENERAL JOHN W. :
HANDY, Commander Air Mobility Command; :
COL. JOHN I. PRAY JR., 436th Air Wing :
Commander, all in their official capacities, :
 :
   **Defendants.** :
 :
 :

**PLAINTIFF'S RULE 56(F) AFFIDAVIT IN SUPPORT OF HIS RESPONSE
TO DEFENDANTS' SUMMARY JUDGMENT MOTION**

I, M. Katherine Stroker, being duly sworn, state that I am one of the attorneys representing

plaintiff Jason Adkins in the above-captioned matter. I further declare that the following statements are

true.

1. The United States Court of Appeals for the Third Circuit ("Third Circuit") has held that:

> [w]here Rule 56(f) affidavits have been filed, setting forth specific
> reasons why the moving party's affidavits in support of a motion for
> summary judgment cannot be responded to, and the facts are in the
> possession of the moving party, . . . a continuance of the motion for
> purposes of discovery should be granted almost as a matter of course. . . .
>
> It is true that Rule 56(f) also authorizes the court in appropriate cases to
> refuse to enter summary judgment where the party opposing the motion
> shows a legitimate basis for his inability to present by affidavit the facts
> essential to justify his opposition, but to take advantage of this provision
> he must state by affidavit the reasons for his inability to do so . . .

*Mid-South Grizzlies v. Nat'l Football League,* 720 F.2d 772, 779 (3d Cir.1983) (citations

omitted), *cert. denied,* 467 U.S. 1215 (1984).

2. To oppose the arguments set forth in defendants' Motion for Summary Judgment, plaintiff needs to conduct the discovery set forth below, and without such discovery plaintiff cannot present by affidavit or declaration all facts essential to opposing the defendants' arguments. Due to the fact that the Court has not yet entered a Rule 16 Scheduling Order or otherwise permitted discovery to begin, plaintiff has been unable to take or obtain any of this necessary discovery.

3. The information listed below is necessary for this court to resolve plaintiff's claims as to who in the government was aware of plaintiff's free speech and when those persons were aware, the public concern that was raised by plaintiff's speech, the government's motives and intent as to plaintiff's employment situation both before and after plaintiff filed this suit, the government's knowledge and reaction to plaintiff's lawsuit, the government's treatment of plaintiff and other fliers who were disabled by the anthrax vaccines and the government's knowledge of the side effects that resulted from the injection of anthrax contaminated with squalene.

4. Plaintiff requires the following discovery before he can adequately respond to the defendants' summary judgment request:

- Discovery to the government, including depositions, interrogatories, document requests and requests for admission regarding:
  - the facts underlying the assertions contained in the affidavits submitted by defendants in support of their motion to dismiss,
  - who within the government was aware of plaintiff's complaints relating to the tainted vaccine, when were they aware, and how they found out,
  - SMSgt. Mahoney's intent and motives in issuing the LOR to plaintiff and who among SMSgt.'s superiors approved and/or directed his issuance of the LOR,

- SMSgt. Mahoney's intent and motives behind assigning plaintiff to different work shifts and other disparate treatment plaintiff received following his exercise of his First Amendment rights and who among SMSgt Mahoney's superiors approved and/or directed plaintiff's disparate treatment,

- SMSgt. Mahoney's and TSgt. Miller's knowledge of plaintiff's health conditions,

- communications between SMSgt. Mahoney and his superiors,

- internal policies (official and unofficial) for reporting complaints tied to the tainted anthrax vaccine,

- internal policies (official and unofficial) relating to the disclosure of information linking adverse health effects and the vaccine administered to airmen at Dover Air Force Base and elsewhere in the military,

- the government's knowledge as to the inclusion of squalene in the vaccines administered to airmen at Dover Air Force Base, who within the government was privy to this knowledge and when they knew,

- information on the government's knowledge as to the adverse health effects associated with the use of squalene, who within the government was privy to this knowledge and when they knew it,

- Dover Air Force Base's initial internal response to publicity regarding base's use of squalene-tainted anthrax vaccine,

- records addressing employment related actions take against other airmen who complained of adverse health effects from the tainted anthrax vaccine and how this differed from the treatment of other airmen declared medically unfit for flight duty,

- the government's intent and motives for pressuring high-ranking officials such as Col. Felix Grieder to keep quiet about the adverse health effects associated with the use of squalene in vaccines,

- routine Squadron discipline procedures relating to airmen use of sick call; DNIF status, work shifts, allocation of tasks, supervision of airmen, and alert status for missions. .

- Discovery to third-party scientists and investigators involved in researching the effects of squalene, including depositions, interrogatories, document requests and requests for admission regarding:

  - the effects of squalene on airmen at Dover Air Force Base,

  - the effects of squalene generally,

  - what the government should reasonably have been expected to know as to the health risks associated with squalene administered to airmen at Dover Air Force Base.

4. This information has not yet been obtained because discovery has not begun in this case.

5. For all of these reasons, plaintiff needs to take discovery before he can respond fully to defendants' Motion for Summary Judgment.


I declare under penalty of perjury that the foregoing is true and correct.

Executed this 15th day of March 2006.

M. Katherine Stroker
Arnold & Porter LLP
555 Twelfth Street, N.W.
Washington, D.C. 20004
(202) 942-5000


SUBSCRIBED AND SWORN TO before me in the District of Columbia this 15th day of March 2006.

Notary Public

Hazel A. Walker
Notary Public, District of Columbia
My Commission Expires 5-31-2009

My Commission expires: _____

# IN UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SSGT JASON A. ADKINS, USAF, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. Act. No. 04-1453-JJF |
| | ) | |
| DONALD H. RUMSFELD, Secretary of Defense; | ) | |
| JAMES G. ROCHE, Secretary of the Air Force; | ) | |
| GEN. JOHN W. HANDY, Commander Air | ) | **PLAINTIFF'S ANSWERING** |
| Mobility Command, COL. JOHN I. PRAY, JR., | ) | **BRIEF IN OPPOSITION TO** |
| 436th Air Wing Commander, in their official | ) | **DEFENDANTS' MOTION** |
| capacities, | ) | **TO DISMISS** |
| | ) | |
| Defendants. | ) | |

**EXHIBIT B:**

**COPIES OF UNPUBLISHED OPINIONS
REQUIRED UNDER LOCAL RULE 7.1.3(a)(G)**

Westlaw.

2006 WL 590357                                                                    Page 1
--- F.3d ----, 2006 WL 590357 (3rd Cir.(N.J.))
**(Cite as: 2006 WL 590357 (3rd Cir.(N.J.)))**

**Briefs and Other Related Documents**

Only the Westlaw citation is currently available.

United States Court of Appeals,
Third Circuit.
James D. O'CONNOR; Jeannette C. O'Connor,
Appellants
v.
CITY OF NEWARK; City of Newark Police
Department.
**No. 05-2237.**

Submitted Under Third Circuit LAR 34.1(a) Feb. 13,
2006.
March 13, 2006.

**Background:** Former police officer brought § 1983
action against city and city's police department
alleging retaliation for assistance with federal
corruption investigation. The United States District
Court for the District of New Jersey, Joseph A.
Greenaway, Jr., J., granted summary judgment in
favor of defendants. Plaintiff appealed.

 **Holdings:** The Court of Appeals, Fisher, Circuit
Judge, held that:
 (1) continuing violation doctrine did not toll the
two-year limitations period for retaliation claims;
 (2) officer failed to establish the existence of any
agreement by police department to expunge his
disciplinary record; and
 (3) continuing violation doctrine did not toll
limitations period of police officer's claim against
city under New Jersey Conscientious Employee
Protection Act.
 Affirmed.

**[1] Civil Rights** 🔑0

78k0 k.
Actions brought under § 1983 are governed by the
personal injury statute of limitations of the state in
which the cause of action accrued. 42 U.S.C.A. §
1983.

**[2] Limitation of Actions** 🔑0
241k0 k.
The limitations period for a section 1983 action in

New Jersey is two years. 42 U.S.C.A. § 1983;
N.J.S.A. 2A:14-2.

**[3] Limitation of Actions** 🔑0
241k0 k.
Continuing violation doctrine did not toll the two-
year limitations period of New Jersey police officer's
§ 1983 claims that denial of promotion, failure to
expunge disciplinary record, and transfer were in
retaliation for his exercise of First Amendment rights
by assisting with federal corruption investigation,
since claims involved discrete acts and not a hostile
environment. U.S.C.A. Const.Amend. 1; 42 U.S.C.A.
§ 1983; N.J.S.A. 2A:14-2.

**[4] Contracts** 🔑0
95k0 k.
Police officer failed to establish the existence of any
agreement by police department to expunge his
disciplinary record, as required to support his claim
that settlement agreement was violated by failure to
expunge; city council resolution memorialized
agreement between officer and city that payment of
money to officer was in consideration of officer's
agreement to amicably resolve and compromise his
claims, resolution did not mention officer's
disciplinary record, and letters between officer and
city did not establish any agreement to expunge.

**[5] Limitation of Actions** 🔑0
241k0 k.
Continuing violation doctrine did not toll limitations
period of police officer's claim against city under
New Jersey Conscientious Employee Protection Act,
since retaliation claims of denial of promotion and
failure to expunge disciplinary record involved
discrete acts and not a hostile environment. N.J.S.A.
34:19-1 et seq.
 On Appeal from the United States District Court for
the District of New Jersey, (D.C. No. 02-cv-04318),
District Judge: Honorable Joseph A. Greenaway, Jr.

Charles J. Sciarra, Newark, NJ, for Appellants.

Susan S. Singer, Newark, NJ, for Appellee, City of
Newark.

Before SCIRICA, Chief Judge, BARRY and
FISHER, Circuit Judges.

OPINION OF THE COURT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 590357
--- F.3d ----, 2006 WL 590357 (3rd Cir.(N.J.))
**(Cite as: 2006 WL 590357 (3rd Cir.(N.J.)))**

Page 2

FISHER, Circuit Judge.

**\*1** In this case we are asked to review the District Court's grant of summary judgment to Newark, New Jersey, and its police department, on several claims arising from alleged retaliation against a police officer based on his assistance with a federal corruption probe. We will affirm.

## I.

James O'Connor was a lieutenant in the Newark Police Department. He provided information to investigators in a federal corruption probe targeting the former Newark police director William Celester. Celester was convicted of embezzlement, and O'Connor alleges that, because of his assistance in the investigation, he was subjected to retaliation on the job. [FN1]

O'Connor brought suit against the city and the department under 42 U.S.C. § 1983, charging that they had infringed his rights to substantive and procedural due process (Count I) and to free expression (Count II). He also alleged that the defendants violated his state-law whistleblower rights under N.J.S.A. 34:19-1 (Count III), engaged in a conspiracy in violation of 42 U.S.C. § 1985 (Count IV), failed to prevent that conspiracy in violation of 42 U.S.C. § 1986 (Count V), libeled and defamed him (Count VI), [FN2] and violated a settlement agreement stemming from an earlier lawsuit (Count VIII). Finally, along with his wife, O'Connor brought a claim for loss of consortium (Count VII).

The District Court determined that O'Connor had failed to present evidence supporting a causal connection between his participation in the investigation and the alleged retaliatory acts, and granted Newark's motion for summary judgment on all counts. We have jurisdiction over this appeal under 28 U.S.C. § 1291. Our review of an order granting summary judgment is plenary. *Bieregu v. Reno*, 59 F.3d 1445, 1449 (3d Cir.1995). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

## II.

[1][2] Actions brought under 42 U.S.C. § 1983 are governed by the personal injury statute of limitations of the state in which the cause of action accrued. *Cito*

*v. Bridgewater Twp. Police Dep't*, 892 F.2d 23, 25 (3d Cir.1989). For section 1983 actions in New Jersey, "that statute is N.J.S.A. 2A:14-2, which provides that an action for injury to the person caused by wrongful act, neglect, or default, must be convened within two years of accrual of the cause of action." *Brown v. Foley*, 810 F.2d 55, 56 (3d Cir.1987). The limitations period for O'Connor's claims is therefore two years.

With minor exceptions, all of the events described in O'Connor's complaint occurred more than two years before filing. O'Connor argues, however, that the statute of limitations should be deemed equitably tolled because his complaint states a hostile workplace environment claim involving a "continuing violation." O'Connor's argument hinges on his hostile workplace environment theory, and requires aggregation of acts occurring outside the limitations period with those occurring inside the period. He does not contend that there are any acts occurring inside the period which, considered in themselves, are sufficient to support liability. Nor has our independent examination of the record revealed any such acts. Because the events that occurred within two years of filing are not, on their own, sufficient to support liability, the dispositive issue before us is whether claims of the sort raised by O'Connor may survive time-barring by inclusion in a continuing violations complaint.

**\*2** This issue was resolved by the Supreme Court in *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002). *Morgan* established a bright-line distinction between discrete acts, which are individually actionable, and acts which are not individually actionable but may be aggregated to make out a hostile work environment claim. The former must be raised within the applicable limitations period or they will not support a lawsuit. *Id.* at 113 ("[D]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges. Each discriminatory act starts a new clock for filing charges alleging that act."). The latter can occur at any time so long as they are linked in a pattern of actions which continues into the applicable limitations period. *Id.* at 105 ("[C]onsideration of the entire scope of a hostile work environment claim, including behavior alleged outside the statutory time period, is permissible for purposes of assessing liability, so long as any act contributing to that hostile environment takes place within the statutory time period.").

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 590357
--- F.3d ----, 2006 WL 590357 (3rd Cir.(N.J.))
**(Cite as: 2006 WL 590357 (3rd Cir.(N.J.)))**

Page 3

*Morgan* provides fairly precise guidance as to what sorts of acts are "discrete." The Court first observes that "[d]iscrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify," *id.* at 114, then lists the discrete acts in the case before it: "Morgan contends that he was wrongfully suspended ... charged with a violation of [a workplace rule], denied training, and falsely accused of threatening a manager." *Id.* (emphasis added).

We can thus take from *Morgan* the following non-exhaustive list of discrete acts for which the limitations period runs from the act: termination, failure to promote, denial of transfer, refusal to hire, wrongful suspension, wrongful discipline, denial of training, wrongful accusation.

Applying the *Morgan* distinction to O'Connor's allegations listed above, *supra* note 1, it is apparent that nearly all of them fall into the category of discrete acts. Accordingly, under *Morgan,* they cannot be aggregated under a continuing violations theory.

Furthermore, the *Morgan* rule that individually actionable allegations cannot be aggregated is of particular import in the context of First Amendment retaliation claims. First Amendment retaliation claims are always individually actionable, even when relatively minor. Even "an act of retaliation as trivial as failing to hold a birthday party for a public employee," if "intended to punish her for exercising her free speech rights," may be actionable if under the circumstances it would be sufficient to "deter a person of ordinary firmness" from exercising his or her First Amendment rights. *Suppan v. Dadonna, 203 F.3d 228, 234-35 (3d Cir.2000)* (citing *Rutan v. Republican Party, 497 U.S. 62, 76 n. 8, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990)*). A First Amendment retaliation claim will lie for any individual act which meets this "deterrence threshold," and that threshold is very low: as we said in *Suppan,* a cause of action is supplied by all but truly de minimis violations. *Id.*

*3 In sum, if *Morgan* applies to this case, then O'Connor's claims are time-barred. [FN3] O'Connor argues that because *Morgan* was a Title VII case, it should not be read to govern claims arising under other provisions of federal law. We must therefore decide whether to join several of our sister circuits in applying *Morgan* to section 1983 cases not brought under Title VII. [FN4]

III.

[3] We find persuasive the reasoning of our sister circuits that the distinction between "continuing violations" and "discrete acts" is not an artifact of Title VII, but is rather a generic feature of federal employment law. Thus, in whatever statutory context the distinction may arise, *Morgan* will control. So far, the Courts of Appeals for the Sixth, Seventh, and Ninth Circuits have applied *Morgan* to § 1983 cases. See *Sharpe v. Cureton, 319 F.3d 259, 267 (6th Cir.2003); Hildebrandt v. Ill. Dep't of Natural Res., 347 F.3d 1014, 1036 (7th Cir.2003); RK Ventures, Inc. v. City of Seattle, 307 F.3d 1045, 1061 (9th Cir.2002).* The Sixth Circuit explained that it could "find no principled basis upon which to restrict *Morgan* to Title VII claims." [FN5]

We agree. The principles at work in *Morgan* apply with equal force to § 1983 claims. *Morgan* held simply that causes of action that can be brought individually expire with the applicable limitations period. By contrast, the "hostile workplace environment" theory is designed explicitly to address situations in which the plaintiff's claim is based on the cumulative effect of a thousand cuts, rather than on any particular action taken by the defendant. In such cases, obviously the filing clock cannot begin running with the first act, because at that point the plaintiff has no claim; nor can a claim expire as to that first act, because the full course of conduct is the actionable infringement. *Morgan, 536 U.S. at 117-18.* The Court did nothing more than to restate, in the employment discrimination context, the common-sense proposition that an applicable statute of limitations begins to run at the time the claim accrues, and that time-barred claims cannot be resurrected by being aggregated and labeled continuing violations. [FN6]

If the allegations in O'Connor's complaint are discrete, then each gave rise to a cause of action at the time it occurred. That cause of action persisted for two years and then lapsed. O'Connor claims that the department engaged in severe retaliation against him to punish him for the exercise of his First Amendment rights. Under *Morgan,* the law required him to sue within two years of the occurrence of these incidents. He did not sue in time, and he is now barred from doing so. Accordingly, we will affirm the District Court's order with respect to Counts I, II, IV, and V. [FN7]

IV.

[4] With respect to Count VIII, the alleged violation of a prior settlement agreement between the parties, we can find no hint in the record of any agreement to

2006 WL 590357                                                                    Page 4
--- F.3d ----, 2006 WL 590357 (3rd Cir.(N.J.))
**(Cite as: 2006 WL 590357 (3rd Cir.(N.J.)))**

expunge O'Connor's disciplinary record. The documents before us are a February 5, 1997 resolution of the Newark City Council authorizing payment to O'Connor of $500,000 to settle a lawsuit, and a subsequent exchange of letters between O'Connor's attorney and an attorney for the city. Examination of these documents reveals no basis for O'Connor's claim.

**\*4** The City Council resolution memorializes the agreement between O'Connor and the city that the $500,000 payment is made in consideration of O'Connor's "agree[ment] to amicably resolve and compromise [his] claims." The resolution contains no mention of O'Connor's disciplinary record.

O'Connor claims that the letters are evidence of an unrecorded "verbal term of the settlement agreement" that specified that his record would be expunged. The letters show no such thing. The first letter is a request by O'Connor's attorney to have O'Connor's record expunged, but neither that letter nor the city's response gives any indication that either side connected that request to the settlement agreement. O'Connor's attorney wrote to the city on February 26, 1997, three weeks after the city council resolution authorizing the settlement payment. In the letter, he states that O'Connor is "concerned" about his disciplinary file and suggests that "per administrative decision of the Attorney General's offices, officers in the [sic] O'Connor's positions [sic] are authorized to have their respective files purged of all such improper charges. Obviously such action can only be taken at the direction of the Police Director in accordance with established procedures."

This letter, written by O'Connor's attorney only three weeks after the council resolution was passed, seeks expungement based on an administrative decision of the Attorney General, not the settlement agreement. The letter does not even mention the settlement agreement; still less does it anywhere suggest that the agreement requires purging the files. Indeed, it states explicitly that "my clients recognize that this is the province of the Director in conjunction with Internal Affairs procedures." We think it not unreasonable to expect that, if O'Connor had an agreement with the city to have his files purged, his attorney would have mentioned it.

We will therefore affirm dismissal of Count VIII.

## V.

[5] O'Connor's state-law claim in Count III arises under the New Jersey Conscientious Employee

Protection Act ("CEPA"), and thus presents a somewhat different question from the federal claims. The underlying facts supporting Count III are the same as with the other claims, but the source of the right is state rather than federal law. It is therefore not self-evident that the distinction between discrete acts and aggregable acts, and the limits on the availability of the continuing violations exception, will be the same for CEPA claims as for federal claims.

The New Jersey Supreme Court considered the application of *Morgan* to state law in *Shepherd v. Hunterdon Developmental Ctr.*, 174 N.J. 1, 803 A.2d 611 (N.J.2002). The court noted that while in general federal and New Jersey law "mirror" one another in the area of employment discrimination, federal law is "merely a guide."

> Preliminarily, we must determine whether to apply *Morgan's* analytical framework when evaluating a state cause of action under the LAD [the "Law Against Discrimination"]. We have noted previously that in resolving disputes under our State employment-law jurisprudence, federal case law is merely a guide. *See Alderiso v. Med. Ctr. of Ocean County, Inc.*, 167 N.J. 191, 201, 770 A.2d 275 (2001) (rejecting federal case law in determining accrual of wrongful discharge claim under New Jersey's Conscientious Employee Protection Act). That said, we consider *Morgan's* formulation of the continuing violation doctrine to be similar to the one advanced in *Wilson*. There also is a benefit in having our State jurisprudence mirror the approach taken in *Morgan* to avoid further confusion in an already complicated area of law. We thus will apply *Morgan's* analytical framework to the present action.

**\*5** *Shepherd*, 803 A.2d at 623. More recently, the court has noted that "[t]he policy concerns underpinning the determination in *Shepherd* in respect of LAD claims require the application of the *Morgan/Shepherd* framework in CEPA actions." *Green v. Jersey City Bd. of Educ.*, 177 N.J. 434, 828 A.2d 883, 891 (N.J.2003).

We read these cases as holding that while federal and state discrimination law are not always coextensive, they overlap with respect to *"Morgan's* formulation of the continuing violation doctrine." Because that doctrine controls this case, it appears to us that "application of the *Morgan/Shepherd* framework" requires, as a matter of state law, that O'Connor's CEPA claim be dismissed. Accordingly, we will affirm the dismissal of that claim as well. [FN8]

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 590357                                                                                Page 5
--- F.3d ----, 2006 WL 590357 (3rd Cir.(N.J.))
**(Cite as: 2006 WL 590357 (3rd Cir.(N.J.)))**

VI.

For the foregoing reasons, the order of the District Court will be affirmed.

FN1. Specifically, O'Connor alleges that the department denied him a promotion, failed to expunge his disciplinary record, transferred him to a position under the command of a superior officer who was hostile to him, provided him with inadequate staff and resources, assigned him excessive work, changed his work schedule, filed unwarranted disciplinary complaints against him, failed to credit him with overtime, awarded him a medal but failed to invite his family to the ceremony, and failed to give sufficient commendations to his unit. O'Connor also alleges that he was subjected to threats and assaults by other officers.

FN2. The District Court's order notes that the defamation count, Count VI, was dismissed orally pursuant to Newark's motion for summary judgment. O'Connor does not raise that count on appeal, so we do not address it here.

FN3. If *Morgan* does not apply, then some or all of O'Connor's claims might still be time-barred, but we would not have recourse to *Morgan'* s bright-line categorical distinction in making that determination.

FN4. It does not appear that we have yet stated expressly in a published opinion that the *Morgan* distinction applies in non-Title VII suits involving adverse employment actions. However, we have applied it, in unpublished decisions, to ADA actions. *See Zdziech v. DaimlerChrysler Corp.,* 114 Fed.Appx. 469, 471 (3d Cir.2004); *Shenkan v. Potter,* 71 Fed.Appx. 893, 895 (3d Cir.2003).

FN5. Several district courts have also recently applied *Morgan* to section 1983 cases. *See, e.g., Ruiz Casillas v. Camacho Morales,* No. 02- 2640, 2004 U.S. Dist. LEXIS 28135, at *15 (D.P.R.2004) ("[T]he continuing violation theory, which originated from Title VII Civil Rights cases, has been widely applied to Section 1983 cases within this Circuit."); *Turner v. District of Columbia,* 383 F.Supp.2d 157, 168 (D.D.C.2005) ("The same analysis

should be applied to discrimination claims brought under § 1983.").

FN6. We deem it worthy of note that while the *Morgan* Court split 5-4 on other issues, it was unanimous on this point. *See Morgan,* 536 U.S. at 123 (O'Connor, J., concurring in part and dissenting in part, joined in relevant part by Rehnquist, C.J., and Scalia, Kennedy and Breyer, J.J.) ("I agree that Title VII suits based on discrete discriminatory acts are time barred when the plaintiff fails to file ... within the [limitations period] designated in the statute."). Indeed, the dissenters would have gone even further than the majority and held that cumulative hostile-workplace-environment suits were time-barred as well. *Id.* ("I dissent from the remainder of the Court's opinion, however, because I believe a similar restriction applies to all types of Title VII suits, including those based on a claim that a plaintiff has been subjected to a hostile work environment."). Thus there is not a single vote on the Court for the proposition that individually actionable discrete acts may support suit outside the limitations period if they are aggregated and labeled as a hostile environment claim.

FN7. Counts IV and V allege violations of 42 U.S.C. § § 1985 and 1986. These sections cover, respectively, conspiracies to violate federal rights, and failures to prevent such violations by those with the relevant knowledge and power to do so. *Morgan* applies to these sections just as it does to section 1983.

FN8. We will affirm the dismissal of Count VII, loss of consortium, insofar as it was derivative of some independent predicate claim, of which there remain none.

--- F.3d ----, 2006 WL 590357 (3rd Cir.(N.J.))

**Briefs and Other Related Documents (Back to top)**

• 05-2237 (Docket) (Apr. 26, 2005)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2004 WL 1918797 (D.Del.)

**(Cite as: 2004 WL 1918797 (D.Del.))**

Page 1

**C**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
D. Delaware.
Gerald A. LECHLITER, Plaintiff,
v.
Donald H. RUMSFELD, Honorable Secretary of
Defense, Department of Defense, and
Thomas E. White, Honorable Secretary of the
Army, Defendants.
**No. Civ.A. 03-098-KAJ.**

Aug. 25, 2004.
Gerald A. Lechliter, Lewes, Delaware, Plaintiff,
pro se.

Colm F. Connolly, United States Attorney; Paulette
K. Nash, Assistant United States Attorney, United
States Attorney's Office, Wilmington, Delaware, for
Defendants, Lt. Col. Tara A. Osborn; Mjr. Gary P.
Corn, U.S. Army Litigation Division, Arlington,
Virginia, of counsel.

MEMORANDUM OPINION

JORDAN, J.

I. Introduction

*1 Presently before me is a motion filed by The
Honorable Donald H. Rumsfeld, Secretary of the
Defense, the Department of Defense, and The
Honorable Thomas E. White, Secretary of the Army
(collectively the "Defendants") to dismiss the
complaint for lack of subject matter jurisdiction, or,
in the alternative, for summary judgment. (Docket
Item ["D.I."] 12; "Defendants' Motion.") Also
before me is *pro se* plaintiff Gerald A. Lechliter's

("Plaintiff") cross-motion for summary judgment
(D.I. 14; "Plaintiff's Motion") and motion for
reconsideration (D.I.32) of the September 29, 2003
Memorandum Order denying Plaintiff's motion for
continuance and limited discovery (D.I.31). For the
reasons that follow, Defendants' Motion will be
granted, Plaintiff's Motion will be denied, and
Plaintiff's motion for reconsideration will be denied
as moot.

II. Background

On June 1, 1999, Plaintiff retired from the United
States Army with more than twenty six years of
active service. (D.I. 13 at Ex. 1 .) On September 25,
2002, the Department of Veterans Affairs ("DVA")
increased Plaintiff's combined service-connected
disability rating from 80 percent to 100 percent,
with an effective date of May 1, 2001. (D.I. 5 at ¶
2, Ex. A.) This change entitled Plaintiff to an
increase in compensation under 10 U.S.C. § 1413 ("
§ 1413") [FN1] from $100 to $300 per month. (*Id.*
at Ex. H.) The Defense Finance and Accounting
Service ("DFAS") initiated Plaintiff's § 1413 pay of
$300 per month on June 1, 2001. [FN2] (*Id* . at ¶
8, Ex. B, Ex. H.) Plaintiff has been paid $300 a
month from June 1, 2001 through the present. (*Id.* at
Ex. H.)

    FN1. Effective January 1, 2004, § 1413
    was repealed.

    FN2. The Defendants assert that Plaintiff
    "was not entitled to, and has never
    received, a disability payment for the
    month of May, 2001." (D.I. 13 at ¶¶ 5,
    7.) 38 U.S.C. §§ 3.31, states that
    "[r]egardless of VA regulations concerning
    effective dates or awards ..., payment of
    monetary benefits based on original,
    reopened, or increased awards of
    compensation, pension, dependency and
    indemnity compensation ..., may not be

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 2

Not Reported in F.Supp.2d, 2004 WL 1918797 (D.Del.)

**(Cite as: 2004 WL 1918797 (D.Del.))**

made for any period prior to the first day of the calendar month following the month for which the award became effective. However, beneficiaries will be deemed to be in receipt of monetary benefits during the period between the effective date of the award and the date payment commences for the purpose of all laws administered by the Department of Veterans Affairs except that nothing in this section will be construed as preventing the receipt of retired or retirement pay prior to the effective date of waiver of such pay in accordance with 38 U.S.C. 5305."

On October 16, 2002, in an effort to recover § 1413 compensation for the month of May 2001, [FN3] plaintiff wrote DFAS a letter, pointing out that § 1413 states that a retiree is entitled to payment of § 1413 pay "for any month for which the retiree has a qualifying service-connected disability," and that Plaintiff had a "qualifying service-connected disability for the entire month of May 1, 2001." (*Id.* at ¶ 10.) On October 17, 2002, DFAS told Plaintiff that the effective date of the rating letter, May 2001, could not be used until the June 1, 2001 date was changed in the DVA Compensation and Pension Master Record Award Data M12 Sheet ("M12"). [FN4] (*Id.* at ¶ 11, Ex. D.) Plaintiff sent DFAS a request for a legal opinion on October 18, 2002. (*Id.* at ¶ 12, Ex. E.)

> FN3. In a letter to the National Veterans Legal Services Program dated November 5, 2002, Plaintiff argues that he's entitled to $200. (D.I. 2 at Ex. H.) Plaintiff states that he was already receiving disability pay of $100 a month, and the increased disability rating from 80 to 100 percent increased his § 1413 pay from $100 to $300, for a difference of $200. (*Id.*) Despite Plaintiff's statement in the November 5, 2002 letter that he's owed $200, Plaintiff seeks $300 in this action. (*Id.* at ¶ 16.)

> FN4. (D.I. 2 at Ex. B.)

In a letter dated October 30, 2002, the Associate General Counsel of the Office of the General Counsel of the DFAS replied to Plaintiff and stated that, pursuant to the special compensation program administered by the Department of Defense ("DoD"), [FN5] "to be eligible for special compensation (or any increase thereto) for a given month, a retiree must be entitled to, and in receipt of DVA disability for that month based upon a rating at a qualifying level of disability." (*Id.* at Ex. F.) Accordingly, the Associate General Counsel stated that Plaintiff's "entitlement to an increase in the special compensation was effective June 2001, which was the first month that [he] was both entitled to and in receipt of, the increased DVA disability award." On November 5, 2002, Plaintiff sent a letter to the National Veterans Legal Services Program, addressing Chapter 62. [FN6] (*Id.* at ¶ 15, Ex. H.)

> FN5. At the time DFAS initiated Plaintiff's § 1413 compensation, it was operating under interim program guidance because Department of Defense Financial Management Regulation ("DoDFMR") did not yet contain provisions addressing § 1413 payments. On October 15, 2002, DFAS published an Interim Change to the DoDFMR incorporating the interim program guidance and establishing § 1413 pay policy and procedures ("Chapter 62"). (D.I. 5 at Ex. G.)

> FN6. Plaintiff does not state whether the National Veterans Legal Services Program responded, or how the matter was concluded.

**\*2** On January 21, 2003, Plaintiff filed a complaint (D.I.1) pursuant to the Little Tucker Act, 28 U.S.C. § 1346(a)(2), and the Administrative Procedures Act ("APA"), 5 U.S.C. 701 *et. seq.,* seeking review of the final agency action denying him § 1413 pay. Plaintiff seeks $300 for the month of May 2001, a declaratory judgment that the Chapter 62 requirements for receipt of special compensation pay are contrary to § 1413 and that an otherwise qualified uniformed service retiree is entitled to §

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 3

Not Reported in F.Supp.2d, 2004 WL 1918797 (D.Del.)

**(Cite as: 2004 WL 1918797 (D.Del.))**

1413 compensation from the effective date of the rating decision by the Secretary of Veterans Affairs, and costs. (*Id.* at 2.)

The Defendants argue that Plaintiff's complaint should be dismissed for lack of subject matter jurisdiction pursuant to Fed.R.Civ.P. 12(b)(1), or, in the alternative, that they are entitled to summary judgment in their favor. (D.I. 13 at 5.)

III. Standard of Review

Lack of subject matter jurisdiction, pursuant to Fed.R.Civ.P. 12(b)(1), may be raised at any time, it cannot be waived and the court is obliged to address the issue on its own motion, if the parties do not raise it. *Dow Chem. Co. v. Exxon Corp.,* 30 F.Supp.2d 673, 689-690 (D.Del.1988) (citing *Moodie v. Federal Reserve Bank of New York,* 58 F.3d 879, 882 (2d Cir.1995)). Once jurisdiction is challenged, the party asserting subject matter jurisdiction has the burden of proving its existence. *Id.* (citing *Robinson v. Overseas Military Sales Corp.,* 21 F.3d 502, 507 (2d Cir.1994)). Under Rule 12(b)(1), the court's jurisdiction may be challenged either facially (the legal sufficiency of the claim) or factually (sufficiency of jurisdictional fact). Under a facial challenge to jurisdiction, the court must accept as true the allegations contained in the complaint. *See id.* Dismissal for a facial challenge to jurisdiction is "proper only when the claim 'clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or ... is wholly insubstantial and frivolous." ' *Kehr Packages, Inc. v. Fidelcor, Inc.,* 926 F.2d 1406, 1408-1409 (3d Cir.1991). Under a factual attack, however, the court is not "confine[d] to allegations in the [ ] complaint, but [can] consider affidavits, depositions, and testimony to resolve factual issues bearing on jurisdiction." *Gotha v. United States,* 115 F.3d 176, 179 (3d Cir.1997).

Pursuant to Federal Rule of Civil Procedure 56(c), a party is entitled to summary judgment if a court determines from its examination of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," that there are no genuine issues of material

fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In determining whether there is a triable dispute of material fact, a court must review all of the evidence and construe all inferences in the light most favorable to the non-moving party. *Goodman v. Mead Johnson & Co.,* 534 F.2d 566, 573 (3d Cir.1976). However, a court should not make credibility determinations or weigh the evidence. *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150 (2000).

*3 To defeat a motion for summary judgment, Rule 56(c) requires the non-moving party to:

do more than simply show that there is some metaphysical doubt as to the material facts ... In the language of the Rule, the non-moving party must come forward with 'specific facts showing that there is a genuine issue for trial.' ... Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is 'no genuine issue for trial.'

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U .S. 574, 586-87 (1986). Accordingly, a mere scintilla of evidence in support of the non-moving party is insufficient for a court to deny summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1986).

IV. Discussion

A. Jurisdiction

As discussed, Plaintiff claims that I have jurisdiction over this matter under the Little Tucker Act, 28 U.S.C. § 1346(a)(2), and the Administrative Procedures Act ("APA"), 5 U.S.C. 701 *et seq.* Both the Little Tucker Act and the APA have been construed as waivers by the United States of sovereign immunity. *See Randall v. United States,* 95 F.3d 339, 345 (4th Cir.1996) (citing *United States v. Mitchell,* 463 U.S. 206, 212 (1983); *Bowen v. Massachusetts,* 487 U.S. 879, 891-892 (1988)).

The Defendant's assert that judicial review under the APA is "inappropriate where there exists some 'other adequate remedy in a court," ' namely the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 4

Not Reported in F.Supp.2d, 2004 WL 1918797 (D.Del.)

**(Cite as: 2004 WL 1918797 (D.Del.))**

Tucker Act. (D.I. 13 at 7.) As the Fourth Circuit noted, "[t]he interplay between the Tucker Act and the APA is somewhat complicated and raises some significant issues of federal court jurisdiction.... [T]he proper statutory framework for the district court's jurisdiction ... affects the appellate jurisdiction [of the Court of Appeals]." [FN7] *Randall,* 95 F.3d at 346.

> FN7. "The United States Court of Appeals for the Federal Circuit, not the regional courts of appeals, has exclusive jurisdiction over appeals based 'in whole or in part' on the Tucker Act." *Randall,* 95 F.3d 346.

The APA provides that a person who claims to have suffered a legal wrong because of agency action is entitled to judicial review of that action. 5 U.S.C. § 702. The waiver of sovereign immunity in the APA is limited to suits seeking relief "other than money damages." In addition, review under the APA is available only for "final agency action for which there is no other adequate remedy in a court." [FN8] 5 U.S.C. 704. "This limitation has been interpreted to preclude review under the APA when a plaintiff has an adequate remedy by suit under the Tucker Act." *Randall,* 95 F.3d at 346 (citing *Alabama Rural Fire Ins. Co. v. Naylor,* 530 F.2d 1221, 1230 (5th Cir.1976); *Bowen,* 487 U.S. at 901 n. 31 (1988)). "Therefore, to determine whether Plaintiff's suit is cognizable under the APA, the court must first examine whether he has an available remedy under the Tucker Act." *Id.* The Tucker Act consists of two parts: 28 U.S.C. § 1491, and 28 U.S.C. § 1346(a)(2), the latter of which is known as the Little Tucker Act. *Randall,* 95 F.3d at 346.

> FN8. Plaintiff claims that he has "exhausted administrative remedies within the agency." (D.I. 5 at ¶ 5.) Given that Plaintiff has alleged nothing more than writing letters to the Office of the General Counsel of DFAS and the National Veterans Legal Services Program, I find this statement questionable. However, the Defendants do not raise the issue of final agency action.

The Little Tucker Act provides that the district courts shall have original jurisdiction, concurrent with the United States Court of Federal Claims for:

> *4 civil action[s] or claim[s] against the United States, not exceeding $10,000 in amount, founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort....

28 U.S.C. § 1346(a)(2). "Although the actual language of the Tucker Act does not specifically prohibit the Court of Federal Claims from issuing injunctive relief, the United States Supreme Court has recognized, as a general rule, that "the Court of [Federal] Claims has no power to grant equitable relief." *Randall,* 95 F.3d at 347 (quoting *Richardson v. Morris,* 409 U .S. 464, 465 (1973)). [FN9]

> FN9. The Fourth Circuit also explained that the Tucker Act, under 28 U.S.C. § 1491(a)(2), authorizes courts to award injunctive relief in limited circumstances, when such relief is necessary to provide an entire remedy and when the injunction is "an incident of and collateral to" an award of monetary relief. *Randall,* 95 F.3d at 347 . However, the Fourth Circuit also noted that this language does not appear in the Little Tucker Act. *Id.* at 347 n. 9.

Plaintiff argues that his request for $300 is not damages, but rather money which he is entitled by statute. (D.I. 15 at 11.) Plaintiff further states that "[t]he sum itself is negligible in comparison with the declaratory, injunctive relief in his prayer for relief." (*Id.*) Therefore, according to Plaintiff, because his claim is equitable, it falls under the APA, not the Little Tucker Act." (*Id.* at 13-14) (citing *Zellous v. Broadhead Assocs.,* 906 F.2d 94, 99 (3d Cir.1990)). I agree.

In *Zellous,* the plaintiffs, who were former, present, and prospective Department of Housing and Urban Development ("HUD") tenants brought suit contending that they were forced to pay a higher

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 5

Not Reported in F.Supp.2d, 2004 WL 1918797 (D.Del.)

(Cite as: 2004 WL 1918797 (D.Del.))

share of their income as rent because of HUD's failure to make timely adjustment in their utilities allowances. *Id.* at 95. The plaintiffs requested declaratory, injunctive, and monetary relief, and, in the alternative, restitution. *Id.* The Third Circuit held that jurisdiction under § 702 of the APA was proper because the relief sought was not for money damages. *Id.* at 96-97 (stating that "[w]e believe our holding is mandated by *Bowen v. Massachusetts,* 487 U.S. 879 (1988)"). The Third Circuit "conclude[d] that [plaintiff's] seek only that to which they were entitled ... and thus the relief requested is 'other than monetary damages." ' *Zellous,* 906 F.2d at 99 (citing 5 U.S.C. § 702).

In *Bowen,* the Supreme Court distinguished actions at law for damages, which are intended to compensate the plaintiff for injury to person, property, or reputation, from equitable actions for specific relief, which include the recovery of specific monies. *Id* . at 893. The Supreme Court concluded that the plaintiff in that case did not seek money in compensation for the damages it had sustained, but only "to enforce the statutory mandate itself, which happens to be one for the payment of money. The fact that the mandate is one for the payment of money must not be confused with the question whether ... [it] is a payment of money as damages or as specific relief." *Id.* at 900-901.

Following the direction of the Third Circuit in *Zellous,* as well as the direction of the Supreme Court in *Bowen,* I find that Plaintiff's claim for $300 and declaratory judgment is to enforce the statutory mandate of § 1413, which was in effect at the time Plaintiff filed suit. Because Plaintiff seeks specific relief for which he believes he was entitled, in other words, equitable relief, I find that the Tucker Act does not apply and hold that I have jurisdiction in this case pursuant to the APA, 5 U.S.C. 701 *et. seq.*

B. Summary Judgment

*5 The district court's review of a final agency action under the APA is limited. *See Randall,* 95 F.3d at 348. The court may set aside the agency's action only if it finds it to be "arbitrary, capricious,

an abuse of discretion, or otherwise not in accordance with law. *Dougherty v. U.S. Navy Bd. For Correction of Naval Records,* 784 F.2d 499, 500 (3d Cir.1986). The district court must also determine whether the agency's decision was supported by substantial evidence and whether the agency considered all of the proffered evidence. *Jarrett v. White,* No. 01-800-GMS, 2002 WL 1348304 at *6 (D. Del. June 17, 2002); *Mozur v. Orr,* 600 F.Supp. 772, 776 (E.D.Pa.1985); *Smith v. Dalton,* 927 F.Supp. 1, 5 (D .D.C.1996). The plaintiff has the burden of proving arbitrary and capricious behavior by providing " 'cogent and clearly convincing evidence' and must 'overcome the presumption that military administrators discharge their duties correctly, lawfully, and in good faith." ' *Jarret,* 2002 WL 1348304 at *6 (citations omitted).

After carefully reviewing Plaintiff's allegations and the record, I find that the facts, taken in a light most favorable to the Plaintiff, cannot support a finding that the DoD, through the DFAS, acted arbitrarily or capriciously, or without substantial evidentiary support in denying Plaintiffs claim for $300 for the month of May 2001. DoD reasonably and properly interpreted the interim guidance that was in effect at the time regarding § 1413 compensation, now incorporated as Chapter 62, to apply only to those who are in actual receipt of DVA disability compensation. As documented on Plaintiff's M12, Plaintiff was in receipt of § 1413 pay in June 2001, and, in correspondence with that date, his § 1413 pay was commenced.

Additionally, because § 1413 has been repealed, Plaintiff's request for declaratory judgment is moot. *See Nextel Partners, Inc ., v. Kingston Township,* 286 F.3d 687, 693 (3d Cir.2002) ("a request for a declaratory judgment that a statutory provision is invalid is moot if the provision has been substantially amended or repealed"). Therefore, the Defendants' Motion will be granted and Plaintiff's Motion will be denied.

C. Motion for Reconsideration

Because the Defendants' Motion will be granted,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                          Page 6

Not Reported in F.Supp.2d, 2004 WL 1918797 (D.Del.)

**(Cite as: 2004 WL 1918797 (D.Del.))**

Plaintiff's motion for reconsideration will be denied as moot.

V. Conclusion

Accordingly, for the reasons set forth herein, the Defendant's Motion (D.I.13) will be granted, Plaintiff's Motion (D.I.14) will be denied, and Plaintiff's Motion for reconsideration (D.I.32) will be denied as moot. An appropriate order will follow.

*ORDER*

For the reasons set forth in the Memorandum Opinion issued on this date,

IT IS HEREBY ORDERED that the Defendant's Motion for Summary Judgment (D.I.12) is GRANTED, the Plaintiff's Cross-Motion for Summary Judgment (D.I.14) is DENIED, and the Plaintiff's Motion for Reconsideration (D.I.32) of the September 29, 2003 Memorandum Opinion (D.I.31) is DENIED.

Not Reported in F.Supp.2d, 2004 WL 1918797 (D.Del.)

**Motions, Pleadings and Filings (Back to top)**

• 1:03CV00098 (Docket) (Jan. 21, 2003)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.                                                                 Page 1

Not Reported in F.Supp., 1995 WL 491291 (E.D.Pa.), 68 Fair Empl.Prac.Cas. (BNA) 1148

**(Cite as: 1995 WL 491291 (E.D.Pa.))**

United States District Court, E.D. Pennsylvania.
Sharon POWELL-ROSS
v.
ALL STAR RADIO, INC.--WPGR-AM and Jerry
Blavat, program director
**95-1078.**

Aug. 16, 1995.

MEMORANDUM

DALZELL

*1 Plaintiff Sharon Powell-Ross has brought this sexual harassment action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e), *et seq.*, against her former employer, All Star Radio, Inc. ("All Star"), owner of radio station WPGR-AM, and its program director, Jerry Blavat. All Star and Blavat have each moved to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1), or alternatively, Rule 12(b)(6). Powell-Ross has moved for additional discovery. For the reasons that follow, we shall grant defendants' motions and deny plaintiff's motion.

I. *Background* [FN1]

All Star Radio, Inc., a Pennsylvania corporation, was incorporated in November of 1991 specifically for the purpose of purchasing WPGR-AM, which it did in June, 1992. According to one of its owners, the intention was to operate the station for a time to increase its value, and then sell it. [FN2] When All Star bought the station, it retained Blavat as program director and disc jockey.

In February of 1993, All Star hired Powell-Ross as an advertising sales representative for WPGR. Complaint ¶ 9. Two months later, Blavat promoted her to an on-air disc jockey position. *Id.* ¶¶ 4, 10. Powell-Ross, who used the name "Lady Love" on

the air, continued to work as a sales representative for All Star while she was a disc jockey. *Id.*

Plaintiff alleges that Blavat began to harass her in July of 1993, by making statements such as "Lady Love let me show you what a real man is about." *Id.* ¶ 12. About a month later, according to the complaint, Blavat began touching Powell-Ross in an offensive way. *Id.* ¶¶ 15, 16. Powell-Ross contends that she complained to WPGR general manager Tom Primavera about Blavat's actions shortly thereafter. Plaintiff further alleges that in November of 1993 Blavat began to inform her "that her sales numbers were not where they should be." *Id.* ¶ 23.

In February of 1994, Blavat allegedly continued to harass Powell-Ross by asking personal questions about her love life and impermissibly touching her. *Id.* ¶ 26. Plaintiff also claims that Blavat persisted in raising the issue of her sales figures in October of that year in retaliation for her complaint to Primavera. *Id.* ¶¶ 24-25.

According to her affidavit appended to her Charge of Discrimination filed with the United States Equal Employment Opportunity Commission, Powell-Ross first contacted the EEOC about the alleged harassment on October 26, 1994. On November 3, 1994, Blavat, Primavera and John Bongiovanni allegedly met with plaintiff in what she contends was an attempt to get her to drop her sexual harassment charges. Complaint ¶¶ 28-30. The EEOC issued a right-to-sue letter on January 27, 1995, and this suit followed on February 23, 1995.

Less than a month later after suit was filed, Blavat and All Star each separately moved to dismiss the complaint for lack of subject matter jurisdiction, or, alternatively, for failure to state a claim, asserting that All Star did not employ the requisite number of employees during the period in question to qualify it

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                Page 2

Not Reported in F.Supp., 1995 WL 491291 (E.D.Pa.), 68 Fair Empl.Prac.Cas. (BNA) 1148

**(Cite as: 1995 WL 491291 (E.D.Pa.))**

as an "employer" within the meaning of Title VII. We denied both motions without prejudice to their refiling and granted Powell-Ross leave to take the deposition of Marina Kats, the Chairperson of All Star Radio, Inc. April 6, 1995 Order ¶ 1.

*2 After Kats's deposition, defendants refiled their motions to dismiss and plaintiff filed a motion to enlarge the time to take additional discovery. We denied the motions to dismiss without prejudice based upon Kats's revelation at her deposition that Primavera, and not Kats herself, was primarily responsible for the company's payroll and thus would better know the identity of the employees. May 31, 1995 Order ¶ (d). We also granted plaintiff's motion to conduct additional discovery and permitted her to take Primavera's deposition. *Id.* ¶ 2.

Following Primavera's deposition, defendants again each moved to dismiss and plaintiff again moved to extend discovery. Because the parties did not respond to each other's motions, we treated each motion as a response to the other since the sole issue of the number of All Star employees was common to all three motions. Primavera's deposition, however, did not adequately assist us or the parties in "develop[ing] a factual record [to] enable the Court to determine whether subject matter jurisdiction exists." July 21, 1995 Order. Since we have an independent duty to determine whether we have subject matter jurisdiction, we conducted three days of evidentiary hearings on this issue. [FN3]

After sifting through the record developed at the hearings, we are convinced that All Star Radio, Inc. did not have fifteen or more employees for twenty or more weeks per year in the relevant years to qualify it as an "employer" within the meaning of Title VII.

## II. *Standard*

As a threshold matter, we must determine the proper legal standard to apply. Each defendant moved to dismiss for lack of jurisdiction pursuant to Rule 12(b)(1), or alternatively, for failure to state a claim pursuant to Rule 12(b)(6). As our Court of Appeals has observed, however,

> The procedure under a motion to dismiss for lack of subject matter jurisdiction is quite different. At the outset we must emphasize a crucial distinction, often overlooked, between 12(b)(1) motions that attack the complaint on its face and 12(b)(1) motions that attack the existence of subject matter jurisdiction in fact, quite apart from any pleadings. The facial attack does offer similar safeguards to the plaintiff: the court must consider the allegations of the complaint as true. The factual attack, however, differs greatly for here the trial court may proceed as it never could under 12(b)(6) or Fed.R.Civ.P. 56. Because at issue in a factual 12(b)(1) motion is the trial court's jurisdiction--its very power to hear the case--there is substantial authority that the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case. In short, no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims. Moreover, the plaintiff will have the burden of proof that jurisdiction does in fact exist.

*3 *Mortensen v. First Fed. Sav. and Loan Ass'n,* 549 F.2d 884, 891 (3d Cir.1977) (footnote omitted); *see also Boyle v. Governor's Veterans Outreach & Assistance Ctr.,* 925 F.2d 71, 74 (3d Cir.1991). We decide this issue solely on 12(b)(1) grounds only after having afforded the plaintiff ample opportunity to support her jurisdictional contention. *Mortensen,* at 892 & n. 18.

As *Mortensen* notes, the burden of proof on a 12(b)(1) motion typically falls on the party invoking the court's jurisdiction over the subject matter. Where, as here, the "jurisdictional question is intertwined with the merits of the case if subject matter is dependent on the same statute which provides the substantive claim in the case," *Holt v. United States,* 46 F.3d 1000, 1003 (10th Cir.1995), it would seem that the burden is better placed on the defendant-employer who has complete access to the necessary proof. Absent direction to the contrary from our Court of Appeals in such a context, we

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                   Page 3

Not Reported in F.Supp., 1995 WL 491291 (E.D.Pa.), 68 Fair Empl.Prac.Cas. (BNA) 1148

**(Cite as: 1995 WL 491291 (E.D.Pa.))**

will impose the burden on the movants and resolve doubts in favor of plaintiff.

### III. *Analysis*

Title VII permits "a person claiming to be aggrieved", like Powell-Ross, to file with the EEOC a charge "alleging that an employer ... has engaged in an unlawful employment practice" such as sex discrimination. 42 U.S.C. § 2000e-5(b). After a brief time afforded to the EEOC to permit conciliation with or enforcement against the employer, the grievant will receive a notice of a right to sue, "and within ninety days after the giving of such notice a civil action may be brought against the respondent named in the charge.... " 42 U.S.C. § 2000e-5(f)(1). Congress then provided that "[e]ach United States district court ... shall have jurisdiction of [such] actions...." 42 U.S.C. § 2000e-5(f)(3).

The controversy here distills to the single inquiry of whether All Star Radio, Inc. is an "employer" under Title VII's definition, which provides:
   The term "employer" means a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person....
42 U.S.C. § 2000e(b). An employee is, in turn, defined as "an individual employed by an employer...." 42 U.S.C. § 2000e(f).

It will be seen from the statute that Congress did not confer on the district courts jurisdiction over all employers. Instead, it ordained a test based upon the number of "employees" on the payroll over a minimum number of "calendar weeks". Since the complaint alleges actionable conduct in both 1993 and 1994, and despite Blavat's argument in his supplemental memorandum to the contrary, the relevant focus is on whether All Star had fifteen employees for twenty or more weeks in 1992, 1993 or 1994, the current and preceding years of the allegedly offensive conduct. *See Rogers v. Sugar Tree Products, Inc.,* 7 F.3d 577, 580-81 (7th Cir.1993) (ADEA); *Dumas v. Town of Mount*

*Vernon, Ala.,* 612 F.2d 974, 979 n. 4 (5th Cir.1980) . If All Star had fewer than the requisite "employees" throughout the period, Title VII does not apply and we are divested of jurisdiction over this subject matter. [FN4]

### A. *Number of Employees*

*4 All Star Radio, Inc. does not keep attendance records of its employees. As we heard repeatedly at the three hearings, the only records that exist which could establish whether an employee worked at a certain time are payroll ledger cards kept in the regular course of business by SR Management Co., a management company that All Star retained to provide payroll services. [FN5]

At our first hearing, Marian Berkery, a bookkeeper for SR Management (now known as RRR Management), testified that every two weeks she would receive a phone call from Ralph Fragapane or Tom Primavera at WPGR who would give her the names of employees and the amounts that each person was due for the pay period. Berkery would record these amounts on the payroll ledger cards, calculate the appropriate deductions, prepare each employee a check and mail the checks to WPGR. We admitted into evidence as exhibits the payroll ledger cards for 1992, 1993 and 1994 as well as the original Internal Revenue Service W-2 and 1099 forms.

For our third hearing, we required the parties to submit a schedule of all the bi-weekly payroll periods in the three applicable years, showing each person who ever received a check in those years. Only All Star complied with this order, submitting the schedule that we marked as Court Exhibit 2 ("Court 2").

Court 2, and the payroll ledger cards upon which it was based, show that in 1992 there were only nine weeks when All Star had fifteen or more people on the payroll. Accordingly, even assuming all were Title VII "employees", 1992 cannot serve as a basis for our jurisdiction over plaintiff's claim.

In 1993, there were at least fifteen people on the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 4

Not Reported in F.Supp., 1995 WL 491291 (E.D.Pa.), 68 Fair Empl.Prac.Cas. (BNA) 1148

**(Cite as: 1995 WL 491291 (E.D.Pa.))**

payroll in eighteen of the twenty-six payroll periods. Since each payroll period typically lasts two weeks, All Star would seemingly meet Title VII's definition of "employer" since it employed fifteen or more individuals for thirty-six weeks in 1993. Similarly, in 1994, there were ten payroll periods, or twenty weeks, with at least fifteen people on All Star's payroll, apparently qualifying All Star as an employer for 1994, too.

Defendants make two arguments, however, why All Star does not meet the "employer" definition of Title VII for 1993 and 1994. First, they contend that an individual cannot be counted as an "employee" unless he or she worked for at least twenty weeks in a given calendar year. Second, they claim that Sally Starr, Michael Guidotti, Jerry Blavat and Eric Farber were either independent contractors or owners and thus should not be counted as Title VII employees.

B. *"Employees" Who Work Fewer than Twenty Weeks*

All Star and Blavat contend that only those people who work for at least twenty weeks in a given calendar year may be counted as "employees". The language of the statute does not on its face resolve this inquiry. As previously noted, Title VII defines an employer as "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year". 42 U.S.C. § 2000e(b). With perfect circularity, Title VII defines an "employee" as "an individual employed by an employer...." 42 U.S.C. § 2000e(f). *See generally Vera-Lozano v. Int'l Broadcasting*, 50 F.3d 67, 69-70 (1st Cir.1995) ; *Greenlees v. Eidenmuller Enterprises, Inc.*, 32 F.3d 197, 198 (5th Cir.1994).

*5 Defendants' argument that only a person who works for at least twenty weeks may be counted as employee, and, correlatively, that a person who works fewer than twenty weeks cannot be an employee, does not withstand analysis. Imagine a restaurant that has sixty workers on the payroll at various times of the year, but all of them work only

thirteen weeks. On any given "working day" during the year, there are fifteen at work. On defendant's theory, the restaurant had no employees for Title VII's purposes because no individual worked for twenty or more weeks. Yet the restaurant at all times had fifteen people working on the premises.

Besides proffering a construction contrary to common sense, defendants' narrow reading contradicts the well-established liberality with which we are directed to construe this remedial statute. *See, e.g., Harris v. Forklift Systems, Inc.*, 114 S.Ct. 367 (1993); *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57 (1986); *Griggs v. Duke Power Co.*, 401 U.S. 424, 429-30 (1971) ("The objective of Congress in the enactment of Title VII is plain from the language of the statute. It was to achieve equality of employment opportunities and remove barriers that have operated in the past to favor an identifiable group of white [or male] employees over other employees."); *Virgo v. Riviera Beach Assocs., Ltd.*, 30 F.3d 1350, 1359 (11th Cir.1994) ( "Consistent with the purposes of [Title VII] we interpret the term 'employer' liberally.") (citation omitted). A leading statutory construction treatise counsels that,

Numerous federal statutes, including the Civil Rights Acts ... have been enacted to prohibit discriminatory hiring practices based upon race, religion, sex, age and marital status. These statutes are often viewed by construing courts as remedial in nature and are broadly construed. Where employment issues come under the Civil Rights Acts liberal construction is the rule, although one court has stated that this rule of liberal construction will not be applied to transgress the prerogatives of Congress. In all cases, a reasonable interpretation that effects legislative intent is afforded statutes prohibiting discrimination in employment.

3A Norma J. Singer, *Sutherland Statutory Construction* § 74.08 (5th ed.1992) (footnotes omitted).

Against this logic and liberality, Blavat cites *Shepherdson v. Local Union 401 of Int'l Ass'n of Bridge Structural & Ornamental Ironworkers*, 823

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                    Page 5

Not Reported in F.Supp., 1995 WL 491291 (E.D.Pa.), 68 Fair Empl.Prac.Cas. (BNA) 1148

(Cite as: 1995 WL 491291 (E.D.Pa.))

F.Supp. 1245, 1251 (E.D.Pa.1993) and *Lattanzio v. Sec. Nat'l Bank,* 825 F.Supp. 86, 91 (E.D.Pa.1993) for the proposition that "[t]he inquiry does not center on whether there were fifteen (15) employees in a payroll period but whether an individual worked twenty (20) weeks." Blavat's Supplemental Memorandum at 2. Blavat further contends that Judge Joyner's *Lattanzio* opinion "controls in this Circuit." Blavat's Supplemental Brief at 5. Although we are not bound by the decision of another district court judge, *Lattanzio* will not bear the authoritative weight Blavat seeks for it.

*6 Judge Joyner held in *Lattanzio* that the acting Chief Executive Officer of Security National Bank was not an "employee" because the plaintiff failed to provide evidence that the acting CEO performed any day-to-day duties. *Lattanzio,* 825 F.Supp. at 91. The acting CEO was also regularly employed as a partner in a law firm with no ties to the bank, received compensation commensurate to a bank director's position (the bank did not deduct taxes from his compensation), and answered to no one but the Board of Directors. *Id.*

Judge Joyner offered a single sentence touching on the issue at hand: "[e]ven if [the acting CEO] had performed CEO duties, he served as CEO for only eight weeks, well short of the 'twenty or more calendar weeks' required by Title VII." *Id.* It will be noted that Judge Joyner had already concluded that the lawyer-CEO was not an employee of the bank based upon qualitative factors having nothing to do with the temporal question, and thus the reference to the number of weeks the CEO worked was only an aside, unaccompanied by citation of authority.

Defendants' reliance on Judge VanArtsdalen's opinion in *Shepherdson* is equally unavailing. The defendants in *Shepherdson* moved to dismiss because "Local 401 is not an 'employer' within the definition of Title VII because during all relevant times Local 401, the alleged employer, had less than fifteen employees." *Shepherdson,* 823 F.Supp. at 1247. While Judge VanArtsdalen inferred that certain workers cannot be counted as employees because they did not work for at least twenty weeks, *id.* at 1252, the burden of his opinion is devoted to

the "single entity" theory which has no application to this case. Significantly, Judge VanArtsdalen noted that even if he counted those individuals who had worked fewer than twenty weeks in 1991 as "employees", the defendant would still be seven employees short of qualifying as a Title VII "employer". The proper Title VII method of counting employees was thus not of consequence to Judge VanArtsdalen's analysis in *Shepherdson,* as it is here.

We therefore reject defendants' focus on how long each person worked per year. The focus that seems faithful to Congress's purpose is the number of workers per "working day" that accumulates to the requisite twenty weeks. *EEOC v. Metropolitan Employment Comm'n,* 1995 WL 422839, *1 (7th Cir. July 18, 1995).* Absent payroll records for each day, the schedule we ordered provides the information Title VII requires us to obtain in this jurisdiction-determining enterprise.

C. *"Employee" or Independent Contractor*

Defendants' second argument is that four individuals, *i.e.,* Sally Starr, Michael Guidotti, Eric Farber and Jerry Blavat, were either independent contractors or directors and thus should not be counted as Title VII employees. There is little doubt that Title VII does not include independent contractors as "employees". *EEOC v. Zippo Mfg. Co.,* 713 F.2d 32, 35-36 (3d Cir.1983); *Spirides v. Reinhardt,* 613 F.2d 826, 829-830 (D.C.Cir.1979).

*7 In the absence of Congressional guidance, courts have developed varying tests to determine when someone qualifies as an "employee" under the employment discrimination statutes such as Title VII. Our Circuit has previously used a hybrid of the common law "right to control" and the "economic realities" standards to determine employee status. *Martin v. United Way of Erie County,* 829 F.2d 445, 451 (3d Cir.1987); *Zippo,* 713 F.2d at 38.

The Supreme Court's more recent pronouncements on the definition of "employee" would seem to have undermined application of the hybrid standard. In an ERISA case, [FN6] the Supreme Court

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                          Page 6

Not Reported in F.Supp., 1995 WL 491291 (E.D.Pa.), 68 Fair Empl.Prac.Cas. (BNA) 1148

(Cite as: 1995 WL 491291 (E.D.Pa.))

instructed that:

> where Congress uses terms that have accumulated settled meaning under the common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of these terms. In the past, when Congress has used the term 'employee' without defining it, we have concluded that Congress intended to describe the conventional master-servant relationship as understood by common-law agency doctrine.

*Nationwide Mut. Ins. Co. v. Darden,* 112 S.Ct. 1344, 1348 (1992) (alterations and citations omitted) (quoting *Community for Creative Non-Violence v. Reid,* 490 U.S. 730, 739-40 (1989) ). *Darden* noted that there is "no shorthand formula or magic phrase that can be applied to find the answer", and adopted "a common-law test for determining who qualifies as an 'employee' " that included the following non-exhaustive factors:

> ... [i] the hiring party's right to control the manner and means by which the product is accomplished .... [ii] the skill required; [iii] the source of the instrumentalities and tools; [iv] the location of the work; [v] the duration of the relationship between the parties; [vi] whether the hiring party has the right to assign additional projects to the hired party; [vii] the extent of the hired party's discretion over when and how long to work; [viii] the method of payment; [ix] the hired party's role in hiring and paying assistants; [x] whether the work is part of the regular business of the hiring party; [xi] whether the hiring party is in business; [xii] the provision of employee benefits; [xiii] and the tax treatment of the hired party.

*Id.* at 1348-49 (quoting *Reid* ).

Other courts in this Circuit have applied the *Darden* factors to define "employee" under the employment discrimination statutes, [FN7] and our Court of Appeals, in *dictum,* has also noted the probable application of *Darden* to an ADEA case. *Sempier v. Johnson & Higgins,* 45 F.3d 724, 728 n. 4 (3d Cir.), *cert. denied,* 115 S.Ct. 2611 (1995). [FN8]

We turn now to the individuals in question to apply

the *Darden* common law factors to decide whether these people are employees within Title VII's contemplation. [FN9]

i. *Sally Starr*

Sally Starr testified at our first hearing on July 26, 1995. Blavat hired Starr, another popular Philadelphia performer, to begin work at WPGR-AM on Mother's Day in 1993. Starr's arrangement with All Star provided that she would receive no salary or benefits of any kind but that she was permitted to keep twenty percent of any advertising revenue she secured for her show. Starr was the only disc jockey at WPGR who did not conform to the station's oldies format, playing her own country music records instead. Starr broadcast on WPGR on Sunday mornings, originally from 10:00 a.m. to 1:00 p.m., but she later extended the show for an additional hour after Blavat asked her to fill some extra airtime. *See* Tr. at 24.

*8 In 1993, Starr earned approximately $1000 in commissions from her advertising sales for WPGR, which she reported represented a "teeny weenie" fraction of her income for the year. Tr. at 21. The following year, Starr earned approximately $950 to $1200 from WPGR. Tr. at 21. If, however, Starr did not sell any advertising in a particular month, WPGR would pay her nothing. Indeed, Starr was even responsible for her own car expenses travelling to and from the station. Tr. at 18. Starr had many outside sources of income, including radio endorsements that were played on another station, KYW Radio, for the Wawa convenience store chain and for Doctor Desert Dry, a company specializing in basement drying. Tr. at 19. Starr testified that she does between two and four personal appearances per week that are in no way affiliated with WPGR and for which she is compensated. Tr. at 20. In 1993 and 1994, Starr received an IRS form 1099, rather than a W-2 form, from All Star.

Applying the *Darden* factors, we have no difficulty holding that Starr was an independent contractor and not a Title VII "employee". While All Star could understandably require Starr to appear at the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                      Page 7

Not Reported in F.Supp., 1995 WL 491291 (E.D.Pa.), 68 Fair Empl.Prac.Cas. (BNA) 1148

**(Cite as: 1995 WL 491291 (E.D.Pa.))**

station during the hours of her show (otherwise there would be nothing but dead air), it had no control over her at any other times of the week. Starr even testified that she attended a few staff meetings when she first began at the station, out of a sense of camaraderie for the other disc jockeys, but that she soon stopped because her attendance was not necessary. Tr. at 18, 28. Moreover, Starr provided her own tools of the trade, *i.e.,* her phonograph records. Her on-air radio personality gives her an unusual, perhaps unique, skill that would be difficult to acquire on the open market. We also note that Starr worked only one day per week for less than two years; WPGR had no right to require her to take on additional duties such as public appearances or extra time slots; and she was paid entirely in the form of commissions on her sales, rather than a regular salary with benefits.

Taken together, the evidence demonstrates that Starr was an independent contractor and not an employee of WPGR.

ii. *Michael Guidotti*

Michael Guidotti testified at our second hearing on July 28, 1995. Using the *Darden* factors, we conclude that Guidotti, like Starr, is an independent contractor and not a Title VII "employee".

Guidotti, the chief engineer for WYXR and WJJZ radio stations, has been on retainer as an on-call service engineer for WPGR since March of 1993. Tr. at 106. For the past six years, he has been a full-time employee of Pyramid Broadcasting, the current owner of WYXR and WJJZ and the former owner of WPGR before it sold the station to All Star. Tr. at 105. Guidotti receives a regular salary and benefits from Pyramid and maintains an office at its WYXR station. Tr. at 110. Guidotti also works as a service engineer for WIBF-FM, which has no ties to either Pyramid or All Star. Tr. at 108. He earns $400 bi-weekly as WPGR's service engineer and gets paid regardless of whether he has to come to the station to service a technical problem. Tr. at 112. Guidotti does not maintain an office at WPGR, he always uses his own tools, and he is never supervised by anyone from All Star

while at the station. When WPGR's transmitter or studio requires replacement parts, Guidotti will order them, but All Star always pays for them directly. Tr. at 114.

**\*9** Clearly, in no economic or agency sense is Guidotti an employee of All Star Radio. Rather, he is a classic independent contractor and thus cannot serve as one of the fifteen employees that All Star needs to have employed to fall within Title VII's coverage and our jurisdiction.

iii. *Jerry Blavat*

Jerry Blavat has been a well-known Philadelphia area disc jockey for the past thirty-five years who performs under the name "the Geator with the Heater". [FN10] Blavat had been the program director, operations manager and a disc jockey at WPGR since 1987, when the station was still owned by Pyramid Broadcasting. Tr. at 35. When All Star purchased the station in June of 1992, it retained Blavat as program director and disc jockey. Blavat is not an equity-holder in All Star, but did advance the corporation a $100,000 loan which was callable at his option and due with interest at the sale of the station. Tr. at 47-49. As program director, Blavat instituted his personalized "Geator Gold" format, consisting mostly of "oldies" hits. Tr. at 43. Blavat was present at the station almost every day. Tr. at 36, 40.

Blavat received no salary, commissions, health or other benefits, or any other renumeration from All Star, [FN11] but, in return for his services, he was permitted freely to promote during his show the activities of his "Celebrity Showcase" production company, including his "Memories" nightclub in Margate, New Jersey, his television show on channel 57, and his paid appearances and "record hops" in the area. Tr. at 31-33, 41. Besides his show on WPGR, Blavat has a regular slot on KOOL 98.3 in Atlantic City, a station with no relation to All Star. Tr. at 33. Blavat also apparently has a literary side, writing a column on the "Margate Hot Spots" for a South Jersey newspaper. *See, e.g.,* Jerry Blavat, "The Geator Gab", *Whoot,* Aug. 3, 1995, at 18.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 8

Not Reported in F.Supp., 1995 WL 491291 (E.D.Pa.), 68 Fair Empl.Prac.Cas. (BNA) 1148

(Cite as: 1995 WL 491291 (E.D.Pa.))

At our first hearing, Blavat summarized his arrangement with the station as follows:

My thing with the station was: I gave them my persona, all right, the Geator, Geator Gold Radio, and I never got paid. For that, I was allowed spots on that station to promote my activities. Tr. at 46.

Some of the *Darden* factors point towards finding an employment relationship. Certainly, the station (the location of work) was All Star property. Blavat had worked at WPGR since 1987 and for All Star since it bought the station. He had authority to hire people, as evidenced by his recruiting Starr. Furthermore, a disc jockey position embodies the heart of the business of a music radio station. Finally, although not explicitly mentioned as indicia of employment in *Darden,* his titles of program director and disc jockey connote a typical employment relationship.

Blavat, however, had anything but a typical employment relationship with All Star. No one from All Star controlled the manner and means by which Blavat performed his job. Blavat testified that WPGR in no way restricted his ability to work for outside ventures and did not direct his work at WPGR, either. Blavat regularly, almost nightly, was paid to appear by area nightclubs, such as "Kokomo Bay" or "Jocelyn's". Tr. at 32. He even broadcast a radio show on another station. Equally telling, All Star did not pay Blavat for his services. If there is any single indicium of employment, it must be that the employee receive a wage for his labors. Blavat did not receive any benefits such as health insurance from All Star.

**\*10** Although Blavat is not an equity holder in All Star Radio, the fact of his interest-postponed $100,000 loan to All Star underscores the value Blavat put on his regular WPGR appearances as a showcase to promote his other activities. More to the point, such a lender-debtor relationship will not be found between typical employees and their employers.

Still other factors suggest an independent contractor rather than a master-servant relationship.

Blavat has spent thirty-five years in the industry as the "Geator", building his reputation as a performer. He has built up over three decades of good will in Philadelphia with radio listeners that is wholly identified with him and not with any radio station. We think that someone with such unique attributes and loyal following must be regarded as an independent contractor and not an employee.

Given the totality of the circumstances, we hold that Blavat was not an employee who may be counted towards the fifteen employee Title VII threshold.

*iv. Eric Farber*

Unlike Blavat, Starr and Guidotti, who All Star contends, and we have found, are independent contractors, All Star's argument regarding Eric Farber is that he is an owner or a director of All Star and thus not its "employee". While a director or owner is traditionally considered an employer, and not an employee, some courts have held that under certain circumstances a director or owner may be considered an employee. *Simpson v. Ernst & Young,* 850 F.Supp. 648, 659- 664 (S.D Ohio 1994) ; *Lattanzio,* 825 F.Supp. at 90 (citing *Grantham v. Beatrice Co.,* 776 F.Supp. 391, 403 (N.D.Ill.1991)) and *Chavero v. Local 241, Div. of the Amalgam Transit,* 787 F.2d 1154, 1157 (7th Cir.1986) (*per curiam* )).

Farber testified at our final day of hearings. Farber is one of five stockholders who own All Star Radio, Inc. Tr. at 159. Three stockholders, Robert Daniels and Robert Rovner (both lawyers) and Anthony Corradetti play no role at all in the radio station. Tr. at 191-92. Marina Kats, also a lawyer, has a limited responsibility, and only Farber from the ownership group actually spent any time on the premises. Tr. at 176, 192. Farber is the Corporate Secretary of All Star Radio, Inc. Tr. at 159.

When All Star first bought WPGR in June of 1992, Farber was the station general manager until Tom Primavera was promoted from salesman to general manager in February, 1993, at which point Farber promoted sales for All Star. Tr. at 164. When he

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 9

Not Reported in F.Supp., 1995 WL 491291 (E.D.Pa.), 68 Fair Empl.Prac.Cas. (BNA) 1148

(Cite as: 1995 WL 491291 (E.D.Pa.))

was general manager, Farber worked approximately thirty-five to fifty hours per week on WPGR business. After Primavera took over, Farber cut his time to twenty hours per week. Tr. at 207-08. Farber took a regular draw against his sales commissions each month and was later paid his remaining commission. Farber received an IRS 1099 form.

Farber also started his own advertising agency in 1992. Tr. at 207. Farber stopped working for WPGR entirely in January, 1994 in order to work full-time for a management consulting firm, although he retains his equity in All Star Radio, Inc. pending the FCC's approval of the station's sale. Tr. at 208.

*11 While Farber presents a closer question of the four proffered exempt people, we find that, under general agency principles, and in accordance with the meaning ascribed to it in the ordinary use of the English language, Farber was an employer, and not an employee who may be counted towards Title VII's fifteen employee requirement. *See, e.g.,* v. *The Oxford English Dictionary* 191 (2d ed.1989) (employer defined as "One who employs"). Under the common law analysis, the most meaningful indication that Farber was an employer is that he completely controlled the manner and means of his own, and to the extent that he was able, his employees' work. If anyone at All Star had plenary management authority over the sales staff, it was Farber. [FN12]

Although Farber took a modest draw from All Star in 1992 and 1993, in accordance with the owners' initial business objectives he will realize his *pro rata* share of the capital gain (or loss) of WPGR following FCC approval of the station's sale. Farber possessed other indicia of being the owner-employer. As one of All Star's five shareholders, Farber participated in shareholders' meetings at which corporate strategy and company revenues were discussed. *Id.* at 164. He, and only he, oversaw the overall direction of the venture. He held himself out to the public on his business cards as "Owner/Corporate Officer". Tr. at 179. This is all evidence of a customary common law status of

an owner or employer, and not of an employee. Being an employer, Farber cannot simultaneously be counted as an employee under Title VII.

Even if we were to hold open the possibility that Farber could be both an employer and an employee (despite the linguistic difficulties attached with that result), [FN13] Farber would in any event fail to qualify as an employee under the *Lattanzio* standards Judge Joyner identified: (i) whether the director has undertaken traditional employee duties; (ii) whether the director was regularly employed by a separate entity; and (iii) whether the director reported to someone higher. *Lattanzio,* 825 F.Supp. at 90. While Farber's efforts to sell advertising time for WPGR may be regarded as "traditional employee duties", these are also vital actions that any small business owner would undertake in order to keep his company alive.

When a company is small enough that it has no corporate hierarchy in any traditional, *Fortune* 500 sense, the distinctions between an ordinary "employer" and a typical "employee" tend to break down. Entrepreneurs in small, start-up businesses often of necessity wear many hats and get their fingers dirty. Furthermore, we note that in 1992 Farber started his own advertising agency, exhibiting the type of economic freedom that is more emblematic of an owner than a conventional deskbound employee. Finally, we repeat that the most significant factor in our view is that no one controlled Farber at WPGR. There was no higher authority to which Farber, as a practical matter, had to report.

*12 Accordingly, we find and hold that Farber was an employer and not an employee for the purposes of Title VII.

D. *Counting the Number of Employees in 1993 and 1994*

Although we hold that Blavat, Starr, Guidotti and Farber are not employees, we still face the task of counting the number of employees All Star had in 1993 and 1994.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 10

Not Reported in F.Supp., 1995 WL 491291 (E.D.Pa.), 68 Fair Empl.Prac.Cas. (BNA) 1148

**(Cite as: 1995 WL 491291 (E.D.Pa.))**

Excluding all of Starr's checks, Blavat's single check, all of Guidotti's checks, and Farber's checks after March of 1993 (when he went from general manager to sales promoter), we find that All Star had fifteen or more employees on its payroll in 1993 for the first seven and the ninth payroll periods. Since each payroll usually consisted of two weeks, [FN14] All Star employed fifteen people in only sixteen weeks and thus does not fall within the statutory definition of employer for 1993.

Similarly, in 1994, excluding Farber's single check, Starr's checks, and all of Guidotti's checks (Blavat did not receive a check in 1994), All Star did not have any payroll periods with fifteen or more people, and thus does not fall within Title VII's scope for that year, either.

IV. *Conclusion*

Because All Star Radio, Inc. did not employ fifteen employees in twenty or more weeks in 1992, 1993 or 1994, the current and preceding years of the alleged discrimination against Powell-Ross, it does not qualify as an employer under Title VII's definition and we do not have jurisdiction over the subject matter of this case. Accordingly, we shall grant defendants' motions to dismiss and deny as moot plaintiff's motion for additional discovery. [FN15] An appropriate Order follows.

ORDER

AND NOW, this 16th day of August, 1995, upon consideration of defendants' motions to dismiss (docket nos. 18 & 19), and plaintiff's motion for additional discovery (docket no. 20), and for the reasons set forth in the accompanying Memorandum, it is hereby ORDERED that:

1. Defendants' motions are GRANTED and this action is DISMISSED FOR LACK OF SUBJECT MATTER JURISDICTION;

2. Plaintiff's motion is DENIED AS MOOT; and

3. The Clerk shall CLOSE this case statistically.

FN1. The following facts are taken from

the complaint and the evidence adduced at the hearings we held on these motions on July 26, July 28 and August 2, 1995.

FN2. Transcript of hearing ("Tr.") at 160. All-Star has an agreement of sale for WPGR-AM and is awaiting approval from the Federal Communications Commission. WPGR is currently broadcasting "foreign language, ethnic type programming." Tr. at 45.

FN3. The hearings were protracted because of the unavailability of certain witnesses.

FN4. Our jurisdiction is founded solely upon this federal question, and diversity jurisdiction is precluded because the parties are all citizens of Pennsylvania.

FN5. Given the absence of attendance records, we have had to assume that every person who received a check in a payroll period actually worked every day of the period. This assumption operates against defendants' position--since Title VII's definition of employer explicitly requires an "employee" to work "each working day"--and thus does not prejudice Powell-Ross.

FN6. ERISA defines an employee as "any individual employed by an employer," 29 U.S.C. § 1002(6), nearly identical to Title VII, 42 U.S.C. § 2000e(f). As Justice Souter observed for the Court in *Darden,* this "nominal definition ... is completely circular and means nothing." *Id.* at 1348.

FN7. *See, e.g., Hernandez v. Norris Square Civic Ass'n,* 1995 WL 365436, *5 (E.D.Pa.1995) (Weiner, J.) (Title VII), *appeal docketed,* No. 95-1573 (3d Cir. July 10, 1995); *Walker v. Correctional Medical Sys.,* 886 F.Supp. 515, 520 (W.D.Pa.1995) (Title VII); *Kellam v. Snelling Personnel Servs.,* 866 F.Supp.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                Page 11

Not Reported in F.Supp., 1995 WL 491291 (E.D.Pa.), 68 Fair Empl.Prac.Cas. (BNA) 1148

**(Cite as: 1995 WL 491291 (E.D.Pa.))**

812, 814 (D.Del.1994) (Title VII); *Lattanzio v. Sec. Nat'l Bank,* 825 F.Supp. 86, 89-90 (E.D.Pa.1993) (Joyner, J.) (Title VII); *Cox v. Master Lock Co.,* 815 F.Supp. 844, 846 (Waldman, J.) (E.D.Pa.) (ADEA), *aff'd without op.,* 14 F.3d 46 (3d Cir.1993).

FN8. Other Courts of Appeals have applied *Darden* to the definitions of "employee" under the employment discrimination statutes. *Loomis Cabinet Co. v. Occupational Safety & Health Review Comm'n,* 20 F.3d 938, 941 (9th Cir.1994); *Wilde v. County of Kandiyohi,* 15 F.3d 103 (8th Cir.1994); *Daughtrey v. Honeywell, Inc.,* 3 F.3d 1488, 1495 (11th Cir.1993); *Frankel v. Bally, Inc.,* 987 F.2d 86, 90 (2d Cir.1993).

FN9. It may be of no consequence which standard we apply since "in practice there is little discernible difference between the hybrid test and the common law agency test." *Frankel,* 987 F.2d at 90; *see also, Wilde,* 15 F.3d at 106 ("We see no significant difference between the hybrid test and the common-law test articulated by the Supreme Court in *Darden.* ").

FN10. No party has explained the meaning of *geator,* and we are sure the only dictionary cognate, *geat,* is not helpful ("a Scandinavian people of southern Sweden subjugated by the Swedes in the 6th century and believed to be ancestors of the Gotlanders", *Webster's Third New International Dictionary,* 942 (unabridged, 1986 ed.)). It does seem clear, however, that *geator* has, at least in the Philadelphia area, stretching perhaps to the New Jersey coast, come to be identified with Blavat.

FN11. Blavat mistakenly received one commission check on March 5, 1993 for $36.00 which, we are told, he subsequently repaid.

FN12. The following colloquy is illustrative of the limited control All Star had over its sales staff:
Q. And were there classes that you set up with these [sales]people that they had to attend?
A. I tried, but no one would ever show up because they didn't have to. Like maybe a couple times they did. Like I would do it three, four times, try to have an opportunity for them to learn, and they didn't, and quite honestly, I couldn't make them because we were 1099.
Tr. at 185.

FN13. Although speakers of English may say that one can work for oneself, one surely cannot discriminate against oneself based upon race, sex, religion or national origin.

FN14. If the payroll closed on the first Friday of a new year, it would consist of one week in the old year, and one week in the new one.

FN15. At the end of the first and second hearing days, we afforded plaintiff every item of discovery she requested. We also required every witness she identified to testify.

Not Reported in F.Supp., 1995 WL 491291 (E.D.Pa.), 68 Fair Empl.Prac.Cas. (BNA) 1148

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## IN UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SSGT JASON A. ADKINS, USAF, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. Act. No. 04-1453-JJF |
| | ) | |
| DONALD H. RUMSFELD, Secretary of Defense; | ) | |
| JAMES G. ROCHE, Secretary of the Air Force; | ) | |
| GEN. JOHN W. HANDY, Commander Air | ) | **PLAINTIFF'S ANSWERING** |
| Mobility Command, COL. JOHN I. PRAY, JR., | ) | **BRIEF IN OPPOSITION TO** |
| 436th Air Wing Commander, in their official | ) | **DEFENDANTS' MOTION** |
| capacities, | ) | **TO DISMISS** |
| | ) | |
| Defendants. | ) | |

**EXHIBIT C:**

**NEWSPAPER ARTICLES**

Copyright 2004 Associated Press
All Rights Reserved

The Associated Press State & Local Wire

These materials may not be republished without the express written consent of The Associated Press

October 12, 2004, Tuesday, BC cycle

**SECTION:** State and Regional

**LENGTH:** 437 words

**HEADLINE:** Delaware congressmen seek probe of anthrax testing claims

**DATELINE:** DOVER, Del.

**BODY:**

Delaware's congressional delegation on Monday called on military officials to investigate allegations that the Defense Department illegally tested anthrax vaccinations at Dover Air Force Base in 1999.

The (Wilmington) News Journal reported Sunday that former base commander Col. Felix Grieder believes that his troops were the subject of illegal experiments at Dover. The troops received anthrax vaccine that may have contained squalene, a fat-like substance that occurs naturally in the body and can boost a vaccine's effect.

Some experts say even trace amounts of squalene can suppress the human immune system, causing arthritis, neurological problems, memory loss and migraine headaches.

Sens. Joe Biden and Tom Carper and Rep. Mike Castle said they will send a letter to Secretary of Defense Donald Rumsfeld asking him to look into the allegations.

Pentagon officials denied testing squalene in Dover and said any contamination in the vaccine must have occurred accidentally, The News Journal reported.

Problems began at Dover in May 1999, after some troops in their 20s and 30s began developing illnesses usually seen in much older people.

Grieder, the former base commander, halted the vaccination program, a move he said brought an end to his military career.

Testing by the Food and Drug Administration detected squalene in all the vaccine sent to Dover, but not in vaccine sent to other military installations. The military no longer tests for squalene.

"In my opinion, there was illegal medical experimentation going on," Grieder, who lives in Texas, told The News Journal.

The Defense Department has said it suspects that the FDA conducted faulty tests and that the vaccine contained no squalene. It also contends that the amounts of squalene the FDA said were contained in the vaccine would have been too small to affect human health.

However, a group of civilian scientists at Tulane University has conducted two studies that found evidence of squalene injections in the blood of troops.

Government officials have acknowledged that the Department of Defense secretly tested squalene on humans in Thailand; Grieder believes similar tests were conducted in Dover. In a March 1999 report, the GAO accused the Defense Department of a "pattern of deception" and said the military confirmed human tests involving squalene only after investigators found out about them.

Delaware congressmen seek probe of anthrax testing claims The Associated

The Defense Department made anthrax inoculations mandatory for all active-duty military personnel in 1998. The immunization order remains in effect, and more than 1.9 million troops have received the inoculations.

**LOAD-DATE:** October 13, 2004

Copyright 2004 The News Journal (Wilmington, DE)
All Rights Reserved
The News Journal

October 17, 2004 Sunday

**SECTION:** NEWS; Pg. 1A

**LENGTH:** 2180 words

**HEADLINE:** ORDERED TO CHOOSE: CAREER OR HEALTH;
SERVICE MEMBERS WHO REFUSE SHOTS OFTEN DEMOTED OR DISCHARGED; Wilmington man in Uzbekistan may face prison; others have left military; QUESTIONS ABOUT TAINTED ANTHRAX VACCINE

**BYLINE:** LEE WILLIAMS, HIRAN RATNAYAKE

**BODY:**

By LEE WILLIAMS

and HIRAN RATNAYAKE

The News Journal

Pvt. Leal Williams, a Wilmington native on an 18-month tour with the Maryland National Guard in Uzbekistan, could face prison for refusing the series of anthrax vaccinations his superiors ordered him to take.

"The shot may protect me from anthrax, but there is nothing to protect me from the shot," he said.

Troops have long been skeptical about the safety of the military's anthrax vaccine program. Originally, seven soldiers in Williams' unit refused the series of six shots. Williams is now the only holdout, and he believes his superiors plan to make an example of him.

"They can't allow a soldier to violate this basic principle. So a lot of people are watching," said the 32-year-old father of three.

As Williams sees it, he must decide between his health and his career. Under the military's mandatory vaccination program, it's a dilemma that has been faced by many soldiers, sailors, airmen and Marines - people like Williams, former Maj. Ruth Rymal and former Air Force Sgt. Barbara Welsh-Rosenblum. It has tested their faith in a government with a record of withholding the truth about the dangers of Agent Orange and radiation exposure experiments on unwitting troops.

Of those who have refused the vaccinations, some have left the service. Others have been demoted, sent to military prison or received dishonorable discharges.

The News Journal reported last week that a former Dover Air Force Base commander, retired Lt. Col. Felix Grieder, concluded after years of investigation that his troops were the subjects of illegal experiments at the base. The troops received anthrax vaccine that may have contained squalene. Some experts say even trace amounts of squalene can suppress the immune system, causing arthritis, neurological problems, memory loss, miscarriages and incapacitating migraine headaches. The military has tested squalene on humans in Thailand and other foreign countries to boost the effect of some vaccines.

Military officials strongly deny conducting illegal experiments and deny a link between the anthrax vaccine and health problems. They say troops must take the vaccine to keep the military strong in the event of a biological attack.

But even the military acknowledges the stress many personnel feel about being ordered to take the anthrax vaccinations in the present climate of uncertainty.

ORDERED TO CHOOSE: CAREER OR HEALTH;SERVICE MEMBERS WHO REFUSE SHOTS OFT

"Unsubstantiated rumors flowing around about the anthrax vaccine have always had a negative impact," said Lt. Col. Frank Smolinsky, spokesman for the secretary of the Air Force.

Dr. Owen Lugar, a Wilmington-based psychologist in practice for more than 35 years, said the military's management of the crisis can cause serious morale problems and unnecessary stress.

"Imagine a person being disillusioned in something that they believed in so strongly, that they would give their life in pursuit of that dream," Lugar said. "They now have to come to grips with their belief in their organization. From disillusionment, they can slide into dysfunction."

In a letter sent Thursday to Secretary of Defense Donald Rumsfeld calling for an investigation into the anthrax vaccination program, Delaware's congressional delegation noted "a great deal of unnecessary confusion and anxiety has been caused by the handling of this issue." The military has said it is preparing a response.

In addition to the Defense Department, the delegation also called for an investigation by the Government Accountability Office, formerly known as the General Accounting Office, and the House and Senate Armed Services Committees.

Lugar and others have said they should go further. The military should suspend the vaccination program until the safety issues are thoroughly investigated, they said. Lugar's son is an Army major who has received the full series of shots.

Senators Joe Biden and Tom Carper and Rep. Mike Castle would not comment on calls to suspend the program.

A bill introduced in Congress last month would give military personnel the option to refuse the anthrax vaccine if they believe the health risk outweighs the benefits of the immunization.

Williams continues to work as a carpenter for his unit, pending his next vaccination order. But the stress and uncertainty of his dilemma are taking a severe toll. He knows he can end it all by simply agreeing to take the vaccine.

"Some days, all I can do is pray," he said.

Soldier of the month

Leal Williams enlisted in the Maryland National Guard in 2003 to put food on the table for his wife and three daughters after a job at a high school fell through.

His mother says he's always been a hard worker. Growing up, he often worked three jobs.

Williams was a year shy of completing an art degree when he joined the service. He was trained as a carpenter by the Army, and assigned to an engineer unit that was mobilized for a tour in Uzbekistan.

His life changed forever during pre-mobilization training at Fort Dix, N.J., when a sergeant talked to him about being re-baptized in Jesus' name.

At Fort Dix, in addition to his spiritual awakening, Williams received three anthrax shots.

His unit left the States on May 9 and traveled for two days before arriving in the former Soviet Republic. Standing orders prevent service personnel from revealing the location of their unit or its mission.

By all accounts, he excelled at his tasks, twice being selected as soldier of the month, William's records show.

"He has always been exemplary in every way," said Louis Huff, a close family friend.

His off-duty hours were spent in Bible study, which was aided by his mother, Cynthia White.

Williams was troubled by rumors he heard about the anthrax shots, so he started to research the vaccine. He was struck by what he discovered.

"It's not safe," he said. "There's really no truth in it. Anybody with a clear mind who looks at the reports by other government agencies is going to find alarming information about the anthrax vaccine."

Williams understands the dangers of getting anthrax better than most. His great-great-grandfather died of anthrax spores he received from a tainted cow hide while working at a tannery in Wilmington in 1919.

ORDERED TO CHOOSE: CAREER OR HEALTH;SERVICE MEMBERS WHO REFUSE SHOTS OFT

In July, Williams informed his platoon sergeant he had decided to refuse the next shot, which he was scheduled to receive in August. After the military informed the soldiers that they would face disciplinary action if they continued to refuse, six others who had been resisting agreed to take the vaccine. Williams held out.

At a field-grade disciplinary hearing in August, his attorney told him to take the shot. Williams fired the military lawyer and defended himself before the hearing officer, a lieutenant-colonel. All Williams could offer were character witnesses.

The hearing officer demoted Williams from Specialist E-4 to Private E-1, fined him $596 and warned him if he refuses the shots again in January, he will be court-martialed for disobeying a lawful order during time of war. He did not have to tell Williams the possible consequences.

The newly demoted private sent appeals for help to President Bush and several Maryland lawmakers. To date, he says, he has not received a response.

His family supports a suspension of the vaccination program.

"It needs to stop," his mother said. "They should let him continue in his career. He shouldn't be threatened or coerced any more."

"They need to halt the program," said Calvin White, his grandfather. "Too many people are being damaged and crippled up."

Career pilot quits

Another soldier, Ruth Rymal, 39, has been around the military since junior ROTC in high school. She attended New Mexico Military Institute and was commissioned a lieutenant in the signal corps. After striving for years, she was admitted to flight school at Fort Rucker, Okla., in 1992.

She left the Army in 1996 and joined the Florida National Guard in 2001 because she missed flying. This year she gave it all up rather than submit to the shots when her unit was mobilized for duty in Iraq.

A close friend suffered extensive health problems after taking the vaccine. Rymal did not want to risk her own health, so she researched the vaccine and decided to refuse the shots.

After her refusal in January, the Blackhawk helicopter pilot was not allowed to go with her unit and instead was sent to Fort Benning, Ga., a place with fewer women than most posts and home of the Army's infantry training center, Airborne and Ranger schools.

"I thought those guys would stick my head on a pike outside the front gate," she said.

Rymal marked time at Fort Benning in a replacement center, while her future was decided by others.

In May, she was formally charged with disobeying a direct order to take the vaccine and offered a chance to resign. She was assigned a military lawyer. Her attorney told her she could be convicted of a federal felony. That was when she gave up.

"He didn't know whether I'd lose the right to vote," she said. "That was it. That's what swayed me."

In a plea bargain, Rymal was allowed to quietly resign her commission, "for the good of the Army."

"That's what really burns me," she said. "I wanted to stay in and deploy with my unit for the good of the Army."

Rymal believes the most serious health effects of the vaccine are still not known.

"I think the continuation of this program is going to come back and be a bigger news story 25 years from now," she said.

A terrible loss

Barbara Welsh-Rosenblum, 44, followed orders and took her shots. Now, after 20 years in the Air Force, she believes she paid a terrible price.

A former Air Force sergeant stationed at Dover Air Force Base, Welsh-Rosenblum had only six months left in 1999 before retirement when she was ordered to start taking the vaccine - a series of six shots that can take 18 months to complete.

ORDERED TO CHOOSE: CAREER OR HEALTH;SERVICE MEMBERS WHO REFUSE SHOTS OFT

When she received the order, she and her husband were trying to conceive their second baby.

Their first child was a textbook delivery. She was in labor for only two hours, never needed pain medication, and was the envy of other mothers on the base.

She explained to her first sergeant that she and her husband were trying to conceive a second child, and she did not want to take the vaccine.

"He told me, OYou will take it and tell me when you're done, and I want to see your shot record,' " Welsh-Rosenblum recalled. "I just wanted to have another baby, retire and stay home. They didn't seem to care."

She was told if she refused she would be booted out of the Air Force. She struggled with the most difficult decision of her life.

"I had nineteen-and-a-half years of service. I couldn't give up my retirement," she said. "I took the shot even though I knew I'd never complete the series before I retired."

Welsh-Rosenblum received her first vaccination in November 1998, after a blood test showed she was not pregnant, according to her military records.

A second blood test cleared her for the second shot, and she was scheduled for a third vaccination two weeks later. This shot was halted after a blood test revealed she was pregnant. The military does not require pregnant women to receive the anthrax vaccine.

Her baby died on April 9, 1999, after nearly five months of pregnancy.

"I went to the doctor and he couldn't find a heartbeat," she said. "I actually delivered her like a normal pregnancy. I held her."

Over the next several years, Welsh-Rosenblum lost four more children, all within the first three or four months of pregnancy.

Although neither pediatricians nor genetic specialists would tie the miscarriages to the vaccine, for Welsh-Rosenblum, that connection is a brute fact.

"Why did my baby die?" she said. "The Air Force never gave me any good reasons. I believe the anthrax vaccine caused my babies' deaths."

She and her husband, a Wilmington police officer, had a healthy child recently. She said the successful delivery occurred because the vaccine is out of her system.

Welsh-Rosenblum wants the program suspended.

"I hope I can prevent one woman from going through what I did."

Contact investigative reporter Lee Williams at 324-2362 or lwilliams@delawareonline.com. Contact Hiran Ratnayake at 324-2547 or hratnayake@delawareonline.com.

THE SQUALENE ISSUE

1/4 Squalene is a fatlike substance that occurs naturally in the body. It boosts a vaccine's effect, but some scientists say injecting even trace amounts of it into the body can cause serious illness.

1/4 In 1998, the Pentagon directs that military personnel be given anthrax vaccine.

1/4 In 1999, Col. Felix Grieder, Dover Air Force Base commander, temporarily halts the vaccinations at the base over safety concerns.

1/4 In 2000, first evidence emerges to suggest anthrax vaccine contains squalene.

1/4 Today, Grieder and others accuse the military of using them as guinea pigs.

ONLINE EXTRAS

A 1999 video of Dover pilots being assured there was no squalene in the anthrax vaccine.

An interactive graphic showing how squalene affects the body.

ORDERED TO CHOOSE: CAREER OR HEALTH;SERVICE MEMBERS WHO REFUSE SHOTS OFT

Additional resources on squalene and the vaccine.

www.delawareonline.com

**LOAD-DATE:** October 20, 2004

Copyright 2004 The News Journal (Wilmington, DE)
All Rights Reserved
The News Journal

October 19, 2004 Tuesday

**SECTION:** NEWS; Pg. 1A

**LENGTH:** 918 words

**HEADLINE:** Vaccine survey points to trouble at DAFB;
Review of data shows those who got anthrax shot at Dover were more likely to fall ill; QUESTIONS ABOUT TAINTED ANTHRAX VACCINE

**BYLINE:** Hiran Ratnayake, Lee Williams

**BODY:**

By Hiran Ratnayake and Lee Williams

The News Journal

Troops vaccinated against anthrax at Dover Air Force Base in 1999 were more likely to get sick than those vaccinated elsewhere, according to research to be published next month.

Walter Schumm, a professor at Kansas State University and a retired colonel in the Army Reserve, analyzed a 4-year-old survey by former Air Force Capt. Jean Tanner. In 2000, Tanner surveyed the troops in her unit in Dover and found that 32 percent who received the anthrax vaccine had such symptoms as severe joint pain, memory loss and arthritis.

"There was something at Dover Air Force Base that was different," Schumm said. He compared the rate at the base to the military's own estimates of adverse reactions to the vaccine worldwide.

Don Whitley, a major in the Air Force Reserve, said he may have filled out Tanner's survey. Whitley said he recalled talking with Tanner at the time and that she was troubled about the vaccine. Whitley received all six shots, and he reported his symptoms to military doctors.

"It was dismissed as not being part of the vaccine," he said.

Tanner could not be reached for comment.

Schumm's analysis is scheduled to appear next month in the medical journal Medical Veritas. His research has been published in several medical journals during the past 25 years. Schumm has a doctorate in family studies from Purdue University.

Pentagon spokesman James Turner said he was unaware of Schumm's research. He said the Defense Department believes the vaccinations administered in Dover were safe.

"We are very confident of the scientific assessments and conclusions that indicate no abnormal pattern of adverse events associated with anthrax vaccine when compared to other routine vaccines," Turner said.

Tanner mailed surveys to the home addresses of 252 members of her unit who received the vaccine in January 2000, according to Schumm's report. They were asked to list specific symptoms related to the vaccine.

The survey was mailed eight months after Col. Felix Grieder temporarily suspended the vaccination program at Dover. Grieder, who lives in Texas, now says his troops were used as guinea pigs in illegal medical experiments by the government at the base.

Grieder's troops received anthrax vaccine that may have contained squalene. Some experts say even trace amounts of squalene can suppress the immune system, causing arthritis, neurological problems, memory loss, miscarriages and

Vaccine survey points to trouble at DAFB;Review of data shows those who

incapacitating migraine headaches. The military has tested squalene on humans in Thailand and other foreign countries to boost the effect of some vaccines.

The military has conducted no specific research into the health effects of the vaccines administered in Dover. Tanner's is the only known survey of troops taken while they were receiving their series of six shots.

Military officials strongly deny conducting illegal experiments and deny a link between the anthrax vaccine and health problems.

Just over half of the members of Tanner's unit responded to the survey. She counted those who did not respond as not having reactions to the vaccine.

Schumm found Tanner's survey by researching the anthrax vaccine on the Internet.

While Schumm makes no mention of squalene in the article, he said those who received the vaccine in Dover at the time had an abnormally high number of reactions. The rate of adverse reactions to the vaccine varied according to what symptoms were considered adverse, he said.

For instance, 82 of the 252 subjects met the military's criteria for a systemic reaction to the vaccine, a rate of 32.1 percent. Using the stricter criteria established by the Centers for Disease Control and Prevention, 47 potential subjects had adverse reactions, a rate of 18.7 percent.

The military has estimated only 0.007 percent of military personnel experience adverse reactions to the vaccine. Throughout his research, Schumm said he has never encountered rates of adverse reactions approaching the rates at Dover.

The survey was not designed as a scientific experiment, Schumm said. Tanner did not have responses from a control group of people who did not receive the anthrax vaccine.

But Schumm said the military should have investigated the survey results because they were so striking.

"It's a 32 percent rate of reactions," Schumm said. "Even just out of curiosity, it should have led to an investigation."

In a letter sent Thursday to Secretary of Defense Donald Rumsfeld calling for an investigation into the anthrax vaccination program, Delaware's congressional delegation noted "a great deal of unnecessary confusion and anxiety has been caused by the handling of this issue." The military has said it is preparing a response.

In addition to the Defense Department, the delegation also called for an investigation by the Government Accountability Office, formerly known as the General Accounting Office, and the House and Senate Armed Services Committees.

"From what I've seen, more people have died from complications with the anthrax vaccine than have been killed by anthrax," Schumm said.

Contact Hiran Ratnayake at 324-2547 or

hratnayake@delawareonline.com.

Contact investigative reporter Lee Williams at 324-2362 or lwilliams@delawareonline.com.

32 percent

Share of those in a survey of Dover Air Force Base personnel who had adverse reactions to anthrax vaccine

0.007 percent

Share of overall military personnel who had adverse reactions to the vaccine, according to a military estimate

**LOAD-DATE:** October 21, 2004

Copyright 2004 The News Journal (Wilmington, DE)
All Rights Reserved
The News Journal

October 17, 2004 Sunday

**SECTION:** NEWS; Pg. 8A

**LENGTH:** 483 words

**HEADLINE:** Fearful pilots reluctant to speak out;
Many would be grounded if military knew the extent of their ailments; QUESTIONS ABOUT TAINTED ANTHRAX VACCINE

**BYLINE:** Hiran Ratnayake, Lee Williams

**BODY:**

By Hiran Ratnayake and Lee Williams

The News Journal

As Air Force personnel in Dover struggle with fears about the anthrax vaccine and tainted lots, active and retired military pilots also are frightened about another scenario: Being grounded.

Dozens of active and retired military pilots who fly commercially were afraid to speak out publicly when interviewed by The News Journal about the anthrax vaccine and squalene. They said their careers could be jeopardized if the extent of their illnesses was made known.

Pilots stand to lose a lot. In 2002, median annual earnings of airline pilots, co-pilots and flight engineers were $109,580. The median annual earnings of commercial pilots was $47,970.

Aviation medical examiners, on a contractual agreement with the Federal Aviation Administration, evaluate the health of pilots to determine whether they are physically and mentally capable of flying an airplane.

Pilots who fly for major airlines, known as Class 1 pilots, receive physicals every six months. Pilots who fly exclusively for private corporations, known as Class 2 pilots, may be required only to receive annual physicals.

If a pilot is exhibiting signs of auto immune disease, he or she must instantly be grounded until further investigation, said Dr. John Hocutt Jr., a Wilmington-based aviation medical examiner. "Auto immune diseases are very serious," he said.

Some civilian researchers, such as Dr. Pamela Asa of Tulane University, believe that trace amounts of squalene injected into the human body suppress the immune system, causing autoimmune disease. Former Dover Air Force Base commander Col. Felix Grieder has accused the military of running an illegal experiment on his troops by adding squalene to the anthrax vaccine.

As Hocutt conducts detailed examinations of the pilots - with an emphasis on vision and previous medical history - he also relies on how forthright they are about their health.

Hocutt has examined 2,000 to 3,000 pilots, several of them former Air Force pilots out of Dover who now fly commercially, in his 20 years as an aviation medical examiner. In that time, he has denied about 25 pilots from flying. According to the FAA, 3,444 pilots were denied their license for medical reasons in the United States in 2003. Data for Delaware were not available.

Arthritis and memory loss can be symptoms of autoimmune disease. Hocutt said it would be very difficult for a pilot who has severe joint pain and arthritis to pass the physical - even if they neglect to mention the symptoms on the physical's questionnaire. But it's possible that they could pass the physical if they suffered from intermittent memory loss.

Fearful pilots reluctant to speak out;Many would be grounded if military

"They could seem perfectly normal when they come in to see me. But if they don't tell me the truth on the form, it would be possible for them to get by," Hocutt said. "You have to be absolutely healthy to fly."

**LOAD-DATE:** October 20, 2004

## IN UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SSGT JASON A. ADKINS, USAF, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. Act. No. 04-1453-JJF |
| | ) | |
| DONALD H. RUMSFELD, Secretary of Defense; | ) | |
| JAMES G. ROCHE, Secretary of the Air Force; | ) | |
| GEN. JOHN W. HANDY, Commander Air | ) | |
| Mobility Command, COL. JOHN I. PRAY, JR., | ) | |
| 436th Air Wing Commander, in their official | ) | |
| capacities, | ) | |
| | ) | |
| Defendants. | ) | |

### [PLAINTIFF'S PROPOSED] ORDER


Having heard all parties, **IT IS HEREBY ORDERED,** that Defendants' Motion To

Dismiss is **DENIED.**


Dated: _____                    _____

                                               JOSEPH J. FARNAN, JR.
                                               United States District Judge

## CERTIFICATE OF SERVICE

I, Stephen J. Neuberger, being a member of the bar of this Court do hereby certify that on

March 15, 2006, I electronically filed this Answering Brief in Opposition to Defendants' Motion

to Dismiss with the Clerk of the Court using CM/ECF which will send notification of such filing

to the following:

Rudolph Contreras, Esq.
Assistant U.S. Attorney
Chief, Civil Division, U.S. Department of Justice
1007 N. Orange Street, Suite 700
Wilmington, DE 19899-2046
Rudolph.Contreras@usdoj.gov

Jeffrey D. Kahn, Esq.
Trial Attorney, Federal Programs Branch
Civil Division, U.S. Department of Justice
P.O. Box 883 Ben Franklin Station
20 Massachusetts Ave., N.W.
Washington, DC 20044
Jeffrey.Kahn@usdoj.gov

/s/ Stephen J. Neuberger
**STEPHEN J. NEUBERGER, ESQ.**