# IN UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **SSGT JASON A. ADKINS, USAF,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civ. Act. No. 04-1453-JJF** |
| | ) | |
| **DONALD H. RUMSFELD, Sec. of Defense;** | ) | |
| **JAMES G. ROCHE, Secretary of the Air Force;** | ) | |
| **GEN. JOHN W. HANDY, Commander Air** | ) | **Jury Trial Demanded** |
| **Mobility Command, COL. JOHN I. PRAY, JR.,** | ) | |
| **436th Air Wing Commander, in their official** | ) | |
| **capacities,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## SECOND AMENDED COMPLAINT

## I. __INTRODUCTION__

1.    Since 1999 the Department of Defense has used military personnel at the Dover Air Force Base as guinea pigs for an experimental anthrax vaccine which has life threatening and debilitating side effects.  When the adverse health effects of this vaccine were exposed by the Wing Commander, a cover-up began consisting of denials and threats of adverse action against uniformed military personnel.  In October 2004 the media, though the News Journal papers, exposed this vital matter of public concern which threatened not only the health of uniformed airmen but also the safety of the missions they fly on C-5 aircraft.

2.    Plaintiff is a respected and decorated airman with an unblemished military record who on the night of October 20th 2004, experienced a debilitating attack of side effects from the experimental anthrax vaccine, which if not treated would have endangered the safety of his crew on an impending wartime military mission in a typical 769,000 pound C-5 aircraft.  Rather than

cover-up his symptoms, plaintiff instead immediately reported to the flight surgeon and spoke out about his condition. He also questioned whether he was suffering because of the experimental anthrax vaccine which the military had inflicted upon him. The flight surgeon immediately grounded plaintiff because his condition endangered his crew mates and the safety of their mission.

3.      Mere hours later, plaintiff was ordered to attend a meeting the very next day where, in direct violation of written rules of progressive discipline, he was given a permanent written reprimand which ended his military career. He then was forced to undergo humiliating public punishment intended to make an example of him and silence all other aviators who spoke within the chain of command or otherwise about their life threatening and mission endangering symptoms caused by the experimental anthrax vaccine.

4.      On November 18, 2004, plaintiff filed suit in this Court seeking, among other things, to enjoin the Air Force from retaliating against him for speaking out and questioning whether the multiple injections of anthrax vaccine that plaintiff received from the Air Force had caused his health problems.

5.      The filing of this suit received significant coverage in the local and national news media. Instead of ceasing its retaliatory actions, however, immediately after plaintiff filed suit the Air Force assigned plaintiff work details that were designed to punish him. The Air Force then subjected plaintiff to continuous and humiliating retaliation that ultimately led him to conclude his only option was to end his military career. Plaintiff separated from the Air Force after more than fourteen years of dedication. Only five more years of service would have earned plaintiff a significant pension and benefit package, including health coverage that would assist with the costs of his ongoing medical difficulties.

6.    Plaintiff now seeks injunctive and declaratory relief from this court for the violation of his First Amendment protected rights to be free from retaliation for speaking out and questioning whether he and others are suffering dire medical effects from a secret military program in which they are the guinea pigs.

## II.   JURISDICTION

7.    This Court has jurisdiction over this action under the Constitution of the United States and 28 U.S.C. §§ 1331 and has authority to grant the relief requested under 5 U.S.C. § 702; 28 U.S.C. § 1361 and 28 U.S.C. §§ 2201 and 2202.

8.    Venue is proper in this district under 28 U.S.C. § 1391(e)(2) and (3) because a substantial part of the events or omissions giving rise to the claim occurred here and because plaintiff resides here.

## III.   PARTIES

9.    Plaintiff, SSgt. Jason A. Adkins, USAF,  is a citizen of the United States and a resident of the State of Delaware.  At the time this suit was filed he was 32 years old, married with one infant child, and was a career enlisted man who served as a flight engineer and technical sergeant on C-5 aircraft based at Dover Air Force Base ("DAFB").  He enlisted in October 1990.  At all times material hereto, he was an outstanding airman.

10.    On May 13, 2003, he was on the first C-5 aircraft flown into the Baghdad, Iraq war zone during Operation Iraqi Freedom.  On another mission on January 8, 2004, he and his crew successfully flew a crippled 454,000 pound C-5 aircraft out of Baghdad after one engine was shredded by a surface-to-air missile.  For that successful mission he and his crew were recommended for the Distinguished Flying Cross for bravery.

11.     He has an unblemished service record spanning 14 years.  Prior to the events at issue in this case, he had never been disciplined.  As one of DAFB's best fliers, he has been selected for numerous classified special operations missions.

12.     The retaliatory adverse actions challenged in this case have harmed plaintiff by chilling his First Amendment rights to freedom of speech.  The challenged actions are a direct and substantial burden upon his right to free speech and expression.  The constitutional deprivations at issue in this case remain capable of repetition and demand review.

13.     Defendant Donald H. Rumsfeld is the Secretary of the Department of Defense of the United States of America.  He is a civilian who is sued in his official capacity.  Defendant Rumsfeld ratified, sanctioned, authorized, approved or participated in the actions challenged in this case.  He was aware of plaintiff's protected speech described below and it antagonized him.

14.     Defendant Dr. James G. Roche was the Secretary of the Air Force from January 2001 until January 2005.  He is a civilian who is sued in his official capacity.  Defendant Roche ratified, sanctioned, authorized, approved or participated in the actions challenged in this case.  He was aware of plaintiff's protected speech described below and it antagonized him.

15.     Defendant General John W. Handy is a four star general and also the Commander of the Air Mobility Command located at Scott Air Force Base in Illinois.  DAFB is in his chain of command.  He is sued in his official capacity.  Defendant Handy ratified, sanctioned, authorized, approved or participated in the actions challenged in this case.  He was aware of plaintiff's protected speech described below and it antagonized him.

16.     Defendant Colonel John I. Pray Jr. was the Commander of the 436th Air Wing and commanded the 4,000 airmen at DAFB from 2003-2005.  He is sued in his official capacity.  Defendant Pray ratified, sanctioned, authorized, approved or participated in the actions

challenged in this case.  He was aware of plaintiff's protected speech described below and it antagonized him.

## IV.  THE FACTS

### A.  The Context of Plaintiff's Protected Speech and Lawsuit

#### 1.  The 1999 Experimental Program

17.    All U.S. armed forces personnel deployed overseas are forced to take a series of six or more anthrax vaccinations.  These vaccinations are involuntary and are forced on these servicemen and women without their consent.

18.    At all times plaintiff complied with instructions to accept these vaccinations and received all required vaccinations.

19.    In September 1998, plaintiff was transferred to DAFB.

20.    In September, October and November of 1998, he received three anthrax inoculations.  He received two more in 1999, another in 2000, one in 2003 and another in 2004, for a total of eight.  Six of his inoculations were tainted with squalene.

21.    Starting in 1999, airmen at DAFB received numerous batches of anthrax vaccine that contained squalene, a substance that can be used to increase the potency of the vaccine.  It is currently believed that DAFB received more tainted batches of anthrax vaccine than any other military installation.  Scientists around the world have demonstrated squalene's ability to stimulate the immune system - which then has the hazardous side effects of causing health problems such as arthritis, neurological problems, multiple sclerosis and lupus, which are associated with symptoms such as rashes, seizures, memory loses and incapacitating migraine headaches.

22.     Testing by the Food and Drug Administration ("FDA") in 2000 detected squalene in increasing concentrations in the batches of vaccine sent to DAFB. Some scientists have stated that the military may have been measuring airmen responses to the steadily increasing doses.

23.     The military has secretly experimented with squalene on unsuspecting human subjects to test its ability to boost the effectiveness of some vaccines. For example, the Department of Defense has admitted to secretly conducting tests on humans using squalene in vaccines in Thailand. In a March 1999 report, the General Accounting Office accused the Defense Department of a "pattern of deception" in its efforts to test these contaminated vaccines on unsuspecting human guinea pigs.

24.     In 1999, when the pilots at DAFB were forced to take the anthrax vaccine, 55 out of 120 pilots in the Air Force Reserve wing stationed there resigned rather than take the vaccine, leaving the base far below strength.

25.     In May 1999 many airmen in their 20's and 30's who had been forced to take the vaccine tainted with squalene began suffering from severe headaches, severe dizziness and "gray-outs." Many also began developing illnesses normally associated with old age.

26.     The wing commander of the DAFB at that time was Colonel Felix Grieder. As a result of significant health problems and other health issues raised by his airmen, and in response to a Pentagon spokesman who stated that "I don't know and I don't care" about the health problems your airmen are suffering from, Colonel Grieder halted the tainted vaccination program.

27.     Colonel Grieder's actions effectively ended his military career. Colonel Grieder was removed from command, reassigned to a Pentagon desk job and pressured by high ranking Defense Department officials as a whitewash commenced. He was replaced by a commander

who was more amenable to the Pentagon's wishes.

28.     The military immediately began a program at DAFB designed to cover-up legitimate concerns by airmen for their health and safety as a result of the tainted vaccination program.  The Pentagon convened a special briefing for the airmen at DAFB where many high-ranking officers promised that the inoculations were safe and that there were no dangerous side effects.  The airmen were told to trust the military because the military purportedly would never do anything to harm them.

29.     But airmen were kept in the dark about health and safety issues.  Information about the occurrence of actual side effects was purposefully withheld from base personnel.

30.     Airmen were actively discouraged from speaking about the topic.  The topic of health and safety was frowned upon.

31.     Notably, one of the Pentagon officials who spoke at the special DAFB briefing was Air Force Surgeon General Charles H. Roadman II.  He told the airmen that, "You've got to take my word as an officer, my word as a physician at face value . . . if you have anti-squalene antibodies in your body . . . it didn't come from the anthrax immunization."

32.     After Surgeon General Roadman gave his personal assurances that the vaccine was safe and effective, the tainted anthrax vaccination program was restarted.

33.     Shortly thereafter, FDA testing discovered squalene in steadily increasing doses in multiple vaccine lots that had been forced upon the airmen at DAFB.  The FDA discovered that the Pentagon and its military representatives had lied to the airmen at DAFB.

## 2.  The October 2004 News Journal Investigative Report and Expose

34.     Beginning on October 10th and continuing through December 28th, the News Journal paper - the newspaper of general circulation in Delaware - and its investigative reporters

- 7 -

Lee Williams and Hiran Ratnayake, ran a hard hitting, well researched and exhaustive series of major news articles exposing the military experimentation on the airmen assigned to the DAFB.

35.     Those news articles and the attendant negative publicity were brought immediately to the attention of each of the defendants.  They rose quickly to the top of the chain of command which then took control of the situation from Washington, D.C. and directed all subsequent actions in response to the media expose and how to limit and control the facts which were being revealed to the general public.

36.     Each of the defendants were angered and displeased by this unwelcome media scrutiny and sought to do whatever they could to kill the news story and to control the flow of information from the military personnel at DAFB.

37.     Numerous attempts were made by the defendants in writing and through the media to discredit the story.

38.     Immense pressure was brought to bear on senior officers at DAFB by the Pentagon, the defendants, and the chain of command to stifle all speech contrary to the approved military version and speech about health issues raised by the contaminated anthrax vaccine.

39.     After the first news story of October 10th, on behalf of defendant Rumsfeld, the Public Affairs Officer for the Pentagon on several occasions issued public statements in response to the story and defended the efficacy of the anthrax vaccine but refused to comment on the contaminated vaccine used at DAFB.

40.     Other members of defendant Rumsfeld's staff also issued similar statements on his behalf.

41.     After the first news story of October 10th on behalf of defendant Roche, the Public Affairs Officer for the Secretary of the Air Force also issued on several occasions public

statements in response to the story and defended the efficacy of the anthrax vaccine but refused to comment on the contaminated vaccine used at DAFB.

### 3.  The Involvement of the Congress

42.     On October 13, 2004, United States Senators Joseph R. Biden, Jr. and Thomas R. Carper, together with Representative Michael N. Castle, delivered a two page letter to defendant Rumsfeld about the recent press reports about the anthrax vaccination program at the DAFB. They demanded a "thorough investigation" because "[a]t a maximum, intentional actions or unintentional incompetence may have created a health hazard for our personnel." For them the issues raised by the news stories were "critical."

43.     They added -

The importance of clearing the air on this issue cannot be overstated. It is in the best interest of everyone for there to be well-documented and readily available information regarding the necessity of the anthrax vaccine, the presence or absence of squalene, and the possible health effects associated with the vaccine and given amounts of squalene. It is critical to the credibility of the U.S. Air Force that the concerns raised by a former wing commander be reviewed in an open and transparent fashion. The controversy surrounding the history of the anthrax vaccine at Dover AFB creates a drag on morale and concerns among personnel at a time when all of their energy should be devoted to their vital missions.

### 4.  The Earlier Pending Federal Lawsuit About the Anthrax Vaccine

44.     In March 2003 the defendant Secretary was sued in federal court in Washington, D.C. over the mandatory involuntary anthrax vaccination program. See Doe v. Rumsfeld, Civ.A. No.03-707-EGS (D.D.C.).

45.     On October 27, 2004 U.S. District Court Judge Emmet G. Sullivan issued a permanent injunction against the Secretary preventing his use of the anthrax vaccine "on the basis that the vaccine is either a drug unapproved for its intended use or an investigational new drug within the meaning of 10 U.S.C. § 1107. Accordingly, the involuntary anthrax vaccination

program, as applied to all persons, is rendered <u>illegal</u> absent informed consent or a Presidential

wavier." <u>Doe v. Rumsfeld</u>, 341 F.Supp.2d 1, 17 (D.D.C. Oct. 27, 2004) (emphasis added). The

court had previously issued a preliminary injunction to the same effect.  <u>See</u> <u>Doe v. Rumsfeld</u>,

297 F.Supp.2d 119 (D.D.C. 2003)

46.    After Judge Sullivan issued his October 2004 Order enjoining the Pentagon's

mandatory anthrax vaccination program, Secretary Rumsfeld made hostile public comments

about the Order.

### B.  The Form and Content of Plaintiff's Protected Speech

47.    Plaintiff read and was aware of the series of articles and investigative reporting by

the News Journal.

48.    Since being injected with the tainted vaccine, plaintiff had been experiencing

medical symptoms that included memory loss, severe headaches, weight loss, constant body

aches, and an irregular heart beat.

49.    Plaintiff was afraid to discuss his symptoms with anyone.  Discussion of the

effects of the anthrax vaccine had been discouraged at DAFB after Col. Grieder's career ended

when he tried to protect his airmen from the side effects of the tainted vaccination program.

50.    During the night of October 20, 2004 and the early morning of the 21st, plaintiff

received very little rest as a result of a severe and incapacitating headache.  At approximately

noon on the 21st, he left his home in Smyrna, DE and traveled to the Base for afternoon sick-call

to visit the Flight Surgeon since his headache had not subsided.

51.    Since his first day in the Air Force, plaintiff has been trained in one basic sacred

safety principle established for all military fliers - flight officers with unsafe medical conditions

are not to fly; aircraft, the crew and the mission are endangered if aircrews cannot perform their

duties to the fullest of their abilities. Even during a flight, if crew members become ill or overly tired, they are encouraged to declare "safety of flight," at which point they are relieved of their duties - no questions asked - and always without any fear of discipline or repercussions.

52.    Plaintiff is the flight engineer on the C-5 aircraft. He sits directly behind the co-pilot and is responsible for all the electronic and mechanical systems on an aircraft longer than a football field. If there are any problems on this massive plane, plaintiff is responsible for fixing them.

53.    Plaintiff was going to the Flight Surgeon to determine if he was fit to fly. Plaintiff went to the Flight Surgeon because he felt that his health would endanger the lives of his crew, the mission and his aircraft. Plaintiff felt that his duties required that he report his health condition.

54.    Plaintiff believed that it was more preferable to seek qualified medical attention than to take the risk of being tasked to fly a mission when not medically able to do so and thus endanger the safety of his crew and the success of the mission.

55.    While on route to DAFB, TSgt. Terry Miller, the mission scheduler, called plaintiff's home at 12:45 p.m. to inform him that he was required to participate in a flight to take place on Friday October 22nd, some 22 hours later.

56.    Plaintiff's wife Amy called plaintiff on his cell phone at the Base and relayed the message. Plaintiff returned the call to Miller at 12:50 p.m. and told him of his intention to see the Flight Surgeon with regard to his medical condition. Plaintiff properly advised Miller that he was unsure if he would be available for the launch the next day and that there was a possibility of his being placed on DNIF (Duties Not to Include Flying) status by the physician but that he would notify Miller as soon as he knew something more.

57.    Plaintiff signed in at the Flight Surgeon's office at 12:55 p.m.  He spoke with the Air Force doctor and was examined for 30-45 minutes.

58.    During his medical examination, plaintiff described his debilitating symptoms truthfully and in great detail.  Among other things, he explained to the physician that he had been having severe headaches for a long time and that they might be migraines.

59.    In the Air Force, the word "migraine" is a red flag for every aviator.  If a flier is diagnosed as having a migraine, he is immediately grounded from ever flying again - it is a permanently disqualifying medical condition.

60.    Migraines also are a known side effect of the squalene tainted anthrax vaccine. Consequently plaintiff asked the Flight Surgeon whether his headaches and current medical condition could be connected to the tainted anthrax vaccine.

61.    The Flight Surgeon then immediately downplayed the connection between his headaches and the anthrax vaccine.  Plaintiff was told that the military would not have exposed him to anything dangerous.

62.    Nonetheless, when the examination was finished, the Flight Surgeon immediately grounded plaintiff, prescribed a narcotic medication and DNIF'd him.

63.    Plaintiff notified Miller immediately and was required to turn in his beeper because he had been DNIF'd by the Flight Surgeon.

**C.  Initial Retaliatory Adverse Action**

64.    Within 3 ½ hours of being DNIF'd, plaintiff was ordered to report to the Base the very next morning in full dress uniform.

65.    He arrived at 7:45 a.m. on October 22nd and saw his squadron commander Lt. Col. Cristos Vasilas and Chief Flight Engineer SMSgt. Ronald J. Mahoney in a closed door

session.

66.     Mahoney then met with plaintiff and TSgt Miller.  They accused plaintiff of dereliction of duty, of faking his medical condition and other false accusations.

67.     Then in violation of military protocol, plaintiff was given the written letter of reprimand (LOR) which is attached to this Complaint as Exhibit A.

68.     The LOR falsely accused plaintiff of having faked his migraine headaches and other medical conditions.  It accused him of consciously deciding to go off sick for a non-emergency reason.  He then was threatened with further "more serious actions."  (Ex. A).

69.     The LOR has effectively killed plaintiff's Air Force career.  It will bar plaintiff from further promotion, access to specialty schools, choice assignments and possibly even re-enlistment.

70.     In the words of one Air Force attorney who has seen hundreds of LORs, the LOR issued to plaintiff is a "pretty bad one."  He added, "It's very unusual and strange he was given an LOR for going on sick call."

71.     Both letters of counseling and letters of admonishment are lesser forms of correction than LORs.  The Air Force's progressive discipline system required that for someone with plaintiff's unblemished record a lesser form of discipline should have been invoked.  However, it was not.

72.     Plaintiff also was given additional punishment.  Again, contrary to a progressive discipline policy, plaintiff received 76 hours of additional duty.

73.     He was placed on public display in the Base's control room as a warning to other airmen who otherwise would have reported their deteriorating medical conditions to the Flight Surgeon.

74.    Plaintiff was made a public example at DAFB and publicly humiliated so that other uniformed personnel would not (1) speak out about safety issues arising from the symptoms they are experiencing from the tainted anthrax vaccine, and (2) question whether their medical condition may be caused by the tainted vaccine.

75.    Plaintiff's speech on the issues raised in this case has resulted in negative feedback by his chain of command.  For the first time in his stellar career, plaintiff's professionalism, loyalty, leadership, and character have been called into question.  This is in stark contrast to all previous characterizations and endorsements that rated him with the highest level as to all of these qualities.  This negative feedback was received as a direct and proximate result of his protected speech.

76.    The Air Force's actions as discussed above also violate other policies.  For example, defendant General Handy's spokesman recently stated on his behalf that "[i]t is <u>not policy</u> at any level to punish people for reporting to sick call."  (emphasis added).

77.    Following plaintiff inquiry about a connection between his illness and squalene and the anthrax vaccine, the plaintiff's treatment by the Flight Surgeon's Office changed.  In particular, plaintiff's' treating physician was changed and the amount of documentation in his file was significantly increased.  For example, on November 8, 2004 plaintiff's examination by the Flight Surgeon's office is documented by extensive typed notes from Dr. Le and explicitly references plaintiffs' questions about the anthrax vaccines he received and any connection to his illness.  No prior examination of plaintiff is documented with copious typed notes, nor was it a common practice to document examinations in that manner.

78.    Plaintiff's freedom to speak out on an issue of public concern - whether the anthrax vaccine given to some airmen at DAFB was tainted with squalene and whether he had

been injected with such tainted anthrax vaccine - is guaranteed under the First Amendment to the Constitution. A citizen's choice to enlist in the United States armed forces does not abrogate his right to express free speech on matters of public concern. The imposition of an unwarranted reprimand, such as an LOR, would result in a chilling effect on, and unwarranted interference with, such free speech.

79.    The totality of retaliatory adverse action taken by defendants against plaintiff is sufficient to deter a person of ordinary firmness from exercising their First Amendment right to freedom of speech.

80.    A reasonable person of ordinary firmness would be deterred from exercising their First Amendment right to freedom of speech when threatened with an LOR which can end their career, humiliating public punishment and attacks on their professionalism, loyalty, leadership, and character.

### D. Defendants' Further Involvement

81.    Immediately after plaintiff was initially retaliated against, through his public affairs staff, defendant Pray ordered that all uniformed personnel at DAFB were forbidden to speak about the anthrax vaccination program and he warned that they would be held accountable if they violated his order.

82.    The media by e-mail and telephone calls brought the retaliation against plaintiff to defendant Pray's attention and he refused to void the adverse actions taken against plaintiff. He ratified, sanctioned and approved the retaliation against plaintiff.

83.    Immediately after plaintiff was initially retaliated against, through his public affairs staff, defendant Handy ordered that all uniformed personnel at DAFB be forbidden to speak about the anthrax vaccination program and he warned that they would be held accountable

if they were to violate his order.

84.     The media by e-mail and telephone calls brought the retaliation against plaintiff to defendant Handy's attention.  His staff investigated the matter and spoke publicly about it.  He refused to void the adverse actions taken against plaintiff.  He ratified, sanctioned and approved the retaliation against plaintiff.

85.     Immediately after plaintiff was initially retaliated against, the media by e-mail and telephone calls brought the retaliation against plaintiff to defendant Roche's attention.  He refused to void the adverse actions taken against plaintiff.  He ratified, sanctioned and approved the retaliation against plaintiff.

86.     On information and belief, immediately after plaintiff was initially retaliated against the retaliation was brought to the attention of defendant Rumsfeld.  He refused to void the adverse actions taken against plaintiff.  He ratified, sanctioned and approved the retaliation against plaintiff.

**E.  Plaintiff's Lawsuit**

87.     On November 18, 2004, plaintiff filed the original complaint in this lawsuit, seeking declaratory and injunctive relief against named defendants.  In filing suit, plaintiff sought, among other things, to prevent the defendants from pursuing their continued retaliation against him for exercising his first amendment right to free speech.

88.     Defendants are aware of plaintiff's lawsuit as they received notice and subsequently attempted to have the original complaint dismissed.

89.     Plaintiff's lawsuit received extensive press coverage in Delaware and was picked up by national wire services.  Most notably, the News Journal of November 19th featured plaintiff and this lawsuit on its front page.  Both AP and Reuters ran the story.

90.     Plaintiff's lawsuit is of sound merit, as most recently illustrated by this Court's rulings of September 16, 2005 and August 25, 2006.

**F.  Causation**

91.     There is a causal link between First Amendment protected speech on matters of public concern and the above described adverse actions. This is demonstrated by:

(a)     The temporal proximity of events.  Remarkably, within just 3 ½ hours of speaking out, plaintiff was ordered to report to a meeting the next morning where unprecedented and unwarranted punishment was imposed on him.

(b)     The fact that after plaintiff was publicly disciplined, his entire squadron was ordered not to speak out on any issues relating to the anthrax vaccine and to clear all press contacts with the DAFB public affairs officer.

(c)     Violation of  policies, procedures, practices and customs.  For example, as acknowledged by defendant General Handy's spokesman, it "is not policy" for an airman to be disciplined for reporting to sick call.  Additionally, the progressive discipline system was violated.

(d)     Circumstantial evidence of a pattern of antagonism following protected activity.

(e)     Personal knowledge and awareness of protected activity by the individual defendants.

(f)     The evidence as a whole.

92.     First Amendment protected activity was a substantial or motivating factor in the adverse actions directed to plaintiff.  The natural probative force of the evidence demonstrates causation.

93.     The defendants cannot prove by a preponderance of the evidence that absent a constitutional violation, plaintiff would have suffered the same adverse actions anyway.

**G.  General Allegations**

94.     At all times plaintiff spoke out on issues of public concern under the First

Amendment, his speech related to and helped bring to light actual wrongdoing and breach of the public trust by high government and military officials which have endangered the lives of innumerable airmen. Specifically, plaintiff's speech addressed whether he and other aviators were experiencing medical side effects of a secret experimental anthrax vaccine which the military has been illegally testing on them.

95.     By its content, form, and context, at all times plaintiff spoke out about matters of public concern.

96.     All of plaintiff's speech was non-disruptive of any legitimate interest of the United States and was on matters of public concern to the United States, its citizens, the public at large, the military, the Executive and Legislative Branches of the federal government, the President, and the media. His speech related to matters of political, social and other concern to the community.

97.     Plaintiff was acting in good faith and with honest motive at all times when he exercised his First Amendment rights to freedom of speech. At all times, plaintiff believed his speech to be true and his speech was in fact true.

98.     Plaintiff was not being disloyal by speaking out or filing his suit. Instead, he sought to protect the lives of his fellow servicemen and the safety of his military mission in time of war.

99.     The public concern in and value to the community at large of being free to hear plaintiff's speech outweighs any asserted government interest in the effective and efficient provision of services.

100.     Nothing plaintiff said interfered with the regular operations of the military.

101.     Plaintiff's speech did not threaten the authority of defendants to run the military.

Nothing plaintiff said damaged his relationship with defendants or any of his superior officers. Plaintiff did not impugn the integrity of his superiors when he spoke out.

102.    Plaintiff's speech did not have a detrimental impact on any close working relationship for which personal loyalty, trust and confidence are necessary.  Plaintiff is not the alter ego of defendants.  Organizationally, plaintiff is far below defendants in the chain of command.

103.    Any disruption that was caused in the military was not caused by plaintiff's speech but was instead caused by the very problems that plaintiff's speech was in fact intended to address.

104.    In his position as a technical sergeant and a flight engineer plaintiff did not make or formulate policy.  Rather, formulation of policy is left up to others.

### COUNT I (FREE SPEECH RETALIATION)

105.    Plaintiff repeats and realleges paragraphs 1-104 set forth above.

106.    The defendants took action adverse to plaintiff as a direct and proximate result of and in retaliation for plaintiffs' First Amendment protected speech on matters of public concern.  All of plaintiff's speech was non-disruptive of any interest of the military.  There is a temporal and causal relationship between plaintiff's aforementioned protected speech, and adverse employment action, including the eventual constructive discharge.  First Amendment protected activity was a substantial or motivating factor in the adverse employment action.  The defendants cannot prove by a preponderance of the evidence that absent a constitutional violation they would have had grounds to take adverse action against plaintiff.

107.    Plaintiff's constitutional right to freedom of speech has been denied under the

First Amendment of the U.S. Constitution.

**Wherefore**, plaintiff prays that this Court:

A.    Enter judgment against the defendants.

B.    Enter a declaratory judgment, declaring the acts of defendants to be
      unconstitutional, illegal, invalid and of no force or effect.

C.    Issue a reparative injunction directing defendants to remove any and all
      adverse materials from plaintiff's personnel file, including the LOR.

D.    Issue a reparative injunction directing that each defendant place a signed
      document in plaintiff's personnel file, apologizing for their illegal
      violations of plaintiff's constitutional rights.

E.    Award plaintiff attorneys' fees and costs under the Equal Access to Justice
      Act.

F.    Require such other and further relief as this Court finds equitable and just.

**THE NEUBERGER FIRM, P.A.**


/s/ Stephen J. Neuberger
**THOMAS S. NEUBERGER, ESQ. (#243)**
**STEPHEN J. NEUBERGER, ESQ. (#4440)**
Two East Seventh Street, Suite 302
Wilmington, Delaware 19801-3707
(302) 652-3792

Attorneys for Plaintiff Jason A. Adkins

**ARNOLD & PORTER L.L.P.**
Susan B. Cassidy, Esq.
Randall Shaheen, Esq.
M. Katherine Stroker, Esq
Alexander Major, Esq
555 12th Street, NW
Washington, DC 20004
202-942-5000 (phone)
202-942-5999 (fax)

Attorneys for Plaintiff Jason A. Adkins

**OF COUNSEL**:

**JOHN W. WHITEHEAD, ESQ.**
**DOUGLAS MCKUSICK, ESQ.**
**THE RUTHERFORD INSTITUTE**
P.O. Box 7482
Charlottesville, Virginia  22906
(434) 978-3888

Dated:  September 5, 2006

**EXHIBIT A**

22 August 2004

MEMORANDUM FOR SSGT ADKINS

FROM: 3 AS/DOIF (SMSgt Mahoney)

SUBJECT: Letter of Reprimand

1. On Thursday 21 October 2004 TSgt Miller, the flight engineer scheduler, informed you of an expected launch from alert on Friday 22 October. Ten minutes after leaving a message on your answering machine you called him back to inform you may be going on DNIF status which you did that afternoon. Your actions decreased the readiness of a high priority alert mission, caused last minute schedule disruptions and could have resulted in loss of training or inability of DoD assets to execute their mission.

2. I expect in the future you will stay in contact with the engineer scheduler and give him/her lead time when you decide to go DNIF for non-emergency conditions. Since you have been a scheduler and have many years experience with our alert mission, I would have expected you to have used better judgment in this situation.

3. Further occurrences of this nature will result in more serious actions.

4. You may submit matters pertaining to this administrative letter of reprimand within three duty days. Matters you submit will become part of the record.

RONALD J. MAHONEY, SMSgt, USAF
Chief Flight Engineer


1st Ind. SSgt Adkins

MEMORANDUM FOR 3 AS/DOIF (SMSgt Mahoney)

I will/will not submit matters.

JASON A. ADKINS, SSgt, USAF
C-5 Flight Engineer

## CERTIFICATE OF SERVICE

I, Stephen J. Neuberger, being a member of the bar of this Court do hereby certify that on

September 5, 2006, I electronically filed this **Pleading** with the Clerk of the Court using CM/ECF which

will send notification of such filing to the following:

Samuel C. Kaplan, Esq.
Trial Attorney, Federal Programs Branch
Civil Division, U.S. Dept. of Justice
P.O. Box 833
20 Massachusetts Ave., N.W.
Washington, D.C. 20044
samuel.kaplan@usdoj.gov

Douglas E. McCann, Esq.
U.S. Attorney's Office
1007 Orange Street, Suite 700
P.O. Box 2046
Wilmington, DE 19899-2046
douglas.mccann@usdoj.gov

/s/ Stephen J. Neuberger
**STEPHEN J. NEUBERGER, ESQ.**